IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT EDWARD ZUCKER; LORY BARAZ; BARAZ ZUCKER PROPERTIES, LLC; ROBERT E. ZUCKER INVESTMENTS, LLC; GARY WERESZYNSKI; GMW II LLC; and MARSHA FROST, | § § § § § § § | |
| | § | Civil Action No. _____ |
| | § | CLASS ACTION - JURY |
| Plaintiffs, | § § | |
| | § | |
| v. | § § | |
| | § | |
| JERRY LEE FARISH, INDIVIDUALLY AND AS CHIEF EXECUTIVE OFFICER OF ERNANI, INC. NKA NEW SUMMIT HOMES, INC.; ERNANI, INC. NKA NEW SUMMIT HOMES, INC.; ERMANI, LLC DBA NEW SUMMIT HOMES, INC.; NEW SUMMIT HOMES, INC.; JILL FARISH, INDIVIDUALLY, AND AS MANAGING MEMBER OF NEW SUMMIT REALTY, LLC AND NEW SUMMIT JILL FAIRSH REALTY, LLC; NEW SUMMIT REALTY, LLC; NEW SUMMIT JILL FARISH REALTY, LLC; NATHAN C. FARISH; ERICK FARISH; NICHOLAS FARISH; JERRY HATFIELD; BARRY L. BROWN, INDIVIDUALLY, AND AS VICE PRESIDENT OF TEXAS BANK AND TRUST COMPANY; TEXAS BANK AND TRUST COMPANY; SCHULTZ AND KELLAR, PLLC; TEXAS AMERICAN TITLE COMPANY DBA INDEPENDENCE TITLE; and TITLE RESOURCES GUARANTY COMPANY, | § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' VERIFIED COMPLAINT – CLASS ACTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PERMANENT INJUNCTION

**NOW COME** ROBERT EDWARD ZUCKER, LORY BARAZ, BARAZ ZUCKER PROPERTIES, LLC, ROBERT E. ZUCKER INVESTMENTS, LLC, GARY WERESZYNSKI, GMW II, LLC and MARSHA FROST, hereinafter called "Representative Class Plaintiffs" complaining of and about Jerry Lee Farish, Individually, and as Chief Executive Officer of Ernani, Inc. nka New Summit Homes, Inc.; Ernani, Inc. nka New Summit Homes, Inc.; Ermani, LLC dba New Summit Homes, Inc.; New Summit Homes, Inc.; Jill Farish, Individually, and as Managing Member of New Summit Realty, LLC and as Managing Member of New Summit Jill Farish Realty, LLC; New Summit Realty, LLC; New Summit Jill Farish Realty, LLC; Nathan C. Farish; Erick Farish; Nicholas Farish; Jerry Hatfield; Barry L. Brown, Individually, and as Vice President of Texas Bank and Trust Company; Texas Bank and Trust Company; Schultz and Kellar, PLLC; Texas American Title Company dba Independence Title; and Title Resources Guaranty Company, as Defendants, and for their claims and causes of action set forth herein below, respectfully shows unto the Court the following:

## I.

## <u>JURISDICTION</u>

1.     This Court has original jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332(a), because Plaintiffs and Defendants are completely diverse in citizenship, and the amount in controversy for each Representative Class Plaintiff exceeds $75,000, exclusive of interest and costs. Additionally, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because at least one or more of Plaintiffs' claims involve questions of Federal law.

## II.

## <u>VENUE</u>

2.     Venue is proper in this Federal District because several of the acts, conduct or

omissions and/or occurrences which give rise to Plaintiffs' claims and causes of action occurred or were obligated to occur within this Federal District. Moreover, each of the real properties made the subject of this Complaint are located entirely within this Federal District.

**III.**

**PARTIES AND SERVICE**

3.      Plaintiff, Robert Edward Zucker ("Robert Zucker"), is an individual whose present address is 4821 E. Fanfol Drive, Paradise Valley, Arizona 85253-1529.

4.      Plaintiff, Lory Baraz ("Lory Baraz"), is an individual whose present address is 4821 E. Fanfol Drive, Paradise Valley, Arizona 85253-1529.

5.      Plaintiff, Baraz Zucker Properties, LLC ("Baraz Zucker"), is an Arizona limited liability company whose home office address is 4821 E. Fanfol Drive, Paradise Valley, Arizona 85253-1529, and Robert Edward Zucker and Lory Baraz are its sole managing members.

6.      Plaintiff, Robert E. Zucker Investments, LLC ("Zucker Investments"), is an Arizona limited liability company whose home office address is 4821 E. Fanfol Drive, Paradise Valley, Arizona 85253-1529, and Robert E. Zucker is its sole member.

7.      Plaintiff, Gary Wereszynski, is an individual whose present address is 1 Talcott Road, Utica, New York 13502.

8.      Plaintiff, GMW II LLC ("GMW"), is a New York limited liability company whose home office address is 1 Talcott Road, Utica, New York 13502, and whose sole member is Gary Wereszynski.

9.      Plaintiff, Marsha Frost ("Frost"), is an individual whose present address is 21633 Masterson Court, Saugus, California 91350.

10.      Upon information and belief, Defendant Jerry Lee Farish, Individually, and as

Chief Executive Officer of Ernani, Inc. nka New Summit Homes, Inc. ("Jerry Farish"), is an individual whose present address is 3109 Rustic Woods Court, Bedford, Texas 76021-4064.

11.     Upon information and belief, Defendant Ernani, Inc. nka New Summit Homes, Inc. ("NSH"), is a Texas corporation doing business in the State of Texas as a real estate developer, builder and/or contractor, and may be served with summons by serving its registered agent, M. Elena Clemenger, at 316 West 4th Street, Weatherford, Texas 76086.

12.     Upon information and belief, Defendant Ernani, LLC dba New Summit Homes, Inc. ("Ermani"), is a Texas limited liability company doing business in the State of Texas as a real estate developer, builder and/or contractor, and is an alter-ego of Defendant NSH, and may be served with summons by serving its registered agent, Nathan C. Farish, at 3516 Pecan Circle, Bedford, Texas 76021.

13.     Upon information and belief, Defendant New Summit Homes, Inc. ("New Summit"), is a Texas corporation doing business in the State of Texas as a real estate developer, builder and/or contractor, and is an alter-ego of Defendant NSH, and may be served with summons by serving its registered agent, M. Elena Clemenger, at 316 West 4th Street, Weatherford, Texas 76086.

14.     Upon information and belief, Defendant Jill Farish, Individually and as Managing Member of New Summit Realty, LLC and as Managing Member of New Summit Jill Farish Realty, LLC ("Jill Farish"), is an individual and the Managing Member of New Summit Realty, LLC and New Summit Jill Farish Realty, LLC, and may be served with summons at 5804 Ballentrae Drive, Colleyville, Texas 76034-5348.

15.     Upon information and belief, Defendant New Summit Realty, LLC ("New Summit Realty"), is a Texas limited liability company doing business in the State of Texas as a

real estate broker or agent, and may be served with summons by serving its registered agent, Jill Farish, at 5804 Ballentrae Drive, Colleyville, Texas 76034-5348.

16.     Upon information and belief, New Summit Jill Farish Realty, LLC ("Jill Farish Realty"), is a Texas limited liability company doing business in the State of Texas as a real estate broker or agent, and may be served with summons by serving its registered agent, Jill Farish, at 5804 Ballentrae Drive, Colleyville, Texas 76034-5348.

17.     Upon information and belief, Defendant Nathan C. Farish ("Nathan Farish"), is an individual and an officer or director of Defendant NSH, and may be served with summons at his home address of 3516 Pecan Circle, Bedford, Texas 76021.

18.     Upon information and belief, Defendant Erick Farish ("Erick Farish"), is an individual and an officer or director of Defendant NSH, and may be served with summons at his home address of 6000 Sterling Drive, Colleyville, Texas 76034-7632.

19.     Upon information and belief, Defendant Nicholas Farish ("Nicholas Farish"), is an individual and an officer or director of Defendant NSH and may be served with summons at his home address of 1812 Glenbrook Court, Bedford, Texas 76021-3539.

20.     Upon information and belief, Defendant Jerry Hatfield ("Hatfield"), is an individual, and may be served with summons at his home address of 6017 Forest River Drive, Fort Worth, Texas 76112-1054.

21.     Upon information and belief, Defendant Barry L. Brown ("Brown"), is an individual, and is/was a Vice President of Texas Bank and Trust Company, and may be served with summons at 6013 Heron Bay Lane, McKinney, Texas 75070.

22.     Upon information and belief, Defendant Texas Bank and Trust Company ("Texas Bank and Trust"), is a licensed banking institution doing business in the State of Texas and may

be served with summons by serving its registered agent, Rogers Pope at 300 East Whatley, Longview, Texas  75061.

23.     Upon information and belief, Defendant Schultz and Kellar, PLLC ("Schultz Kellar"), is a Texas professional limited liability company doing business in the State of Texas as a law firm and "fee attorney" office of Texas American Title Company dba Independence Title, and may be served with summons by serving its registered agent, Dustin Kellar at 1100 East Southlake Blvd., Suite 300, Southlake, Texas 76092.

24.     Upon information and belief, Texas American Title Company dba Independence Land ("Independence Title"), is a Texas limited liability company doing business in the State of Texas as a licensed Texas title insurance agent or direct operation, and upon further information and belief, has an affiliated business arrangement with Defendant Title Resources Guaranty Company, and may be served with summons by serving its registered agent, Corporate Creations Network, Inc., 2425 W. Loop South #200, Houston, Texas 77027. Alternatively, Defendant Independence Title may be served with summons by serving any authorized officer, director or employee at its principal offices located at 5900 Shepherd Mountain Cove, Bldg. 2, Suite 200, Austin, Texas 78730.

25.     Upon information and belief, Defendant Title Resources Guaranty Company ("Title Resources"), is a California corporation doing business in the State of Texas as a title insurance underwriter, and upon further information and belief, has an affiliated business arrangement with Defendant Independence Title, and may be served with summons by serving its registered agent, Corporate Creations Network, Inc. at 1430 Truxtun Ave., 5th Floor, Bakersfield, California 93301. Alternatively, Defendant Title Resources may be served with summons by serving any authorized officer, director or employee at its branch office located in

the State of Texas at 8111 LBJ Freeway, Suite 1200, Dallas, Texas 75251.[1]

## IV.

## GENERAL FACTUAL ALLEGATIONS

26.     This Class Action lawsuit is brought by the Representative Class Plaintiffs based upon claims and losses resulting from investments made with/to the Farish and/or New Summit Defendants, and/or his/its/their numerous other affiliated entities as more particularly described herein, which class investors are victims of a colossal Ponzi scheme created, orchestrated, and perpetrated by the Farish and/or New Summit Defendants, and which acts, conduct or omissions were specifically designed to take advantage of all of the class members and bilk them out of tens of millions of dollars, many of whom have lost their entire life savings.

27.     Upon information and belief, the Bank Defendants, Title Defendants and Jerry Hatfield, directly or indirectly, helped, aided, abetted and/or enabled the Farish and/or New Summit Defendants, and his/her/its/their affiliated business entities, to carry out this egregious and unconscionable course of conduct over a five (5) year period commencing in 2014, and through which each of the defendants, directly or indirectly, benefitted financially and realized and/or obtained enormous pecuniary gains and profits, including, but not limited to tens of millions of dollars in loan proceeds and interest, loan fees and charges, closing fees, document preparation fees, attorney's fees, title insurance premiums, real estate sales commissions, real estate sales proceeds and various other perks and benefits, all to the detriment of each of the class

---

[1] Defendants Jerry Farish, Individually, Jill Farish, Individually, Nathan Farish, Erick Farish and Nicholas Farish are hereinafter collectively referred to as the ("**Farish**" **Defendants**).

Defendants Ernani, Inc. nka New Summit Homes, Inc., New Summit Homes, Inc., Ermani, LLC dba New Summit Homes, Inc., New Summit Realty, LLC, and New Summit Jill Farish Realty LLC are hereinafter collectively referred to as the ("**New Summit**" **Defendants**).

Defendants Barry L. Brown and Texas Bank and Trust are hereinafter collectively referred to as the **("Bank" Defendants)**.

Defendants Schultz and Kellar, PLLC, Texas American Title Company dba Independence Title and Title Resources Guaranty Company are hereinafter collectively referred to as the **("Title" Defendants)**.

members as more particularly described herein, *infra*.

28.    Upon information and belief, commencing on or about 2014, the Farish and/or New Summit Defendants, each intentionally or knowingly created,  implemented, perpetuated and carried out a fraudulent real estate Ponzi scheme against all of the class members, which Ponzi scheme was specifically designed to bilk, steal and convert millions of dollars of investments made by each of the class members, none of whom had any knowledge, idea or understanding that their investments were part of the fraudulent scheme, and relied upon the false representations, promises and inducements made by the Farish and/or New Summit Defendants when investing into the Ponzi scheme.

29.    Upon information and belief, the Farish and/or New Summit Defendants promised all class investors a return of at least twenty percent (20%) on all investments made into the real estate Ponzi scheme if they invested at least $200,000.00.

30.    Upon information and belief, the initial structure of the real estate investment scheme created and implemented by the Farish and/or New Summit Defendants, was that the class investor would give either the Farish and/or New Summit Defendants an initial cash investment of at least $200,000.00 to purchase a vacant lot of real estate, and the class investor would then be required to obtain a construction loan to finance construction of a luxury home on the lot, usually in excess of $1 million dollars, and the Farish and/or New Summit Defendants would then be hired to develop and build the home as contractor/developer. Once built, the luxury home and lot would then be sold by the class investor, usually through a listing agreement with Defendants Jill Farish, New Summit Realty, and/or Jill Farish Realty. Once sold to a bona fide purchaser, the class investor would then be paid back their initial investment plus 20% return from the sales proceeds, and the Farish Defendants and/or New Summit Defendants would

then be paid all net profits above the cost of construction and the class investor's initial investment and profit, usually in excess of hundreds of thousands of dollars.

31.     Upon information and belief, commencing on or about 2014, Defendant Jerry Farish, individually, who was also working as a pilot for American Airlines at the time, on behalf of, with the help of, and through, all of the Farish and/or New Summit Defendants began to solicit and recruit investors to invest into the real estate investment scheme.

32.     Upon information and belief, commencing on or about 2014, Richard "Dave" Jones ("Dave Jones"), who is also a pilot working for American Airlines and a class member, along with his wife Lisa Elizabeth Jones ("Lisa Jones"), and several of their family members, who are also members of the class, in reliance upon the false promises, inducements, representations, and assurances made by the Farish and/or New Summit Defendants of guaranteed 20% returns, unwittingly invested into the real estate investment scheme having absolutely no idea whatsoever that the investments would ever be part of a Ponzi scheme.

33.     Upon information and belief, on or about late 2014 and into early 2015, Dave Jones and Lisa Jones, who had already made over $400,000 worth of initial investments with the Farish and/or New Summit Defendants, began to help recruit additional investors to invest, many of whom were also airline employees and their family members and friends.

34.     Upon information and belief, some of the initial transactions that were closed in 2014 under the Ponzi scheme created by the Farish and/or New Summit Defendants were successful in that both the class investor and the Defendants each fully performed as agreed, and mutually profited and benefitted from the investment transactions, which had the desired effect of garnering interest of additional investors.

35.     Upon information and belief, on or about late 2014 and into 2015, the Farish

and/or New Summit Defendants, after the seemingly profitable business structure created by these Defendants as described above had begun to gain traction as more and more investors were investing large sums of cash, dramatically altered and changed the structure of the real estate investment scheme. The new structure created by these Defendants required and demanded that all secured investors, after making their initial cash investment to the Farish and/or New Summit Defendants, and part of a development agreement, and after taking out a construction loan and developing the lot and building the luxury home, then had to convey the title to the subject property and/or give power of attorney over the subject property to the Farish and/or New Summit Defendants, and further required that all sales of the newly built luxury home be listed and sold exclusively by Defendants Jill Farish, New Summit Realty and/or Jill Farish Realty.

36.    Upon information and belief, this radical change in the investment structure as described above, i.e. by requiring that all sales of the constructed home and lot be directly controlled by the Farish and/or New Summit Defendants, had the direct and intended result of providing total control over the sales proceeds upon sale of the luxury home and lot to the Farish and/or New Summit Defendants, including exclusive control over the class investor's original investment and the promised returns, so that the class investor would be at the mercy of the Farish and/or New Summit Defendants to actually pay them back their original investment and promised returns.

37.    Upon information and belief, on or about late 2014 and into 2015, the Farish and/or New Summit Defendants, began to use the class investor's sales proceeds to fund other transactions with other investors, and the initial investor who had financed construction of the luxury home was not paid back their investment, thereby breathing life into and creating the fraudulent Ponzi scheme.

38.     Upon information and belief, on or about late 2014 and into 2015, the Farish and/or New Summit Defendants, in furtherance of the fraudulent Ponzi scheme, and in lieu of actually tendering payment of the class investor's initial investment and promised returns, instead created, drafted and executed Promissory Notes called "rollovers" ("Rollover Notes") whereby these Defendants would retain the initial investor's investment and promised return to stimulate additional investments, and rather than pay back the initial investor what was already due and owing to them for their initial investment and promised return, would instead roll over all of those sums into another property and investment.

39.     Upon information and belief, instead of actually paying back the initial class investor their investment and promised 20% return, the Farish and/or New Summit Defendants would execute a Rollover Note to the class investor, which usually included an extremely high interest rate, or provided for a specific amount of interest that was well in excess of legally usurious rates of interest. The Farish Defendants called these types of Promissory Notes, "Rollover Notes" because the initial investor's investment funds and the profit derived after construction and sale of a luxury home would be "rolled" into the Promissory Note, and the Rollover Promissory Note was then supposed to be secured by a second lien Deed of Trust secured against another property that was already under construction by another class investor, which further perpetuated the fraudulent Ponzi scheme.

40.     Upon information and belief, the Farish and/or New Summit Defendants, each personally created, drafted and provided all of the Rollover Notes to each investor, including all terms, provisions, obligations and promises contained therein such as the principal amount, interest, maturity date and security for each note.

41.     Upon information and belief, none of the investors were ever provided an

opportunity to negotiate, discuss, or bargain for any of the terms, provisions, obligations or promises contained in the Rollover Notes, because the Farish and/or New Summit Defendants had already converted their investments into the Rollover Notes in direct response to the initial investor's request and demand for payment of their original investment and promised return.

42.     Upon information and belief, and as part of the conversion of the class investors' investments into the Rollover Notes, the Farish and/or New Summit Defendants, would allegedly secure payment of the Rollover Notes by creating and executing a second lien Deed of Trust in favor of the initial investor to secure the rollover investment as a second lien against the title to the other class investor's property that was also being developed, and would expressly inform the initial class investor that their Rollover Note was secured by the other property being developed by the other class investor, and further promised the class investors that the Rollover Note would be paid in full once the other property being developed was fully completed and sold.

43.     Upon information and belief, nearly every putative second lien Deed of Trust that was supposed to secure payment of the Rollover Note was never actually recorded against the title to the subject property that was supposed to secure payment of the Rollover Note, even though the Farish and/or New Summit Defendants personally assured each investor that the second lien Deed of Trust would be recorded to protect their interest and investment.

44.     Upon information and belief, the Farish and/or New Summit Defendants never provided any original, signed and notarized Deed of Trust instrument to any investor to record, rather these Defendants told and assured each investor that he/she/it/they would make certain that it was properly recorded, or ensure that the Title Defendants properly recorded them at closing.

45.     Upon information and belief, several of the Rollover Notes were also secured by

either *"all assets of New Summit Homes and/or Jerry Farish"* and/or by *"all gross sales commissions of New Summit Realty and/or New Summit Jill Farish Realty."* (emphasis added).

46.     Upon information and belief, the creation of the Rollover Notes and the investments made thereunder had the desired effect of pitting each of the class investors involved in those transactions against each other so that the secured investor that held fee simple title to the property under development held a superior investment position, and the "Rollover Note" investor held an inferior investment position, which then caused the Rollover Note investor to be fully dependent upon the secured investor's full performance in completing development of the luxury home, thereby creating a conflict of interest between different class investors in furtherance of the fraudulent Ponzi scheme.

47.     Upon information and belief, on or about late 2014 and into 2015, the Farish and/or New Summit Defendants also began to solicit and recruit other investors through another type of investment vehicle they created, which also involved the use of a Promissory Note; however, this type of investment would be only secured by, *"all assets of New Summit Homes and/or Jerry Farish"* or *"all sales commissions of New Summit Realty and/or Jill Farish Realty."* These types of investments are hereinafter referred to as "Unsecured Notes."[2]

48.     Upon information and belief, the Farish and/or New Summit Defendants also promised the additional investors under the Unsecured Notes at least a twenty percent (20%) return on their Unsecured Note investment.

49.     Upon information and belief, on or about early 2015, the Farish and/or New Summit Defendants recruited dozens of more investors, many of whom were referrals from other

---

[2] Although the "Unsecured Notes" purport to be secured by "*all assets of New Summit Homes and/or Jerry Farish*" or "*all sales commissions of New Summit Realty and/or Jill Farish Realty*" none of the notes were ever actually secured. None of these types of notes was ever secured by a UCC-1, and no other form of collateral or security was ever provided by any of the Defendants to any class member.

investors who had successfully invested and been paid back on their initial investments, and many of whom were co-workers, family of co-workers, and friends, and the ruse was afoot.

50.     Upon information and belief, as more investors began to invest, the Farish and/or New Summit Defendants were driven by greed to expand the Ponzi scheme and the original, investment scheme faded into oblivion and was replaced by the Ponzi scheme such that by 2016, the Farish and/or New Summit Defendants simply stopped paying back any of the class investors and instead absconded with, stole and converted millions of dollars of the class investors' personal investment funds for their own personal use and/or pecuniary gain.

51.     Upon information and belief, the Farish and/or New Summit Defendants further induced the class investors to invest more and more into their Ponzi scheme by providing additional perks and benefits such as invitations to use their corporate suite rented at the American Airlines Center, including Dallas Mavericks basketball games, Dallas Stars hockey games, concerts and other events. Upon information and belief, the invitees, recipients and/or beneficiaries of these perks and benefits also included several of the other Defendants and/or their employees, agents and representatives, including but not limited to the Bank Defendants and Title Defendants.

52.     Upon information and belief, at some point in 2015, the Farish and/or New Summit Defendants began to direct all secured investors (those actually purchasing a lot and obtaining a construction loan to finance the construction of a luxury home) to one title closing office, the Title Defendants. Other title companies that had previously closed similar transactions for class investors were no longer being referred any of the Farish and/or New Summit Defendants' title closing business.

53.     Upon information and belief, the Title Defendants closed dozens of the secured

transactions wherein the class investor would use his personal funds from savings, or an IRA, and pay those monies directly to the Farish and/or New Summit Defendants to purchase the vacant lot, and then obtain financing to construct the home from the Bank Defendants, including servicing the debt, paying the property taxes, and insuring the property, only to be forced to convey title to the property or execute a power of attorney to the Farish and/or New Summit Defendants, who would then take control of marketing and selling the property directly or through Defendants Jill Farish, New Summit Realty and/or Jill Farish Realty after completion of construction of the luxury home, thereby maintaining total control over all aspects of the transactions involving both the purchase and development of the property, as well as resale and control over all proceeds derived therefrom.

54.     Upon information and belief, on or about 2015, in nearly all of the secured investment type transactions as described herein, the Farish and/or New Summit Defendants closed both transactions (i.e. the first transaction to purchase and develop the property, and the second transaction to sell the developed property and newly built luxury home to a bona fide purchaser) using the same title agent, company and underwriter as the first transaction, i.e. the Title Defendants, who directly aided, abetted, assisted and enabled the Farish and/or New Summit Defendants to perfect the title to the property before resale by drafting and preparing warranty deeds or power of attorney forms for the class investor to execute. In those instances, the Title Defendants' attorneys, escrow officers, agents, and/or employees, who have an employment, agency and/or contractual relationship with one another, and at all material times, were acting in its/their capacity as a closing agent on behalf of all parties to each transaction, and had actual knowledge and awareness of the fact that all of the sales proceeds resulting from the resale of the subject property would be paid directly to the Farish and/or New Summit

Defendants, and that the class investor's promised investment and return on investment would be subject to payment at the sole discretion of those Defendants, if and when those Defendants ever actually decided to pay.

55.    Upon information and belief, at no point did any agent, attorney, officer, director or employee of any of the Title Defendants ever bother to inform the unsuspecting and uninformed class investor of the facts described above, *supra*, or even explain how that process actually worked, thereby providing a shield of legal legitimacy to and directly helping, aiding, abetting, and/or enabling the Farish and/or New Summit Defendants to carry out and proliferate the ongoing fraudulent Ponzi scheme.

56.    Upon information and belief, in several of these closing transactions, the Title Defendants, and/or its/their attorneys, escrow officers, agents or employees, actually pressured and harassed the class investor to execute those documents (warranty deeds and powers of attorney) without ever explaining the reasons why, or without ever bothering to disclose the fact by executing those documents and instruments the class investor would lose all control over their investment and promised return.

57.    Upon information and belief, the Defendant Schultz Kellar has/had a legal, contractual, employment or direct agency relationship with Independence Title and Title Resources.

58.    Upon information and belief, Defendant Independence Title has/had a legal, contractual or direct agency relationship with Defendant Title Resources, which underwrites title insurance on its behalf.

59.    Upon information and belief, in every transaction closed by the Title Defendants on behalf of all of the class investors and the Farish and/or New Summit Defendants, the Title

Defendants received direct profits and pecuniary gains in the form of escrow closing fees, attorney's fees, document preparation fees, as well as splits of the title insurance premiums charged to and paid for by the class investor in the first transaction as described above, *supra*.

60.     Upon information and belief, the Title Defendants closed the second transaction on behalf of the Farish and/or New Summit Defendants, and in nearly all of the second transactions, the Title Defendants also provided an R-2 pass through credit of the title insurance premium that was charged to and paid for by the class investor in the first transaction to the Farish and/or New Summit Defendants in the second transaction, without ever informing the class investor of that fact and without ever requiring the class investor to execute his/her/their written consent of the pass through credit to the Defendants as required by the applicable rules and procedures set forth in the Texas Insurance Code and Basic Manual of Title Insurance.

61.     Upon information and belief, the Title Defendants, after closing and funding of the second transaction, then disbursed all net sales proceeds resulting from the second transaction directly to the Farish and/or New Summit Defendants, but no portion of the net sales proceeds were ever actually paid to the class investor, who was supposed to have been paid back their original investment plus profit BEFORE anyone else was paid pursuant to the express terms, conditions and promises set forth in the development agreements executed between each class investor and the Farish and/or New Summit Defendants, which development agreements the Title Defendants had actual knowledge and awareness of because they were provided copies of agreements as part of the closing of the first transaction.

62.     Upon information and belief, at no point did the Title Defendants, nor any of their respective attorneys, agents, escrow officers, directors, or employees, ever inform any class investor of the fact that an R-2 pass through credit requires the written consent of ALL parties to

both transactions (first and second), nor ever informed nor explained to any class investor that all of the net sales proceeds resulting from the second transaction would be paid to and/or disbursed directly to the Farish and/or New Summit Defendants, before the investor would be paid, i.e. that their investment and promised profit would not be paid back through the second transaction, but rather only if and when Farish and/or New Summit Defendants ever decided to actually pay them, even though the Title Defendants had actual knowledge and awareness of those facts and received a direct, pecuniary gain and profit from closing of each of the second transactions.

63.     Upon information and belief, at no point ever did the Title Defendants, nor any of their attorneys, agents, escrow officers, directors or employees, ever disclose to or explain to any class investor the legal significance and/or possible negative consequences that may result to the class investor by execution of a warranty deed or power of attorney to the Farish and/or New Summit Defendants, or that by executing those documents the class investor effectively lost all control over their investment and the collateral securing payment of their investment and promised return, thereby putting them at extreme risk of loss if the Farish and/or New Summit Defendants breached their underlying investment agreements and/or defaulted in performance thereof, or that these Defendants could then abscond with all of the sales proceeds of the second transaction and convert those funds for their own pecuniary gain, all of which possibilities and consequences were readily foreseeable.

64.     Upon information and belief, the Farish and/or New Summit Defendants also directed each investor in nearly every secured transaction to use the same mortgage loan originator to facilitate placement of nearly every construction loan that was used by these Defendants to create and facilitate the fraudulent Ponzi scheme. The mortgage loan originator was Mike Anderson of Southern Star Capital, LLC dba Reliance Mortgage Company

("Anderson").

65.     Upon information and belief, Anderson received compensation for every construction loan in the form of an origination fee of approximately one percent (1%) of the principal amount of each construction loan from each lender, and nearly every construction loan was financed by and through the Bank Defendants.

66.     Upon information and belief, Anderson, personally, also invested in the fraudulent Ponzi scheme being perpetuated by the Farish and/or New Summit Defendants.

67.     Upon information and belief, none of the class investors who applied for a construction loan were ever required to credit qualify for the loan, or provide any detailed credit histories, nor were they required to provide any type of down payment funds to the Bank Defendants, but rather the down payment funds were paid by the class investor directly to the Farish and/or New Summit Defendants in the form of the cash investments as described herein.

68.     Upon information and belief, the Bank Defendants made dozens of construction loans to several class investors, and each of those loans included a Construction Loan agreement that required both the investor and the Bank Defendants to adhere to strict rules and procedures concerning disbursement of all draws for construction and development to the Farish and/or New Summit Defendants as contractor or developer.

69.     Upon information and belief, the Bank Defendants required each secured class investor to open a checking account as part of the construction loan requirements so that all of the draw funds for construction were deposited into those checking accounts and were controlled by the Bank Defendants.

70.     Upon information and belief, the Construction Loan agreement between the class investor and the Bank Defendants required the investor, before requesting payment of any draw

funds for construction, to first obtain from the Farish and/or New Summit Defendants, as contractor/builder, detailed invoices from all sub-contractors, materials providers or service providers, including each of these Defendants, as applicable, which set forth the specific details, specifications and amounts for all labor, materials and/or services rendered or to be rendered to the subject property.

71.     Upon information and belief, when requesting draws the class investor was required to provide a signed Draw Request executed by the class investor and the Farish and/or New Summit Defendants, and attach to such draw request copies of invoices, details, statements or explanations to support each draw request provided by the Farish and/or New Summit Defendants. The class investor would then be required to transmit or submit the draw request to the Bank Defendants by, email or fax, and the Bank Defendants would then verify the validity of the draw request and disburse the draw funds directly to the Farish and/or New Summit Defendants.

72.     Upon information and belief, after disbursement of the draw funds as described above, the Bank Defendants would then be responsible to inspect the subject property to ensure that the draw funds were actually used by the Farish and/or New Summit Defendants for their intended purposes, i.e. to ensure that the Farish and/or New Summit Defendants was/were doing the actual work or providing the actual services, or actually paying the sub-contractors or materials providers under each draw request.

73.     Upon information and belief, in several of the construction loan transactions, the Bank Defendants provided the first draw request to the class investor at the closing of the construction loan transaction (first transaction), and the amount requested under the first draw request was usually well in excess of $100,000 or ten percent of the total draw amount available.

In fact, all of the initial draw requests were actually part of the set of closing documents prepared and provided by the Bank Defendants directly to the Title Defendants, and none of the initial draw requests included in closing document package had an invoice, statement or explanation attached to it. In other words, the class investor was not able to question any of these initial draw requests or inquire about what exact work, labor or services were to be paid for or covered under the initial draw request, and instead were instructed by the Title Defendants to just sign them without explanation.

74.    Upon information and belief, on or about 2016, the Farish and/or New Summit Defendants further perpetrated the Ponzi scheme by providing the class investors with completed and signed draw requests with invoices and statements attached, and after receiving payment of the draw request proceeds from the Bank Defendants, which was supposed to be managing, verifying and inspecting the proper use of the draw funds through follow up inspections, and then never actually performed any work, labor or services of any kind, nor ever paid any sub-contractor or materials provider, i.e. the Farish and/or New Summit Defendants made false representations of material fact, submitted falsified invoices and/or statements, and then after getting paid most or all of the draw funds that were earmarked for construction of the home, never actually did any work or provided any services or materials to or for the subject property whatsoever, which then forced the class investor to have to incur and maintain the monthly loan payments under the construction loan, pay the property taxes, pay the hazard insurance, and in some instances, pay the sub-contractors and materials providers for all of their work, labor, services and materials out of their own pocket, and further caused the class investor to suffer severe financial losses, and ultimately, to be unable to perform under the construction loan.

75.    Upon information and belief, on or about July 2016, the Bank Defendants actually

became aware of the fact that the Farish and/or New Summit Defendants were being paid draw funds and not doing any work or providing any services or paying any sub-contractor or materials provider as described above, but yet took no action whatsoever to stop these Defendants from absconding with, stealing and converting the draw funds for his/her/its/their own pecuniary gain and benefit to the detriment of each class investor, nor did the Bank Defendants ever inform any of the class investors about any of these facts until years after the draw funds had already been stolen and converted by the Farish and/or New Summit Defendants.

76.    Upon information and belief, on or about July 2016, the Bank Defendants stopped performing its/their contractual, legal and/or normal business practice and custom of actually verifying the use of the construction draw funds by failing, neglecting or refusing to perform any follow up inspections of the subject properties after disbursement of the draw funds to confirm the actual use of the draw funds that were paid to the Farish and/or New Summit Defendants, and wholly failed, neglected or refused to inform any of the class investors of the same.

77.    Upon information and belief, the Bank Defendants, who as of July 2016, had actual knowledge and awareness of the fact that the Farish and/or New Summit Defendants were receiving draw funds and were not using those funds for their intended purpose, wholly failed, neglected or refused to take any action whatsoever to curtail or stop these Defendants from absconding with and converting the draw funds until approximately the end of 2017, which was nearly one and one half years after he/she/it/they first became aware of those facts, and during that same time period (July 2016 to the end of 2017) several more class investors closed several more construction loan transactions, Rollover Note transactions and Unsecured Note transactions, and were bilked out of millions of dollars by the Farish and/or New Summit Defendants, and have incurred hundreds of thousands of dollars more to hire different

contractors to complete construction without having the benefit of the use of any draw funds, and all the while were required by the Bank Defendants to keep up with their ongoing obligations under the construction loan, i.e. the class investor was forced to pay for all costs of construction out of their own pocket or through any means available because the Bank Defendants failed to perform his/its/their legal and contractual obligations, and/or failed to disclose these critical material facts to the class investors.

78.     Upon information and belief, the Bank Defendants, and/or his/its/their agents and employees, directly profited and benefitted and received substantial pecuniary gains in the form of loan origination fees, loan charges and fees, and interest from each construction loan.

79.     Upon information and belief, on or about the end of 2017, the Bank Defendants, even though they already knew, and had actual knowledge and awareness of the fact that the Farish and/or New Summit Defendants had already breached the investment agreement and performance obligations to each class investor under those agreements, and had absconded with and converted millions of dollars from the class investors through the draw funds already paid to them, and had walked away from the construction projects having never done any work or labor, or provided any actual services, or paid any sub-contractor or materials provider, began to take legal action to enforce and collect upon the construction loans against several class investors, and in one specific case, actually filed a lawsuit against the Zucker Plaintiffs for breach of the construction loan agreement, which breach was directly and proximately caused by the acts, conduct or omissions of the Bank Defendants as described herein, *supra*.

80.     Upon information and belief, the acts, conduct or omissions of the Bank Defendants of failing, neglecting or refusing to actually verify and inspect the subject property after authorizing and disbursing draw funds to the Farish and New Summit Defendants, and

knowing that these Defendants had already absconded with and converted the draw funds, of then demanding interest payments, loan payments, loan charges, and of failing to inform the class investors of what it/she/it/they already knew, and of failing to mitigate the damages sustained and incurred by the class investors as a result of acts, conduct or omissions of each of the Farish and/or New Summit Defendants, was the proximate cause of the actual damages sustained and incurred by the class investors in excess of the minimum jurisdictional limits of this court.

81.     As a result of all of the acts, conduct or omissions of all of the Defendants as described herein, *supra*, on March 19, 2018, the class investors made written demand upon all of the Defendants and sought reimbursement to each class member for all investment monies that were stolen and/or converted by the Farish and/or New Summit Defendants, including a demand for treble damages under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"). Each of the defendants was placed on written notice of the class investors' intent to file this lawsuit should the defendants fail to comply with all of the demands of the class set forth in the DTPA class action demand letter. A true and correct copy of the DTPA Class Action Demand Letter is attached hereto marked Exhibit "A".

82.     As of the date hereof, none of the Defendants have complied with any of the demands set forth in the DTPA class action demand letter.

## V.

## SPECIFIC REPRESENTATIVE CLASS PLAINTIFFS' FACTUAL ALLEGATIONS

83.     Pursuant to FRCP 23 and Local Rule 23.1, each of the Representative Class Plaintiffs possess "standing" as they each share the same interests and have suffered the same injuries shared by all other members of the represented class and sub-classes identified and

described herein.

84.     The Representative Class Plaintiffs allege herein that all damages and equitable relief being sought also arise from the same operative facts and legal theories shared by all class members and sub-class members that each represents, and that each Representative Class Plaintiff also shares a common nucleus of operative facts as those shared by and among all other class members and sub-class members which each represents.

A.     **FIRST SUB-CLASS: SECURED INVESTORS**

85.     Representative Class Plaintiffs Robert Edward Zucker, Lory Baraz, Baraz Zucker Properties, LLC and Robert E. Zucker Investments, LLC ("Zucker Plaintiffs"), represent those class members who invested with the Defendants through the secured construction loan transactions as described herein, *supra*. Upon information and belief, there were approximately forty (40) of the secured transactions closed involving this sub-class of investors.

86.     Upon information and belief, the source and/or sponsorship of all investment funds used, made, invested or loaned by the Zucker Plaintiffs concerning all secured investment transactions described herein were the personal savings, personal Individual Retirement Account (IRA) funds and/or personal 401k funds of Robert Edward Zucker and/or Lory Baraz.

87.     Upon information and belief, at all material times hereto, each of the Zucker Plaintiffs were and are "consumers" as that term is defined by the Texas Deceptive Trade-Practices Consumer Protection Act, TEX. BUS. & COM CODE § 17.41 et seq.

88.     Upon information and belief, on or about October 30, 2015, the Zucker Plaintiffs made his/her/its/their first investment related to the purchase of a vacant lot commonly known as 7027 Casa Loma, Dallas, TX 75214 ("Casa Loma").

89.     Upon information and belief, the Zucker Plaintiffs used his/her/its/their personal

funds to invest into the Casa Loma property.

90.     Upon information and belief, as part of the Casa Loma investment transaction, the Zucker Plaintiffs invested and wired to the Farish and/or New Summit Defendants an initial cash investment of $175,000 BEFORE closing and funding of the purchase and construction loan transaction, and also applied for and obtained a construction loan from the Bank Defendants in the principal amount of $608,000, and the Zucker Plaintiffs were approved for this loan but were not required to provide any credit verification of any kind or any type of down payment.

91.     Upon information and belief, the Zucker Plaintiffs closed the Casa Loma transaction through and at the offices of the Title Defendants.

92.     Upon information and belief, as part of the conditions for approval of the construction loan for the Casa Loma property, the Bank Defendants specifically required the Farish and/or New Summit Defendants to confirm receipt of the 20% down payment or equity amount paid by the Zucker Plaintiffs to those Defendants as part of the initial cash investment, and advised those Defendants that no draws for construction would be funded until the project was more than 20% completed.

93.     Upon information and belief, the procedures and process for draw requests for construction of the home under the Casa Loma property between the Zucker Plaintiffs and the Bank Defendants specified that all draw requests be provided by the Zucker Plaintiffs in writing, and that each draw request be signed by the Zucker Plaintiffs and the Farish and/or New Summit Defendants, and that each have supporting invoices, statements, itemizations or explanations for all monies being paid and disbursed under the draw request.

94.     Upon information and belief, it was the Zucker Plaintiffs understanding that after approval and disbursement of the draw request, the Bank Defendants had an obligation, duty,

custom and/or regular business practice of inspecting the property to ensure and confirm that all monies disbursed under each draw request were used for their intended purpose.

95.     Upon information and belief, the Zucker Plaintiffs successfully sold the Casa Loma property before completion of construction of the home on the property, i.e. "pre-construction," and were paid back their initial investment plus a return on investment of approximately $35,000.

96.     Upon information and belief, the Zucker Plaintiffs maintained fee simple title and ownership of the Casa Loma property throughout the initial purchase and construction loan closing and through final sale to a bona fide purchaser, i.e. the Zucker Plaintiffs did not execute a warranty deed or power of attorney to any of the Defendants.

97.     Upon information and belief, the Zucker Plaintiffs were disbursed the net sales proceeds from the sale of the Casa Loma property directly from the Title Defendants.

98.      Upon information and belief, upon being disbursed the net sales proceeds of the Casa Loma property, the Zucker Plaintiffs tendered payment of all sums above and beyond the Zucker Plaintiffs' initial investment and return on investment to the Farish and/or New Summit Defendants as per the express terms of the investment agreement.

99.     Upon information and belief, on or about March 2016, the Zucker Plaintiffs entered into another secured transaction agreement with the Farish and/or New Summit Defendants, wherein the Zucker Plaintiffs agreed to purchase and finance a vacant lot for development of a luxury home in the exclusive Vaquero subdivision commonly known as 2216 Cedar Elm Terrace, Westlake, Texas 76262 ("Cedar Elm"), including obtaining a construction loan from the Bank Defendants. True and correct copies of the General Agreement and Distribution of Net Profit Agreement by and between the Zucker Plaintiffs and the Farish and/or

New Summit Defendants concerning the Cedar Elm property and transaction are each attached hereto marked Exhibit "B".

100.    Upon information and belief, the Farish and/or New Summit Defendants further induced the Zucker Plaintiffs to enter into the Cedar Elm transaction by informing the Zucker Plaintiffs that he/it/they were ready to build immediately.

101.    Upon information and belief, the General Agreement between the Zucker Plaintiffs and the Farish and/or New Summit Defendants concerning the Cedar Elm transaction required the Zucker Plaintiffs to obtain a construction loan from the Bank Defendants of at least $400,000 to purchase and develop the lot, and also required the Zucker Plaintiffs to maintain monthly payments of interest on the construction loan until the luxury home was completed and sold.

102.    Upon information and belief, the General Agreement between the Zucker Plaintiffs and the Farish and/or New Summit Defendants also required the Zucker Plaintiffs to sign a real estate contract allowing Defendants Jill Farish and/or New Summit Realty to market the property for sale.

103.    Upon information and belief, the General Agreement between the Zucker Plaintiffs and the Farish and/or New Summit Defendants concerning the Cedar Elm property required the Zucker Plaintiffs to allow the Bank Defendants to direct wire all construction draws directly to the Farish and/or New Summit Defendants upon receipt of a signed draw request from the Zucker Plaintiffs with an attached invoice, statement, detail and/or explanation attached to each draw request.

104.    Upon information and belief, the General Agreement between the Zucker Plaintiffs and the Farish and/or New Summit Defendants concerning the Cedar Elm property

required the Zucker Plaintiffs to give these Defendants a $25,000 payment for escrow and a finder's fee.

107.    Upon information and belief, the General Agreement between the Zucker Plaintiffs and the Farish and/or New Summit Defendants concerning the Cedar Elm property specified that these Defendants build the home as expeditiously as possible.

106.    Upon information and belief, the General Agreement between the Zucker Plaintiffs and the Farish and/or New Summit Defendants concerning the Cedar Elm property specified that these Defendants would pay for all overages that were above and beyond the agreed construction cost.

107.    Upon information and belief, the Distribution of Net Profits Agreement between the Zucker Plaintiffs and the Farish and/or New Summit Defendants concerning the Cedar Elm property specified that once the property was sold the Zucker Plaintiffs would be paid the agreed net profit of $200,000 plus all costs incurred for the purchase, and all holding and/or closing costs incurred by the Zucker Plaintiffs.

108.    Upon information and belief, the Distribution of Net Profits Agreement between the Zucker Plaintiffs and the Farish and/or New Summit Defendants concerning the Cedar Elm property defined "net profit" as all monies remaining after subtracting from the sales price (listed on the closing HUD statement) and all out of pocket costs the owner (Zucker Plaintiffs) paid, including but not limited to the following:

> * the total purchase cost of the land of $400,000, plus
> * the contracted construction cost of $1,050,000, plus
> * all closing costs included in the purchase and sales HUD statements, plus
> * any and all holding cost incurred by the buyer (Zucker Plaintiffs) to service and maintain the construction loan and property (including any and all incurred property taxes, HOA dues, or other assessments that may be required from the time the property is bought until the property is sold).

109.    Upon information and belief, on or about July 18, 2016, the Zucker Plaintiffs applied for and obtained a construction loan from the Bank Defendants concerning the purchase and development of the Cedar Elm property. The original loan amount was based upon a 75% loan to cost on the project.

110.    **Upon information and belief, the Zucker Plaintiffs wired investment monies to the Farish and/or New Summit Defendants for the Cedar Elm property as follows: July 19, 2016 - $35,000; July 21, 2016 - $200,000, and August 18, 2016 - $95,000. Prior to the first wire being sent by the Zucker Plaintiffs, Defendant Jerry Farish personally told the Zucker Plaintiffs that he/she/it/they were ready to start construction immediately**. (emphasis added).

111.    Upon information and belief, the purchase transaction involving the construction loan for the Cedar Elm property was closed, funded and disbursed by the Title Defendants.

112.    Upon information and belief, at closing of the Cedar Elm transaction, and as part of the Bank Defendant's loan closing instructions and documents presented to the Zucker Plaintiffs by the Title Defendants, Defendant Texas Bank and Trust included a "blank" Construction Loan Disbursement Statement ("Draw Request"), which the Zucker Plaintiffs were instructed to sign. The first draw request presented to the Zucker Plaintiffs during the closing of the Cedar Elm transaction did NOT have any amounts or numbers listed anywhere on the form, nor any invoice, statement, itemization or explanation attached to it from the Farish and/or New Summit Defendants, nor from any sub-contractor, service provider or materials provider. A true and correct copy of the "blank" first Draw Request form executed by the Zucker Plaintiffs at the closing of the Cedar Elm transaction is attached hereto marked Exhibit "C".

113.    Upon information and belief, the authorization of the first draw request under the

Cedar Elm transaction was completed and supervised by the Bank Defendants in a completely different manner than the initial construction draw request for the Casa Loma property as described herein, *supra*. *See ¶¶ 92 and 93.*

114.    Upon information and belief, and completely unknown to the Zucker Plaintiffs at that time, the total amount of the first Draw Request for the Cedar Elm property that was actually authorized and disbursed by the Bank Defendants to the Farish and/or New Summit Defendants was $168,065.

115.    Upon information and belief, and completely unknown to the Zucker Plaintiffs at that time, the entire amount of the first Draw Request for the Cedar Elm property of $168,065 was supposed to have been used by the Farish and/or New Summit Defendants to purchase doors, windows, and lumber, and for unspecified lot preparation services for the property.

116.    Upon information and belief, and even though the first Draw Request was "blank" when signed by the Zucker Plaintiffs at closing and did not contain any invoice, statement, itemization or explanation attached to it from any of the Defendants, including any invoice from any materials provider for doors, windows and lumber, the Bank Defendants approved and disbursed the $168,065 draw request funds to the Farish and/or New Summit Defendants.

117.    **Upon information and belief, on July 26, 2016, and without any knowledge or consent of the Zucker Plaintiffs, the Farish and/or New Summit Defendants altered the blank first draw request form that the Zucker Plaintiffs had signed at closing and changed it and renamed as "*Draw Request No. 2*," and filled in the amount of $168,065 on the blank line next to the words *Contractor's Payment Request*, and attached to it an invoice from the Farish and/or New Summit Defendants along with a signed and notarized statement executed by Defendant Jerry Farish, as CEO of New Summit Homes; however, there was**

**no invoice, statement, itemization or explanation attached to it from any materials provider or supplier**. (emphasis added).

118.     **Upon information and belief, the alleged Draw Request No. 2 is a complete sham and forgery, because the Zucker Plaintiffs never saw this specific draw request, had absolutely no knowledge of the same, and did not sign it at the time that it was allegedly made**. A true and correct copy of the forged, fraudulent and falsified Draw Request No. 2 for the Cedar Elm transaction as described herein is attached hereto marked Exhibit "D". (emphasis added).

119.     Upon information and belief, the Bank Defendants did NOT inspect the Cedar Elm property after disbursing the $168,065 draw request funds to the Farish and/or New Summit Defendants as was its contractual and legal duty, and its usual and customary business practice, or the manner in which it handled draw requests in the Casa Loma transaction described herein above. *See* ¶ **94**.

120.     Upon information and belief, no doors, windows, or lumber was/were ever purchased for or delivered to the Cedar Elm property at any time by the Farish and/or New Summit Defendants.

121.     Upon information and belief, on or about March 2017, the Vaquero Homeowner's Association advised the Zucker Plaintiffs that the condition of the Cedar Elm property was unacceptable, and that a $100 per day fine would be levied against the Zucker Plaintiffs if the situation was not remedied immediately.

122.     Upon information and belief, on or about June 2017, nearly one year after closing of the construction loan and disbursement of the $168,065 under the fraudulent Draw Request No. 2 for the Cedar Elm property, the Farish and/or New Summit Defendants finally started to do

some very limited lot preparation work by having a sub-contractor install footings on the subject property. **However, as of the date hereof, no other work, labor, services or materials were ever provided by the Farish and/or New Summit Defendants to or for the Cedar Elm Property after June 2017**. (emphasis added).

123.    Upon information and belief, on or about July 18, 2017, the Zucker Plaintiffs and the Bank Defendants negotiated and entered into a Debt Modification Agreement, which included a six-month extension of the maturity date of the construction loan for the Cedar Elm property until January 18, 2018. **At this point in time, July 18, 2017, the Zucker Plaintiffs had absolutely no knowledge of, and not been disclosed and were totally unaware of the fact that the Bank Defendants had already disbursed $168,065 to the Farish and/or New Summit Defendants under the false and fraudulent Draw Request No. 2 (Exhibit "D"); and therefore, entered into the Debt Modification Agreement without having knowledge of relevant facts that could have dramatically affected or impacted his/her/its/their decision to execute that agreement**. (emphasis added).

124.    Upon information and belief, in addition to the monthly interest payments previously paid by the Zucker Plaintiffs to the Bank Defendants under the original construction loan terms for the time period of August 2016 until July 2017, the Zucker Plaintiffs also paid modified monthly interest payments of approximately $2,511 per month to the Bank Defendants from August 2017 through February 2018 under the Debt Modification Agreement.

125.    Upon information and belief, on August 16, 2017, the Bank Defendants, through Defendant Brown, sent the Zucker Plaintiffs an email wherein the Bank Defendants demanded that, ***"[A]s the construction phase nears, we need to have your 25% equity contribution to begin to pay construction draws. Your equity requirement ($362,500) will be maintained on***

*deposit with the bank and will be the first funds disbursed to the contractor only upon receipt of an authorized draw request, completion of an independent inspection, and your written approval.*" (emphasis added). A true and correct copy of the email from the Bank Defendants to the Zucker Plaintiffs dated August 16, 2017 at 4:12 p.m. is attached hereto marked Exhibit "E".

126.    Upon information and belief, on August 16, 2017, the Bank Defendants, through Defendant Brown, sent another email to the Zucker Plaintiffs wherein these Defendants stated that, *"[C]urrent balance is $563,215.24, which was the balance for the lot purchase, closing costs, and there has been some lot preparation. Remaining balance available for construction is $524,284.46 plus your equity of $362,500 for a total of $886,784.46 to complete the project. We did not ask you for any equity on the original closing of the land purchase."* (emphasis added). A true and correct copy of the second email sent by the Bank Defendants to the Zucker Plaintiffs on August 16, 2017 at 4:37 p.m. is attached hereto marked Exhibit "F".

127.    Upon information and belief, after receiving the August 16, 2017 emails from the Bank Defendants, the Zucker Plaintiffs called and spoke to the Bank Defendants and discussed possible options to resolve the outstanding loan. The Bank Defendants told the Zucker Plaintiffs that if they could procure another contractor or developer to complete the home, the defendants would extend the Zucker Plaintiffs a 100% loan to build it. However, the Bank Defendants' offer failed to consider the fact that it was the Bank Defendants that had already released $168,065 of draw funds to the Farish and/or New Summit Defendants for doors, windows and lumber that were never actually purchased, **a fact that was still unknown to and was NOT disclosed to the Zucker Plaintiffs by the Bank Defendants in any of these emails or during any of these follow up telephone discussions**, or the fact that the total cost of construction would be in excess of $2 million dollars, or that the highest possible price that the Zucker Plaintiffs could

expect to receive for the fully constructed home and lot would be approximately $1.6 million dollars, which upon information and belief, was the highest price that any newly constructed home and lot in that subdivision had ever sold for up to that point in time. Based upon those factors and the fact that the Farish and/or New Summit Defendants original construction budget of $1,050,000 was totally unrealistic and unworkable, the Zucker Plaintiffs decided against the proposed build out option suggested by the Bank Defendants. (emphasis added).

128.   **Upon information and belief, neither in any of the August 16, 2017 emails, nor during any of the subsequent phone calls between the Zucker Plaintiffs and the Bank Defendants, did any of the defendants ever disclose to the Zucker Plaintiffs the fact that a Draw Request in the amount of $168,065 had already been disbursed and paid by the Bank Defendants to the Farish and/or New Summit Defendants as described above, nor of the fact that no windows, doors, or lumber was ever actually purchased or delivered to the subject property**. (emphasis added).

129.   Upon information and belief, the statements made by the Bank Defendants in the August 16, 2017 emails, which states in pertinent part that, *"as the construction phase nears…"* are false statements of material fact that the Zucker Plaintiffs relied upon to their detriment, because the construction phase had actually already begun back in July 2016 when the Bank Defendants disbursed $168,065 to the Farish and/or New Summit Defendants under the falsified, forged and fraudulent Draw Request No. 2, without any disclosure of the same to the Zucker Plaintiffs as described herein, *supra*. (emphasis added).

130.   Upon information and belief, the August 16, 2017 emails from the Bank Defendants also contain false statements of material fact that the Zucker Plaintiffs relied upon to their detriment, because $168,065 had already been disbursed to the Farish and/or New Summit

Defendants as described above, and the first draw request actually signed by the Zucker Plaintiffs at closing did NOT contain any invoice, statement, itemization or explanation, nor did the Bank Defendants timely complete an independent inspection of the property after disbursing those draw funds to those defendants.

131.   **Upon information and belief, on or about late fall of 2017, the Zucker Plaintiffs were notified, FOR THE FIRST TIME, that the Farish and/or New Summit Defendants had not done any work to the Cedar Elm property, and that he/she/it/they had failed to pay the sub-contractor that had installed the concrete footings on the property, and that the Bank Defendants had previously disbursed $168,065 to those Defendants, and that the windows, doors and lumber were never actually purchased by or delivered to the subject property by those defendants**. (emphasis added).

132.   Upon information and belief, on or about late fall of 2017, and **FOR THE FIRST TIME** the Zucker Plaintiffs were notified that a sub-contractor, who had been hired by the Farish and/or New Summit Defendants to lay the foundation footings as described above (*see* ¶ 122), had filed a mechanic's lien against the property because the sub-contractor was never paid by those Defendants. **As a result, the Zucker Plaintiffs were required to pay the sub-contractor to obtain satisfaction and release of the mechanic's lien**. (emphasis added).

133.   Upon discovering that the Bank Defendants had previously disbursed $168,065 to the Farish and/or New Summit Defendants, and that those funds had not been used by the Defendants for their intended purpose as no doors, windows, or lumber had ever actually been purchased by those Defendants, and after expiration of the maturity date of the construction loan under the Debt Modification Agreement matured as of January 18, 2018, the Zucker Plaintiffs continued with their ongoing attempts to negotiate and discuss possible solutions concerning the

construction loan with the Bank Defendants.

134.    Upon information and belief, on February 20, 2018, Plaintiff Robert Edward Zucker met in person with Defendant Brown and another regional manager of Defendant Texas Bank and Trust, Gary Mulhollen, at a local Dallas restaurant to discuss the Cedar Elm loan and property. **During this meeting, Plaintiff Robert Edward Zucker specifically asked the Bank Defendants why any draw funds had been disbursed to the Farish and/or New Summit Defendants, including the $168,065 under the fraudulent Draw Request No. 2, which did not include an invoice, statement, itemization or explanation attached to it, nor any receipts for the alleged windows, doors or lumber supposedly being purchased with those funds. In response, the Bank Defendants, specifically Defendant Brown, said that they had been checking, verifying and inspecting all of the work, labor and materials being provided by the Farish and/or New Summit Defendants in approximately twenty (20) other transactions up to that point in time (July 2016), and as a result had become "comfortable" with paying out undocumented and unsupported draw requests, and without verifying or inspecting the property afterward**. (emphasis added).

135.    **Upon information and belief, during the February 20, 2018 meeting, the Bank Defendants, specifically Defendant Brown, further advised Plaintiff Robert Edward Zucker that they felt that they had done the Zucker Plaintiffs a favor by paying the first draw request of $168,065 to the Farish and/or New Summit Defendants, because Defendant Jerry Farish personally told the Bank Defendants that the windows, doors and lumber were purchased at a discount**. (emphasis added).

136.    Upon information and belief, during the February 20, 2018 meeting, **the Bank Defendants, specifically Defendant Brown, also told Plaintiff Robert Edward Zucker that**

**at some point in late 2017, nearly one and one half years later, they did actually send out an inspector to the Cedar Elm property, who then confirmed that the only work that had been done on that property was the setting of footings for the concrete foundation, which actually did not occur until the summer of 2017, and was done by a sub-contractor that was never paid, and that there had never been any windows, doors or lumber purchased or delivered to the subject property. According to the Bank Defendants, after this inspection in late 2017, they "*shut down*" this construction project and all other pending projects of the Farish and/or New Summit Defendants, and ceased doing business with any of them.** (emphasis added).

137.    Upon information and belief, on or about March 2018, the Zucker Plaintiffs paid $8,250 to another contractor to restore the Cedar Elm property to its original condition in order to avoid the $100 per day fine being levied by the Vaquero Homeowner's Association.

138.    Upon information and belief, on March 26, 2018, the Bank Defendants, through Defendant Brown, once again advised the Zucker Plaintiffs that they were demanding full payment of the construction loan or some resolution to the outstanding construction loan. At that time, March 26, 2018, the Bank Defendants, through Defendant Brown, sent an email to the Zucker Plaintiffs which referenced a possible loan modification or another extension of the construction loan. Upon receipt, the Zucker Plaintiffs forwarded the email to their undersigned counsel, who then replied directly to the Bank Defendants and advised those defendants that the Zucker Plaintiffs were being represented and that a Class Action demand letter (Exhibit "A") had recently been sent out to all of the Defendants, including the Bank Defendants. Plaintiff's counsel's email reply also requested that the Bank Defendants direct any and all future communications concerning the loan and property, including any proposed modifications,

renewals or extensions of the construction loan, to Plaintiffs' counsel, and also attached a copy of the Class Action demand letter that had recently been mailed. No response to Plaintiffs' counsel's email was ever received from any of the Defendants. A true and correct copy of Plaintiffs' counsel's reply email to the Bank Defendants' email dated March 26, 2018 is attached hereto marked Exhibit "G".

139.    On April 25, 2018, Defendant Texas Bank and Trust sued the Zucker Plaintiffs under Cause No. 2018-797-A in the 188th Judicial District Court of Gregg County, Texas, claiming among other things that the Zucker Plaintiffs breached the construction loan agreement by failing to pay the Note, and caused the construction of the project not to be completed by July 18, 2017. The lawsuit also named both Lory Baraz and Robert Edward Zucker, individually, as defendants and guarantors of the construction loan. A true and correct copy of the Plaintiff's Original Petition filed by Defendant Texas Bank and Trust against the Zucker Plaintiffs as described above is attached hereto marked Exhibit "H".

140.    Upon being served with citation, the Zucker Plaintiffs filed an Answer denying all allegations set forth in Defendant Texas Bank and Trust's lawsuit, including affirmative defenses and a verified denial, and subsequently removed that lawsuit to the U.S. District Court, Northern District of Texas-Dallas division, under Civil Action No. 3:18-cv-01379-N, on the grounds of diversity jurisdiction. A true and correct copy of the Notice of Removal dated May 30, 2018, is attached hereto marked Exhibit "I".

B.      **SECOND SUB-CLASS: ROLLOVER NOTE INVESTORS**

141.    Representative Class Plaintiffs Robert Edward Zucker, Lory Baraz, Robert E. Zucker Investments, LLC and/or Baraz Zucker Properties, LLC ("Zucker Plaintiffs"), also represent those class members who invested with the Farish and/or New Summit Defendants

under and through the Rollover Note instruments and transactions as described hereinabove, *supra*. Upon information and belief, there were approximately twenty (20) of the Rollover Note transactions closed involving this sub-class of investors.

142.    Upon information and belief, on April 8, 2016, the Zucker Plaintiffs made another investment of $270,000 with the Farish and/or New Summit Defendants, which investment was secured by a first lien Note and Deed of Trust secured by the property commonly known as 5646 Miller Avenue, Dallas, Texas 75206 ("Miller Avenue"). The Borrower under the first lien Note and Deed of Trust for the Miller Avenue transaction was Messer Holdings Series LLC, which is another class investor whom the defendants had chosen to purchase and develop the Miller Avenue property.

143.    Upon information and belief, prior to the closing of the Miller Avenue property, the Zucker Plaintiffs wired $270,000.00 to the Farish and/or New Summit Defendants, who then drafted the first lien Note and Deed of Trust that was executed by Messer Holdings Series, LLC to the Zucker Plaintiffs at closing.

144.    Upon information and belief, after construction of the Miller Avenue property was completed, on or about May 2017, the Zucker Plaintiffs then requested payment of the $270,000 investment provided to the Farish and/or New Summit Defendants, along with their promised return.

145.    Upon information and belief, in lieu of actually repaying the $270,000 investment amount loaned by the Zucker Plaintiffs to the Farish and/or New Summit Defendants for the Miller Avenue property, and specifically by and through Defendant Jerry Farish, personally, instead informed the Zucker Plaintiffs that it would be easier and more efficient to repay the Miller Avenue investment through reinvestment under another secured Promissory Note

executed by the Borrower (Messer Holdings Series, LLC) and secured by the closing and funding of another, separate property commonly known as 11021 Royalshire Drive, Dallas, Texas ("Royalshire").

146. **Upon information and belief, at some point after construction of the Miller Avenue property was completed, Messer Holdings Series LLC conveyed title to the Miller Avenue property to the Farish and/or New Summit Defendants, who, on May 18, 2017, then instructed the Title Defendants, which had also closed the second side transaction for the Miller Avenue property, to transfer $220,000 (which was supposed to be the Zucker Plaintiffs' net proceeds from the sale of the Miller Avenue property) from its escrow account where the Miller Avenue proceeds were being held to the Royalshire transaction which the Title Defendants were also closing**. A true and correct copy of the email from Defendant Jerry Farish to Laura James, Escrow Officer of the Title Defendants providing instructions for the transfer of the Zucker Plaintiffs' $220,000 Miller Avenue proceeds to the Royalshire transaction is attached hereto marked Exhibit "J". (emphasis added).

147. Upon information and belief, in addition to the Rollover Note for the rollover of the $220,000 Miller Avenue proceeds, at the same time, May 2017, at the specific instance and direction of the Farish and/or New Summit Defendants, the Zucker Plaintiffs also invested an additional $184,000 from Robert Edward Zucker's self-directed IRA, which was also supposed to be secured by the Royalshire property.

148. **Upon information and belief, on May 17, 2017, Messer Holdings Series LLC, at the specific instance and direction of the Farish and/or New Summit Defendants, executed a Promissory Note to the Zucker Plaintiffs in the amount of $220,000, which included a flat rate of return of $44,000, with a maturity date of, *"[U]pon the closing and***

*funding of 11021 Royalshire Drive, Dallas, Texas 75230.***" At the same time, Messer Holdings Series LLC also executed a Deed of Trust in favor of the Zucker Plaintiffs, as Beneficiary, ALTHOUGH NO ACTUAL TRUSTEE WAS NAMED OR INCLUDED IN THE DEED OF TRUST, and which Deed of Trust was supposed to secure a lien in favor of the Zucker Plaintiffs against the Royalshire property, i.e. the Deed of Trust was supposed to be recorded in the official real property records of Dallas County, Texas, where the subject property was located**. True and correct copies of the $220,000 Rollover Note and Deed of Trust for the Royalshire property are each attached hereto marked Exhibit "K". (emphasis added)

149. **Upon information and belief, on May 17, 2017, Messer Holdings Series LLC also executed a Promissory Note and Deed of Trust in favor of Robert Zucker IRA in the amount of $184,000, which Note was also supposed to be secured by a Deed of Trust, and the Deed of Trust was also supposed to be recorded in the official real property records of Dallas County, Texas, to perfect a lien against the property in favor of Robert Zucker IRA. Once again, however, NO TRUSTEE WAS NAMED IN THIS DEED OF TRUST, and the maturity date of this Note was described as, *"[U]pon closing and funding of 11021 Royalshire Drive, Dallas, Texas 75230."*** (emphasis added).  A true and correct copy of the $184,000 Deed of Trust is also attached hereto marked Exhibit "K".

150. Upon information and belief, Defendant Jerry Farish, personally, created, drafted, provided and delivered both the original $220,000 Rollover Promissory Note and Deed of Trust, and the $184,000 additional IRA Promissory Note and Deed of Trust instruments to Messer Holdings Series LLC to execute concerning the Rollover Note and the additional IRA investment made by the Zucker Plaintiffs for the Royalshire property.

151. **Upon information and belief, Defendant Jerry Farish, personally, told and assured the Zucker Plaintiffs that both of the Deeds of Trust for the Royalshire property would be recorded in the official real property records of Dallas County, Texas, to secure payment and performance of both the Rollover Note of $220,000 and the additional IRA Promissory Note of $184,000**. (emphasis added).

152. **Upon information and belief, the Zucker Plaintiffs also relied on the Title Defendants, who had closed the sale of the Miller Avenue property and who were also closing on the Royalshire transaction and were fully aware of both transactions and had transferred $220,000 from the Miller Avenue property to the Royalshire transaction, to ensure that both Deeds of Trust executed by Messer Holdings Series LLC to the Zucker Plaintiffs for the Royalshire transaction would be properly recorded in the official real property records of Dallas County, Texas, to secure the Zucker Plaintiffs' lien interests against the Royalshire property as part of the closing of the Royalshire transaction**. (emphasis added).

153. **Upon information and belief, neither the $220,000 Deed of Trust nor the $184,000 Deed of Trust executed by Messer Holdings Series LLC to the Zucker Plaintiffs that were supposed to secure payment of both the $220,000 Rollover Note and the $184,000 additional IRA Promissory Note were ever actually recorded by any of the defendants in the official real property records of Dallas County, Texas**. (emphasis added).

154. Upon information and belief, neither the Farish or New Summit Defendants has/have ever paid the Zucker Plaintiffs any of the $220,000 Rollover Note nor any of the $44,000 promised rate of return under the Rollover Promissory Note, nor have any of these defendants ever paid the Zucker Plaintiffs any of the additional $184,000 IRA Promissory Note,

nor any interest thereunder.

155.    Upon information and belief, the Farish and/or New Summit Defendants wholly defaulted under his/her/its/their development agreement with Messer Holdings Series LLC, and each has also defaulted under both the Rollover Promissory Note and the IRA Promissory Note, and never did any actual work for the Royalshire property whatsoever.

156.    Upon information and belief, the Zucker Plaintiffs and Messer Holdings Series LLC have been actively trying to develop the Royalshire property, and each has incurred significant additional costs and expenses to maintain and develop the subject property, including but not limited to the payment of property taxes, insurance and other carrying costs. Both the Zucker Plaintiffs and Messer Holdings Series LLC have also had to try to resolve a zoning variance dispute related to this particular property, which zoning issue directly resulted because of acts, conduct and/or omissions of the Farish and/or New Summit Defendants, and his/her/its/their failure to secure the zoning variance prior to acquisition.

157.    In another example of a similar transaction involving the Zucker Plaintiffs and the Farish and/or New Summit Defendants, which pertains to a property known as 1901 Little Blue Stem, Westlake, Texas 76262 ("Blue Stem"), upon information and belief, at least three (3) different investors were ultimately pitted against each other by the Farish and/or New Summit Defendants, who once again wholly absconded with, stole, and converted each of the investors' investment funds.

158.    Upon information and belief, as part of the Blue Stem property transaction, the Farish and/or New Summit Defendants received investment amounts and payments from three (3) different investors, none of whom were the actual purchaser of the property or borrower under the construction loan that was being obtained to develop the Blue Stem property.

159.    Upon information and belief, the actual purchaser and borrower under the construction loan for the Blue Stem property was Stephen Grace.

160.    Upon information and belief, the Blue Stem transaction was also closed, processed, funded and disbursed by the Title Defendants.

161.    Upon information and belief, on May 23, 2016, the Zucker Plaintiffs wired $460,000 to the Farish and/or New Summit Defendants, based upon his/her/its/their representations, promises and inducements made concerning this investment. The specific investment details, representations and inducements made by the Farish and/or New Summit Defendants to the Zucker Plaintiffs concerning the Blue Stem property investment are each attached hereto marked Exhibit "L".

162.    Upon information and belief, on that same date, May 23, 2016, the Zucker Plaintiffs actually wired $460,000 to the Farish and/or New Summit Defendants, based upon his/her/its/their representations, promises and inducements made concerning the Blue Stem investment.

163.    Upon information and belief, and at the specific direction and special instance and request of the Farish and/or New Summit Defendants, on May 23, 2016, Stephen Grace executed a Promissory Note to the Zucker Plaintiffs in the principal amount of $460,000, with a rate of return of $200,000, and a maturity date of, *"[U]pon closing and funding of 1901 Little Blue Stem, Westlake, Texas 76262."* (emphasis added).

164.    **Upon information and belief, on that same date, May 23, 2016, Stephen Grace also executed a Promissory Note and 2nd Mortgage Deed of Trust in favor of the Zucker Plaintiffs, which was supposed to be secured by the Blue Stem property and recorded as a valid second lien against the title to the subject property. Once again,**

**however, while the Zucker Plaintiffs were named as Beneficiary of the Deed of Trust, NO ACTUAL TRUSTEE WAS NAMED**. True and correct copies of the Promissory Note and 2nd Mortgage Deed of Trust executed by Stephen Grace in favor of the Zucker Plaintiffs for the Blue Stem property are each attached hereto marked Exhibit "M".

165.    Upon information and belief, the Promissory Note and 2nd Mortgage Deed of Trust (Exhibit "M") were created, drafted, provided and delivered by the Farish and/or New Summit Defendants to Stephen Grace to execute.

166.    Upon information and belief, and based upon the representations, promises and inducements made by Farish and/or New Summit Defendants to the Zucker Plaintiffs, the 2nd Mortgage Deed of Trust in favor of the Zucker Plaintiffs for the Blue Stem property was supposed to be recorded in the official real property records of Tarrant County, Texas, to perfect a second lien against the title to the subject property, second and inferior only to the $1,395,000 construction loan lien being made by Stephen Grace to Defendant Texas Bank and Trust for purchase and construction of the home on the Blue Stem lot.

167.    Upon information and belief, on May 24, 2016, Stephen Grace closed the Blue Stem transaction by, through and under the Title Defendants, who had actual knowledge and awareness of the 2nd Mortgage Note and Deed of Trust executed in favor of the Zucker Plaintiffs by Stephen Grace. A true and correct copy of the HUD-I Settlement Statement for the Blue Stem transaction is attached hereto marked Exhibit "N".

168.    Upon information and belief, the 2nd Mortgage Promissory Note executed by Stephen Grace to the Zucker Plaintiffs was **NOT** mentioned or referenced anywhere in the HUD-I Settlement Statement for the Blue Stem transaction. (emphasis added).

169.    **Upon information and belief, the 2nd Mortgage Deed of Trust executed by**

**Stephen Grace to the Zucker Plaintiffs concerning the Blue Stem property was NOT actually recorded in the official real property records of Tarrant County, Texas**. (emphasis added).

170.   **Upon information and belief, the acts, conduct or omissions of the Farish and/or New Summit Defendants, and/or the Title Defendants, who actually closed the Blue Stem transaction, of failing to record the 2nd Mortgage Deed of Trust was/were intentional and/or made with the pre-determined intent and effect of converting the Zucker Plaintiffs' investment monies from a secured investment into an unsecured investment as against the subject property and allowed the Farish and/or New Summit Defendants to abscond with, steal and/or convert the $460,000 investment made by the Zucker Plaintiffs for the Blue Stem property**. (emphasis added).

171.   Upon information and belief, the Bank Defendants, intentionally, knowingly and/or recklessly aided, abetted, assisted and/or enabled the Farish and/or New Summit Defendants, and/or Title Defendants, who each obtained a direct pecuniary gain, profit or benefit from the fraudulent conversion of the Zucker Plaintiffs' Blue Stem property investment, also received a direct pecuniary gain and benefit from the Farish and/or New Summit Defendants in the form of an invitation to play golf at the exclusive Vaquero Golf Course.

172.   Upon information and belief, in an email dated May 17, 2016 at 3:32 p.m., the Bank Defendants, through Defendant Brown, informed the Farish and/or New Summit Defendants, that the Blue Stem construction loan for Stephen Grace had been approved and provided the details for the same. This email further stated, _**"[N]ow Jerry, can you get me on Vaquero for some golf?"**_ (emphasis added). _See_ May 17, 2016 email attached hereto as part of Exhibit "O".

173.    Upon information and belief, shortly after receiving the Bank Defendants' May 17, 2016 email, Defendant Jerry Farish replied, *"…[I]n the meantime I will work on coordinating the golf game for you."* (emphasis added). *Id.*

174.    **Upon information and belief, Stephen Grace was not required to credit qualify or make any type of down payment for the construction loan, rather the down payment funds were provided by the Zucker Plaintiffs on his behalf in the form of the $460,000 investment wired to the Farish and/or New Summit Defendants as described herein above, *supra*.** (emphasis added).

175.    Upon information and belief, and much like the closing of the Cedar Elm transaction as described herein above, *supra*, as part of the closing of the Blue Stem transaction, the Farish and/or New Summit Defendants included an invoice that was supposed to be part of the first draw request in the amount $194,400, and which was supposed to be used by the defendants for, "*fees required by the homeowner's association, plans for the home completed, foundation and framing plans with engineer's stamp of approval, all permits to start the building process, and all work involved in getting pad ready for the foundation to be started.*" (emphasis added). A true and correct copy of the $194,400 invoice created and provided by the Farish and/or New Summit Defendants for the Blue Stem property is attached hereto marked Exhibit "P".

176.    **Upon information and belief, the Farish and/or New Summit Defendants, although having been disbursed $194,400 by the Bank Defendants Brown for the items set forth and described in the invoice (Exhibit "P"), did NOT do, provide or perform any of the work, labor or services, nor provide any materials as described in the invoice for the Blue Stem property**. (emphasis added).

177.    Upon information and belief, on January 19, 2017, over eight months after closing and funding of the Blue Stem transaction, and at the specific direction and special instance and request of the Farish and/or New Summit Defendants, Stephen Grace executed another Promissory Note in the principal amount of $200,000 to NOJO Properties, LLC ("NOJO"), which Note set forth a rate of return of $50,000, and a maturity date of, *"[U]pon the closing and funding of 1901 Little Blue Stem, Westlake, Texas 76262."* (emphasis added).

178.    Upon information and belief, on that same date, January 19, 2017, Stephen Grace also executed a 2nd Mortgage Deed of Trust in favor of NOJO. True and correct copies of the Promissory Note and 2nd Mortgage Deed of Trust executed by Stephen Grace to NOJO for the Blue Stem property are each attached hereto marked Exhibit "Q".

179.    Upon information and belief, on January 19, 2017, Defendant Jerry Farish, personally, came to the home of the mother of Jennifer Wereszynski, who is the wife of Representative Class Plaintiff Gary Wereszynski, and picked up a check for $200,000 made payable to Defendant NSH, in consideration of execution of the Promissory Note and 2nd Mortgage Deed of Trust executed by Stephen Grace to NOJO. **During this meeting, Defendant Jerry Farish was asked, "*will this money be safe investing with you? Would you invest your own mother's money in this investment?*  To which, Defendant Jerry Farish replied, "*Of course!*"** (emphasis added).

180.    Upon information and belief, the Promissory Note and Deed of Trust executed by Stephen Grace to NOJO were each created, drafted, provided and delivered by the Farish and/or New Summit Defendants to Stephen Grace to execute.

181.    Upon information and belief, the 2nd Mortgage Deed of Trust executed by Stephen Grace to NOJO did not actually name a Trustee.

182.    Upon information and belief, the 2nd Mortgage Deed of Trust executed by Stephen Grace to NOJO was actually recorded in the official real property records of Tarrant County, Texas under Instrument No. D217013085, because NOJO refused to pay the $200,000 investment consideration to the Farish and/or New Summit Defendants unless and until the Deed of Trust was actually recorded. **The recording of the NOJO Deed of Trust effectively perfected NOJO's lien interests ahead of the Zucker Plaintiffs, whose Deed of Trust that was executed 8 months earlier was never actually recorded**. (emphasis added).

183.    Upon information and belief, on June 27, 2017, over thirteen (13) months after Stephen Grace closed on the purchase of the Blue Stem property, and at the specific direction and special instance and request of the Farish and/or New Summit Defendants, **NEW SUMMIT HOMES, by Jerry Farish, CEO** executed a Promissory Note in the principal amount of $350,000 to MAH Construction, LLC ("MAH"), who is another class investor, and which note specified a rate of return of $65,000, and a maturity date of, *"[U]pon the closing and funding of 1901 Little Blue Stem, Westlake, Texas 76262."* (emphasis added).

184.    Upon information and belief, on that same date, June 27, 2017, **NEW SUMMIT HOMES by Jerry Farish, CEO** executed a 2nd Mortgage Deed of Trust in favor of MAH Construction purporting to encumber the Blue Stem property. True and correct copies of the Promissory Note and 2nd Mortgage Deed of Trust executed by Jerry Farish, as CEO of New Summit Homes to MAH are attached hereto marked Exhibit "R". (emphasis added).

185.    Upon information and belief, on June 27, 2017, MAH wired $350,000 to the Farish and/or New Summit Defendants, in consideration of the execution of the Promissory Note and 2nd Mortgage Deed of Trust executed by **NEW SUMMIT HOMES by Jerry Farish, CEO**. (emphasis added).

186.    Upon information and belief, the Promissory Note and Deed of Trust executed by **NEW SUMMIT HOMES by Jerry Farish, CEO** to MAH were each created, drafted, provided and delivered by the Farish and/or New Summit Defendants to MAH.

187.    Upon information and belief, the 2nd Mortgage Deed of Trust executed by **NEW SUMMIT HOMES by Jerry Farish, CEO** to MAH did not actually name a Trustee. (emphasis added).

188.    Upon information and belief, the 2nd Mortgage Deed of Trust executed by **NEW SUMMIT HOMES by Jerry Farish, CEO** to MAH concerning the Blue Stem property was **NOT** actually recorded in the real property records of Tarrant County, Texas. (emphasis added)

189.    **Upon information and belief, at no point was NEW SUMMIT HOMES ever deeded the title to nor acquired any ownership interest of any kind in or to the Blue Stem property, nor ever obtained any legal right, title or interest in or to the Blue Stem property; and therefore, NEVER had any legal right, interest, standing or authority to encumber the Blue Stem property through the 2nd Mortgage Deed of Trust that it executed to MAH.** (emphasis added).

190.    **Upon information and belief, as of the date hereof, neither the Zucker Plaintiffs, nor NOJO, nor MAH, have ever been paid any amounts by the Farish and/or New Summit Defendants, nor by Stephen Grace, concerning each of their investments, which combined total over $1 million dollars.** (emphasis added).

191.    **Upon information and belief, as of the date hereof, the Blue Stem property has never actually been developed and remains a vacant lot, which the Tarrant County Appraisal District currently values at $410,760, although Defendant Jerry Farish told some of the investors that he had been developing it.** (emphasis added).

192.     **Upon information and belief, as of the date hereof, the Bank Defendants authorized the payment of at least the $194,400 draw request to the Farish and/or New Summit Defendants, but very little or no development has actually occurred and the property remains a vacant lot**. (emphasis added).

193.     Upon information and belief, as of the date hereof, the Defendants Jill Farish, New Summit Realty and/or Jill Farish Realty currently has/have the vacant Blue Stem property lot listed for sale on MLS for $1 million dollars, even though very little development has been completed and property remains a vacant lot with a current tax appraisal value of $410,760.

## C.     THIRD SUB-CLASS: UNSECURED NOTE INVESTORS

194.     Representative Class Plaintiffs Gary Wereszynski and his single member LLC, GMW II, LLC ("Wereszynski"), and Marsha Frost ("Frost"), represent those class members who invested with the Farish and/or New Summit Defendants under and through the Unsecured Note instruments and transactions as described hereinabove, *supra*. Upon information and belief, there were approximately forty (40) of the Unsecured Note transactions closed by this sub-class of investors.

195.     Upon information and belief, on or about June 2015, Plaintiff Marsha Frost, who was referred to the Farish and/or New Summit Defendants by her brother Roger Oquist, who is another class member that had previously made several investments with these Defendants up to that point in time, was offered the opportunity to invest into the Defendants' investment Ponzi scheme through another type of investment created by these defendants, which is referred to hereinafter as an "Unsecured Note" transaction.

196.     Upon information and belief, the Farish and/or New Summit Defendants specifically represented, promised and induced Plaintiff Marsha Frost to invest by telling her that

if she invested at least $100,000 her investment would be secured by *"all assets of New Summit Homes and/or Ernani, Inc."* (emphasis added).

197.    Upon information and belief, on June 1, 2015, and based upon the express representations, promises and inducements made by the Farish and/or New Summit Defendants, Plaintiff Marsha Frost wired $100,000 to the Farish and/or New Summit Defendants, and in return received a Promissory Note of even date[3] executed by Defendant Jerry Farish, as CEO of Defendant NSH, in the principal amount of $100,000, with an interest rate of 15.6% (simple rate), and a monthly payment of $1,300.00 per month, and a maturity date of May 31, 2019, and secured by "*all assets held by New Summit Homes and/or Ernani, Inc.*" (emphasis added). A true and correct copy of the Promissory Note dated June 1, 2015, executed by Defendant Jerry Farish, as CEO of Defendant NSH to Plaintiff Marsha Frost is attached hereto marked Exhibit "S".

198.    Upon information and belief, the source or sponsorship of Plaintiff Marsha Frost's $100,000 investment funds that were wired to the Defendants as described above were her personal money that was being held in a trust that she had created for herself.

199.    Upon information and belief, at all material time hereto, Plaintiff Marsha Frost was and is a "consumer" as that term is defined by the Texas Deceptive Trade-Practices Consumer Protection Act, TEX. BUS. & COM CODE § 17.41 et seq.

200.    Upon information and belief, the $100,000 Promissory Note executed by Defendant Jerry Farish, as CEO of Defendant NSH to Plaintiff Marsha Frost was created, drafted, provided and delivered by the Farish and/or New Summit Defendants to Plaintiff Marsha Frost.

201.    Upon information and belief, at no point did any of the Defendants ever provide

---

[3] Although the Promissory Note is dated June 1, 2015, it was not actually executed by the defendants until August 5, 2015.

Plaintiff Marsha Frost with any type of security for the Promissory Note such as a UCC-I form, nor any information concerning any of the alleged assets of Defendants NSH or Ernani that were on hand to secure this investment, nor any other type of security or collateral of any kind.

202.   Upon information and belief, Plaintiff Marsha Frost received monthly payments under the Promissory Note ("Exhibit "S") executed by Defendant Jerry Farish, as CEO of NSH, for the months of July 2015 through August 2017, in the amount of $1,300 per month, for a total paid of approximately $32,500.

203.   Upon information and belief, the Farish and/or New Summit Defendants defaulted in the performance of payments under the Promissory Note (Exhibit "S") as of September 2017.

204.   After the Farish and/or New Summit Defendants ceased paying the monthly payments on the Note, Plaintiff Marsha Frost then made written demand upon the Farish and/or New Summit Defendants by email dated October 5, 2017, for payment in full of all amounts due and owing to her, including interest. A true and correct copy of Plaintiff Marsha Frost's October 5, 2017, email demand for payment of the $100,000 Unsecured Promissory Note is attached hereto marked Exhibit "T".

205.   Upon information and belief, as of the date hereof, none of the Defendants have ever responded to Plaintiff Marsha Frost's written demand nor has she been paid any additional monies beyond those described hereinabove. *See ¶ 202*.

206.   Upon information and belief, at no point have the Farish and/or New Summit Defendants ever provided Plaintiff Marsha Frost with any type of written information, confirmation, accounting, or documentation of any kind concerning or describing any of the alleged assets of New Summit Homes and/or Ernani Inc. that were supposed to secure payment

of the Promissory Note.

207.    Upon information and belief, on January 25, 2017, Plaintiff Gary Wereszynski, through his single member LLC, GMW II LLC ("Wereszynski Plaintiffs"), after a lengthy series of phone calls and conversations with Defendant Jerry Farish, also agreed to invest with the defendants.

208.    Upon information and belief, on January 25, 2017, the Farish and/or New Summit Defendants executed an Investment Agreement whereby, in consideration of the Wereszynski Plaintiffs' cash investment of $100,000, the Defendants agreed to repay this amount as follows:

1)    *14% annual (simple interest); or,*
2)    *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold (**gross commissions earned by New Summit Realty from all New Summit Homes sold in the next 12 months is estimated to be slightly over 1 Million Dollars).*"* (emphasis added).

A true and correct copy of the Investment Agreement executed by the Farish and/or New Summit Defendants along with the $100,000 check tendered by the Wereszynski Plaintiffs to the Defendants, and the text messages confirming receipt by the Defendants of the investment sums, is attached hereto marked Exhibit "U".

209.    Upon information and belief, the source or sponsorship of the Wereszynski Plaintiffs' $100,000 investment funds that were sent to the Defendants under the Investment Agreement (Exhibit "U") originally came from Gary Wereszynski's personal IRA, a portion of which IRA was cashed and deposited into the bank account of his single member LLC, GMW II LLC.

210.    Upon information and belief, at all material time hereto, the Wereszynski Plaintiffs were and are a "consumer" as that term is defined by the Texas Deceptive Trade-Practices Consumer Protection Act, TEX. BUS. & COM CODE § 17.41 et seq.

211.    Upon information and belief, based upon the express representations, promises and inducements made by the Farish and/or New Summit Defendants, on January 25, 2017, the Wereszynski Plaintiffs sent a check in the amount of $100,000 to the Farish and/or New Summit Defendants via overnight mail. The check was received by the Defendants on January 26, 2017, who then confirmed receipt by text message to the Wereszynski Plaintiffs on January 27, 2018. Copies of the check and text messages are also attached hereto marked Exhibit "U".

212.    Upon information and belief, the Farish and/or New Summit Defendants, although having received and deposited the $100,000 investment from the Wereszynski Plaintiffs, wholly defaulted in performance of the Investment Agreement (Exhibit "U") and have never paid any monies whatsoever to the Wereszynski Plaintiffs at any time after January 25, 2017.

213.    Upon information and belief, after the Farish and/or New Summit Defendants defaulted in the performance of payments under the Investment Agreement (Exhibit "U"), the Wereszynski Plaintiffs, via emails and text messages, demanded payment of all amounts due and owing to them, including interest.

214.    Upon information and belief, as of the date hereof, none of the Defendants have ever responded to the Wereszynski Plaintiffs' demands and have not been paid any monies of any kind, rather the Farish and/or New Summit Defendants absconded with, stole and converted their investment for their own pecuniary gain.

215.    Upon information and belief, at no point have any of the Defendants ever provided the Wereszynski Plaintiffs with any type of written information, confirmation, accounting, or documentation of any kind concerning or describing any of the alleged sales of New Summit Homes by New Summit Realty that were supposed to secure payment of the

investment agreement.

216.   Upon information and belief, and after sending out the class action demand letter (Exhibit "A"), the Representative Class Plaintiffs discovered that Defendant Jerry Hatfield, individually, or through several business entities in which he has an ownership interest, or in which he is an officer, director or authorized agent, directly or indirectly, aided, abetted, assisted and/or enabled the Farish and/or New Summit Defendants, to abscond with, steal and/or convert millions of dollars of the Representative Class Plaintiffs' investment sums through deposits of the converted investment funds into various bank accounts of his various business entities, and/or the subsequent use of those same funds to purchase or acquire additional assets such as houses, cars, trucks, boats, RVs, and other real and personal property, including funds to buy and develop more real estate projects, i.e. **Defendant Jerry Hatfield, individually, or through several of his business entities, helped the Farish and/or New Summit Defendants launder the money that was stolen and converted from all the class investors' investment funds**. (emphasis added).

217.   Upon information and belief, Defendant Jerry Hatfield also aided, abetted, assisted and/or enabled Defendants Jerry Farish, Individually, and Jill Farish, by purchasing his/their homestead property from foreclosure sale and then leasing the home back to the Defendants, or by selling it back to Defendants, and this same homestead property was also listed as the official address of Defendants NSH, New Summit, and/or Ermani, and was the site of numerous real estate transactions, some of which involved the class investors.

## VI.

## COUNT ONE -
## APPLICATION FOR A TEMPORARY RESTRAINING ORDER
## AND PERMANENT INJUNCTION

218.     Paragraphs 1-217 are incorporated herein by reference.

219.     Pursuant to FRCP Rules 64 and 65, all of the Representative Class Plaintiffs hereby move this Court, with or without notice, to enter a Temporary Restraining Order wherein each of the Defendants, and their respective officers, directors, agents, attorneys, representatives, employees, trustees, substitute trustees, assignees, heirs, administrators, successors and/or assigns, are each immediately ordered, enjoined and restrained from selling, leasing, assigning, renting, conveying, alienating, converting, or transferring, in any manner whatsoever, any right, title, interest, profit, gain, sum or benefit, in or to any real or personal property that was derived from, obtained, or resulted from any of the numerous acts, conducts and/or omissions of each of the Defendants as described herein, *supra*, and made the subject of this civil action, for a period of at least fourteen (14) days from the date of entry of such Order.

220.     All of the Representative Class Plaintiffs further hereby move this Court, with or without notice, to enter a Temporary Restraining Order wherein each of the Defendants, and their respective officers, directors, agents, attorneys, representatives, employees, trustees, substitute trustees, assignees, heirs, administrators, successors and/or assigns, are each immediately ordered, enjoined and restrained from hiding, concealing, secreting, damaging, destroying or removing any and all real or personal property from its present and existing location, form, state and/or place, that was derived from, obtained or resulted from any of the numerous acts, conducts and/or omissions of each of the Defendants as described herein, *supra*, and made the subject of this civil action, for a period of at least fourteen (14) days from the date

of entry of such Order.

221.    The Representative Class Plaintiffs further move this Court, with or without notice, to enter a Temporary Restraining Order wherein Defendant Texas Bank and Trust, and all of its officers, directors, employees, agents, attorneys, trustees, and/or substitute trustees, is/are immediately ordered, enjoined and restrained from foreclosing or attempting to foreclose on any Deed of Trust lien it purports to hold against any of the real properties in which any Class Representative has any interest, and specifically, including the Cedar Elm, Royalshire and Blue Stem properties as described herein, *supra*, and made the subject of this civil action, for a period of at least fourteen (14) days from the date of entry of such Order.

222.    Further, once the Court signs and enters a Temporary Restraining Order as requested herein, *supra*, the Representative Class Plaintiffs further move this Court to schedule a hearing concerning Plaintiff's Application for a Permanent Injunction, and that upon notice and a hearing, that the Court enter an Order permanently enjoining each of the Defendants, and/or their respective officers, directors, agents, attorneys, representatives, employees, trustees, substitute trustees, assignees, heirs, administrators, successors and/or assigns, from all of the foregoing acts or conduct, including from completing or attempting to complete any foreclosure sale of any real property in which any class member has or holds any interest, until the merits of the Representative Class Plaintiffs' various claims and causes of action pleaded herein have been fully and finally adjudicated.

223.    Upon information and belief, the acts, conducts and/or omissions of each of the Defendants as described herein, *supra*, pose an immediate and imminent threat of irreparable harm to the Representative Class Plaintiffs, because unless all of the Defendants are immediately enjoined and restrained as requested herein, the Defendants will sell, lease, assign, rent, convey,

remove, secret, hide, conceal, convert, deprive and/or dissipate the Representative Class Plaintiffs of any and all right, title, equity and/or interest in or to any real or personal property that was derived from, obtained or resulted from any of the numerous acts, conducts and/or omissions of each of the Defendants as described herein, *supra*.

224.    Pursuant to FRCP Rule 65, all conditions precedent to the Representative Class Plaintiffs seeking a temporary restraining order and permanent injunction as requested herein have occurred or have been met.

## VII.

## COUNT TWO –
## BREACH OF CONTRACT

225.    Paragraphs 1-224 are incorporated herein by reference.

226.    Under Texas law, the elements of a cause of action for breach of contract are as follows:

(1)    There is a valid, enforceable contract;
(2)    The plaintiff is a proper party to sue for breach of the contract;
(3)    The plaintiff performed, tendered performance of, or was excused from performing its contractual obligations;
(4)    The defendant breached the contract; and,
(5)    The defendant's breach caused the plaintiff injury.[4]

## A.    SUB-CLASS OF SECURED INVESTORS' BREACH OF CONTRACT CLAIMS.

## 1.    Breach of Contract Claims of the Zucker Plaintiffs against the Farish and New Summit Defendants.

227.    The Zucker Plaintiffs and the Farish and/or New Summit Defendants entered into and executed the General Agreement and Distribution of Net Profit Agreement for the Cedar

---

[4] *See Marquis Acquisitions, Inc. v. Steadfast Ins.*, 409 S.W.3d 808, 813-14 (Tex.App.-Dallas 2013, no. pet.)(elements 1, 3-5); *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex.App.-El Paso 2009, no pet.)(elements 1, 3-5); *B&W Sup. v. Beckman*, 305 S.W.3d 10, 16 (Tex.App.-Houston [1st Dist.] 2009, pet. denied)(elements 1, 3-5); *City of The Colony v. North Tex. Mun. Water Dist.*, 272 S.W.3d 699, 739 (Tex.App.-Fort Worth 2008, pet. dism'd).

Elm property (Exhibit "B").  *See ¶¶ 99-108*.

228.    The Zucker Plaintiffs are the proper party with standing to sue the Farish and/or New Summit Defendants for breach of contract related to the Cedar Elm property. *Id.*

229.    The Zucker Plaintiffs fully performed under the General Agreement and the Distribution of Net Profit agreements for the Cedar Elm Property. *See ¶ 110*.

230.    The acts, conduct or omissions of the Farish and/or New Summit Defendants constitute a material breach of both the General Agreement and the Distribution of Net Profit agreements for the Cedar Elm property. *See ¶¶ 118-122*.

231.    The breach of the General Agreement and Distribution of Net Profit agreements related to the Cedar Elm property by the Farish and/or New Summit Defendants was the direct and proximate cause of the damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 118-140*.

**2.    Breach of Contract Claims of the Zucker Plaintiffs against the Bank Defendants.**

232.    The Zucker Plaintiffs and the Defendant Texas Bank and Trust contracted for, entered into and executed the Construction Loan agreement related to the Cedar Elm property. *See ¶¶ 99, 111-112*.

233.    The Zucker Plaintiffs are the proper party with standing to sue Defendant Texas Bank and Trust for breach of contract related to the Cedar Elm property. *Id.*

234.    The Zucker Plaintiffs performed under the Construction Loan agreement for the Cedar Elm Property. *See ¶ 112*.

235.    The acts, conduct or omissions of Defendant Texas Bank and Trust constitute a material breach of the Construction Loan agreement related to the Cedar Elm property. *See ¶¶ 112-116*.

236.     The breach of the Construction Loan agreement for the Cedar Elm Property by Defendant Texas Bank and Trust was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *Id.*

**B.     SUB-CLASS OF ROLLOVER NOTE INVESTORS' BREACH OF CONTRACT CLAIMS.**

**1.     Breach of Contract Claims of the Zucker Plaintiffs against the Farish and/or New Summit Defendants.**

**(A)     Breach of Contract Claims concerning the Royalshire Property**.

237.     The Zucker Plaintiffs and the Farish and/or New Summit Defendants contracted for, entered into and executed the $220,000 Promissory Note and Deed of Trust for the rollover proceeds from the Miller Avenue Property, as well as the $184,000 IRA Promissory Note and Deed of Trust, both of which were supposed to be secured by the Royalshire property (Exhibit "K"). *See ¶¶ 145-149*.

238.     The Zucker Plaintiffs are the proper party with standing to sue the Farish and/or New Summit Defendants for breach of contract related to the $220,000 and $184,000 Promissory Note and Deed of Trust agreements related to Royalshire property. *Id.*

239.     The Zucker Plaintiffs fully performed under the $220,000 Promissory Note and Deed of Trust, and under the $184,000 IRA Promissory Note and Deed of Trust agreements related to the Royalshire Property. *Id*.

240.     The acts, conduct or omissions of the Farish and/or New Summit Defendants constitute a material breach of the $220,000 Promissory Note and Deed of Trust, and the $184,000 IRA Promissory Note and Deed of Trust agreements made to the Zucker Plaintiffs related to the Royalshire property. *See ¶¶ 150-156.*

241.     The breach of the $220,000 Promissory Note and Deed of Trust, and $184,000

IRA Promissory Note and Deed of Trust agreements related to the Royalshire property by the Farish and/or New Summit Defendants was/were the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *Id.*

**(B)      Breach of Contract Claims concerning the Blue Stem Property.**

242.      The Zucker Plaintiffs and the Farish and/or New Summit Defendants contracted for, entered into and agreed to the $460,000 Promissory Note and Deed of Trust secured by the Blue Stem property (Exhibits "L" and "M"). *See ¶¶ 157-164.*

243.      The Zucker Plaintiffs are the proper party with standing to sue the Farish and/or New Summit Defendants for breach of contract related to the $460,000 Promissory Note and Deed of Trust agreements made to the Zucker Plaintiffs related to the Blue Stem property. *Id.*

244.      The Zucker Plaintiffs fully performed under the $460,000 Promissory Note and Deed of Trust agreements related to the Blue Stem Property. *See ¶ 162.*

245.      The acts, conduct or omissions of the Farish and/or New Summit Defendants constitute a material breach of the $460,000 Promissory Note and Deed of Trust agreements made to the Zucker Plaintiffs related to the Blue Stem property. *See ¶¶ 165, 166, 169-170.*

246.      The breach of the $460,000 Promissory Note and Deed of Trust agreements related to the Blue Stem property by the Farish and/or New Summit Defendants was the direct and proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 190-193.*

**C.      SUB-CLASS OF UNSECURED INVESTORS' BREACH OF CONTRACT CLAIMS.**

**1.      Breach of Contract Claim of Plaintiff Marsha Frost against the Farish and New Summit Defendants.**

247.    Plaintiff Marsha Frost and the Farish and/or New Summit Defendants contracted for, entered into and executed the $100,000 Promissory Note that was supposed to be secured by *all assets held by New Summit homes and/or Ernani, Inc.* **See ¶ 197-200**.

248.    Plaintiff Marsha Frost is the proper party with standing to sue the Farish and/or New Summit Defendants for breach of contract related to the $100,000 Promissory Note made to Plaintiff Marsha Frost. ***Id.***

249.    The acts, conduct or omissions of the Farish and/or New Summit Defendants constitute a material breach of the $100,000 Promissory Note made to Plaintiff Marsha Frost and secured by all assets held by New Summit homes and/or Ernani, Inc. ***See ¶¶ 201-205***.

250.    The breach of the $100,000 Promissory Note agreement by the Farish and/or New Summit Defendants was the proximate cause of the actual damages sustained and incurred by the Plaintiff Marsha Frost in excess of the minimum jurisdictional limits of this Court. ***Id.***

**2.      Breach of Contract Claim of the Wereszynski Plaintiffs against the Farish and New Summit Defendants.**

251.    The Wereszynski Plaintiffs and the Farish and/or New Summit Defendants contracted for, entered into and executed the $100,000 Promissory Note secured by *2% of the gross commissions earned by New Summit Realty from all New Summit homes sold*. ***See ¶ 207-211***.

252.    The Wereszynski Plaintiffs is/are the proper party with standing to sue the Farish and/or New Summit Defendants for breach of contract related to the $100,000 Promissory Note made to the Wereszynski Plaintiffs. ***Id.***

253.    The acts, conduct or omissions of the Farish and/or New Summit Defendants constitute a material breach of the $100,000 Promissory Note made to the Wereszynski Plaintiffs. ***See ¶¶ 212-215***.

254.    The breach of the $100,000 Promissory Note agreement made to the Wereszynski Plaintiffs by the Farish and/or New Summit Defendants was the proximate cause of the actual damages sustained and incurred by the Wereszynski Plaintiffs in excess of the minimum jurisdictional limits of this Court. *Id.*

## VIII.

## COUNT THREE – STATUTORY FRAUD IN A REAL ESTATE TRANSACTION

255.    Paragraphs 1-254 are incorporated herein by reference.

256.    Under Texas law, the elements of a cause of action for Statutory Fraud in a Real Estate Transaction are as follows:

*(1)    There was a transaction involving real estate or stock;*
*(2)    During the transaction, the defendant*
    *a.    made a false representation of fact;*
    *b.    made a false promise, or*
    *c.    benefitted by not disclosing that a third party's representation or promise was false;*
*(3)    The false representation or promise was made for the purpose of inducing the plaintiff to enter into a contract;*
*(4)    The plaintiff relied on the false representation or promise by entering into the contract; and*
*(5)    The reliance caused the plaintiff injury.*[5]

## A.    SUB-CLASSES OF SECURED INVESTORS' AND ROLLOVER INVESTORS' STATUTORY FRAUD IN A REAL ESTATE TRANSACTION CLAIMS.

### 1.    Statutory Fraud in a Real Estate Transaction Claims of the Zucker Plaintiffs against the Farish and New Summit Defendants.

#### (A)    Statutory Fraud concerning the Cedar Elm property.

257.    The Zucker Plaintiffs and the Farish and/or New Summit Defendants contracted

---

[5] *See* TEX. BUS. & COM. CODE § 27.01 et seq. *See also Schlumberger Tech. v. Swanson*, 959 S.W.2d 171, 182 (Tex.1997); *Anderton v. Cawley*, 378 S.W.3d 38, 56-57 (Tex.App.-Dallas 2012, no pet.); *Casstevens v. Smith*, 269 S.W.3d 222, 231 (Tex.App.-Texarkana 2008, pet. denied); *Kelly v. Rio Grande Computerland Grp.*, 128 S.W.3d 759, 771 (Tex.App.-El Paso 2004, no pet.); *Gonzales v. American Title Co.*, 104 S.W.3d 588, 594 (Tex.App.-Houston [1st Dist.] 2003, pet. denied.

for, entered into and executed the General Agreement and Distribution of Net Profit Agreements for the Cedar Elm property (Exhibit "B"), which was a transaction involving real estate. *See ¶¶ 99-110*.

258.    As part of the Cedar Elm transaction, the Farish and/or New Summit Defendants made false representations of material fact and/or promises to the Zucker Plaintiffs, and/or benefitted by not disclosing that a third party's representation or promise was false. *Id*.

259.    As part of the Cedar Elm transaction, the false representations and/or false promises made by the Farish and/or New Summit Defendants to the Zucker Plaintiffs was/were made for the purpose of inducing the Zucker Plaintiffs to enter into to the transaction. *Id.*

260.    As part of the Cedar Elm transaction, the Zucker Plaintiffs relied upon the false representations and/or promises made by the Farish and/or New Summit Defendants, and entered into the transaction. *Id.*

261.    As part of the Cedar Elm transaction, the Zucker Plaintiffs' reliance upon the false representations and/or promises made by the Farish and/or New Summit Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 117-140*.

        **(B)**    **Statutory Fraud concerning the Royalshire property.**

262.    The Zucker Plaintiffs and the Farish and/or New Summit contracted for, entered into and executed the $220,000 Promissory Note and Deed of Trust for the rollover proceeds from the Miller Avenue Property, as well as the $184,000 IRA Promissory Note and Deed of Trust, both of which were secured by the Royalshire property (Exhibit "K"), which was a transaction involving real estate. *See ¶¶ 145-149*.

263.    As part of the Royalshire transaction, the Farish and/or New Summit Defendants

made false representations of material fact and/or promises to the Zucker Plaintiffs, and/or benefitted by not disclosing that a third party's representation or promise was false. *Id*.

264.    As part of the Royalshire transaction, the false representations and/or false promises made by the Farish and/or New Summit Defendants was/were made for the purpose of inducing the Zucker Plaintiffs to enter into to the Royalshire transaction. *Id.*

265.    As part of the Royalshire transaction, the Zucker Plaintiffs relied upon the false representations and/or promises made by the Farish and/or New Summit Defendants and entered into the Royalshire transaction. *Id*.

266.    As part of the Royalshire transaction, the Zucker Plaintiffs' reliance upon the false representations and/or promises made by the Farish and/or New Summit Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 153-156*.

(C)     **Statutory Fraud concerning the Blue Stem Property.**

267.    The Zucker Plaintiffs and the Farish and/or New Summit Defendants contracted for, entered into and executed the $460,000 Promissory Note and Deed of Trust secured by the Blue Stem property (Exhibits "L" and "M"), which was a transaction involving real estate. *See ¶¶ 157-164*.

268.    As part of the Blue Stem transaction, the Farish and/or New Summit Defendants made false representations of material fact and/or promises to the Zucker Plaintiffs, and/or benefitted by not disclosing that a third party's representation or promise was false. *Id*.

269.    As part of the Blue Stem transaction, the false representations and/or false promises made by the Farish and/or New Summit Defendants was/were made for the purpose of inducing the Zucker Plaintiff to enter into to the transaction. *Id.*

270.    As part of the Blue Stem transaction, the Zucker Plaintiffs relied upon the false representations and/or promises made by the Farish and/or New Summit Defendants and entered into the transaction. *Id.*

271.    As part of the Blue Stem transaction, the Zucker Plaintiffs' reliance upon the false representations and/or promises made by the Farish and/or New Summit Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 176-193.*

## IX.

## COUNT FOUR –
## FRAUD BY NON-DISCLOSURE

272.    Paragraphs 1-271 are incorporated herein by reference.

273.    Under Texas law, the elements of a cause of action for Fraud by Non-Disclosure are as follows:

*(1)    The defendant concealed from or failed to disclose certain facts to the plaintiff;*
*(2)    The defendant had a duty to disclose facts to the plaintiff;*
*(3)    The facts were material;*
*(4)    The defendant knew:*
    *a.    the plaintiff was ignorant of the facts, and*
    *b.    the plaintiff did not have an equal opportunity to discover the facts;*
*(5)    The defendant was deliberately silent when it had a duty to speak;*
*(6)    By failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting;*
*(7)    The plaintiff relied on the defendant's nondisclosure; and*
*(8)    The plaintiff was injured as a result of acting without knowledge of the undisclosed facts.*[6]

## A.    SUB-CLASSES OF SECURED INVESTORS' AND ROLLOVER INVESTORS' CLAIMS FOR FRAUD BY NON-DISCLOSURE.

---

[6] *See Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001)(elements 1, 3, 4, 6, 8); *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)(element 2); *Blankinship v. Brown, 399 S.W.3d 303, 308 (Tex.App.-Dallas 2013, pet. denied)(elements 1-8); Business Staffing, Inc. v. Jackson Hot Oil Serv.*, 401 S.W.3d 224, 238 (Tex.App.-El Paso 2012, pet. denied)(elements 1, 3, 4, 6, 8); *Feagins v. Tyler Lincoln-Mercury, Inc.*, 277 S.W.3d 450, 457 (Tex.App.-Texarkana 2009, no pet.).

1.      **Fraud by Non-Disclosure Claims of the Zucker Plaintiffs against the Farish and New Summit Defendants**.

(A)      **Fraud by Non-Disclosure concerning the Cedar Elm Transaction**.

274.      The Farish and/or New Summit Defendants concealed and failed to disclose to the Zucker Plaintiffs that he/she/it/they were requesting $168,065 to purchase doors, windows and lumber, and for unspecified lot preparation services, for the Cedar Elm property. ***See ¶¶ 112-120***.

275.      the Farish and/or New Summit Defendants had a legal and/or contractual duty and obligation to provide the Zucker Plaintiffs with his/her/its/their signature for each draw request, and to attach to each draw request an invoice, statement, itemization and/or explanation concerning the purpose of such draw request under the construction loan for the Cedar Elm property, and to use the funds disbursed to him/her/it/them under each draw request for the intended purpose set forth in such draw request. ***Id.***

276.      The facts that were concealed or not disclosed to the Zucker Plaintiffs by the Farish and/or New Summit Defendants concerning the $168,065 first draw request were material. ***Id.***

277.      The Farish and/or New Summit Defendants knew, and had actual knowledge and awareness, that the Zucker Plaintiffs were ignorant of the fact that these Defendants had altered and forged the blank first draw request and created in its stead the Draw Request No. 2, or that these Defendants had actually been disbursed $168,065 under the altered, forged and fraudulent Draw Request No. 2, or that the funds for the draw request were not actually used for their intended purposes and that the Zucker Plaintiffs did not have an equal opportunity to discover those facts. ***Id.***

278.      The Farish and/or New Summit Defendants were deliberately silent when

he/she/it/they had a duty to inform the Zucker Plaintiffs of the fact that he/she/it/they had altered, forged and deceptively obtained payment of $168,065 under the first draw request through the altered, forged and fraudulent Draw Request No. 2, and that he/she/it/they had absconded with, stolen or converted the those sums for his/her/its/their own pecuniary gain and benefit and did not use those sums for their intended purpose. *Id.*

279.    The Farish and/or New Summit Defendants, by concealing or not disclosing to the Zucker Plaintiffs any of the material facts concerning the first draw request and the altered, forged and fraudulent Draw Request No. 2, deliberately intended to induce the Zucker Plaintiffs to sign the first draw request and to have those sums disbursed to those Defendants. *Id.*

280.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants of concealing or failing to disclose material facts concerning the first draw request and the creation of the forged and fraudulent Draw Request No. 2, and of failing to use those sums for their intended purpose, and of failing to purchase and deliver the windows, doors, lumber and unspecified lot preparation services to the Cedar Elm property, and instead absconding with, stealing and converting those sums for his/her/its/their own pecuniary gain and benefit, was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court.  *See ¶¶ 121-139*.

(B)    **Fraud by Non-Disclosure Claims concerning the Royalshire Transaction**.

281.    The Farish and/or New Summit Defendants concealed and failed to disclose to the Zucker Plaintiffs that he/she/it/they never intended to and did not record the Deed of Trust executed by Messer Holdings Series LLC to secure payment of the $220,000 Rollover Promissory Note, and that he/she/it/they never intended to and did not record the Deed of Trust executed by Messer Holdings Series LLC to secure payment of the $184,000 IRA Promissory

Note, which deeds of trust were both supposed to be recorded in the official real property records of Dallas County, Texas, to secure and protect the investments made by the Zucker Plaintiffs for the Royalshire property. *See* ¶¶ **145-149**.

282.    The Farish and/or New Summit Defendants concealed and failed to disclose to the Zucker Plaintiffs the fact that he/she/it/they never intended to and did not record the Deed of Trust that was supposed to secure payment of the $220,000 Rollover Promissory Note, nor of the fact that he/she/it/they never intended to and did not record the Deed of Trust that was supposed to secure the $184,000 IRA Promissory Note, which deeds of trust were both supposed to be recorded in the real property records of Dallas County, Texas, to secure and protect the investments made by the Zucker Plaintiffs for the Royalshire property, and that instead these defendants would abscond with, steal and convert both the $220,000 and $184,000 investments made by the Zucker Plaintiffs concerning the Royalshire property. *Id.*

283.    The Farish and/or New Summit Defendants had a contractual duty and obligation to record both the Deed of Trust that was supposed to secure the $220,000 Rollover Promissory Note, and to record the Deed of Trust that was supposed to secure the $184,000 IRA Promissory Note in the real property records of Dallas County, Texas, to secure and protect the investments made by the Zucker Plaintiffs for the Royalshire property. *Id.*

284.    The facts that were concealed or not disclosed to the Zucker Plaintiffs by the Farish and/or New Summit Defendants concerning the Defendants intent not to and failure to record both deeds of trust that were supposed to be secured by the Royalshire property, were material. *Id.*

285.    The Farish and/or New Summit Defendants knew that the Zucker Plaintiffs were ignorant of the fact that the Defendants did not record both of the deeds of trust that were

supposed to secure both the $220,000 Rollover Promissory Note and the $184,000 IRA Promissory Note in the real property records of Dallas County, Texas, and that the Zucker Plaintiffs were relying on the Defendants representations, promises and inducements that they would, in fact, record both deeds of trust in the real property records of Dallas County to secure and protect the Zucker Plaintiffs' investments concerning the Royalshire property, and that the Zucker Plaintiffs did not have an equal opportunity to discover those facts. *Id.*

286.    The Farish and/or New Summit Defendants were deliberately silent when he/she/it/they had a duty to inform the Zucker Plaintiffs of the fact that neither of the deeds of trust that were supposed to secure payment of the $220,000 Rollover Note and the $184,000 IRA Promissory Note were ever recorded in the real property records of Dallas County, Texas, which were supposed to secure and protect the investments made by the Zucker Plaintiffs for the Royalshire property. *Id.*

287.    The Farish and/or New Summit Defendants, by concealing or not disclosing the material facts concerning his/her/its/their failure to record the deeds of trust that were supposed to secure both the $220,000 Rollover Promissory Note and the $184,000 IRA Promissory Note in the real property records of Dallas County, Texas, to secure and protect the investments made by the Zucker Plaintiffs for the Royalshire property, deliberately intended to induce the Zucker Plaintiffs to enter into and perform under the investment agreements regarding the $220,000 Rollover Promissory Note and the additional $184,000 IRA Promissory Note concerning the Royalshire property. *Id.*

288.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants of concealing or failing to disclose material facts concerning his/her/its/their intentional and knowing failure to record both the deed of trust that was supposed to secure the $220,000

Rollover Promissory Note and the $184,000 IRA Promissory Note that were supposed to be recorded in the real property records of Dallas County, Texas to secure and protect the investments made by the Zucker Plaintiffs for the Royalshire property, was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **153-156**.

      **(C)**    **Fraud by Non-Disclosure Claims concerning the Blue Stem Transaction.**

289.    The Farish and/or New Summit Defendants concealed and failed to disclose to the Zucker Plaintiffs that he/she/it/they never intended to and did not record the Deed of Trust executed by Stephen Grace to secure payment of the $460,000 Second Lien Promissory Note for the Blue Stem property, which deed of trust was supposed to be recorded in the real property records of Tarrant County, Texas, to secure and protect the investment made by the Zucker Plaintiffs for the Blue Stem property. *See* ¶¶ **157-164**.

290.    The facts that were concealed or not disclosed to the Zucker Plaintiffs by the Farish and/or New Summit Defendants concerning those Defendants' failure to record the Second Lien deed of trust that was supposed to be secured by the Blue Stem property were material. *Id.*

291.    The Farish and/or New Summit Defendants knew that the Zucker Plaintiffs were ignorant of the fact that the Defendants did not record the Second Lien Deed of Trust that was supposed to secure the $460,000 Promissory Note in the real property records of Tarrant County, Texas, and that the Zucker Plaintiffs were relying on the Defendants representations, promises and inducements that they would, in fact, record the deed of trust in the real property records of Tarrant County, Texas, to secure and protect the Zucker Plaintiffs' investment concerning the Blue Stem property, and that the Zucker Plaintiffs did not have an equal opportunity to discover

those facts. *Id.*

292.    The Farish and/or New Summit Defendants were deliberately silent when he/she/it/they had a duty to inform the Zucker Plaintiffs of the fact that the deed of trust that was supposed to secure payment of the $460,000 Second Lien Promissory Note was never actually recorded in the real property records of Tarrant County, Texas, which was supposed to secure and protect the investment made by the Zucker Plaintiffs for the Blue Stem property. *Id.*

293.    The Farish and/or New Summit Defendants, by concealing or not disclosing the material fact of his/her/its/their failure to record the deed of trust that was supposed to secure payment of the $460,000 Second Lien Promissory Note in the real property records of Tarrant County, Texas, to secure and protect the investment made by the Zucker Plaintiffs for the Blue Stem property, which concealed and undisclosed facts deliberately intended to induce the Zucker Plaintiffs to enter into the investment agreement regarding the $460,000 Second Lien Promissory Note concerning the Blue Stem property. *Id.*

294.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants of concealing or failing to disclose the material fact of his/her/its/their intentional and knowing failure to record the deed of trust that was supposed to secure the $460,000 Second Lien Promissory Note and that was supposed to be recorded in the real property records of Tarrant County, Texas to secure and protect the investment made by the Zucker Plaintiffs for the Blue Stem property, was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court.  *See* **¶¶ 190-193**.

**2.    Fraud by Non-Disclosure Claims of the Zucker Plaintiffs against the Bank Defendants**.

**(A)    Fraud by Non-Disclosure concerning the Cedar Elm transaction.**

295.    The Bank Defendants concealed and failed to disclose to the Zucker Plaintiffs that

he/she/it/they had disbursed $168,065 to the Farish and/or New Summit Defendants to purchase doors, windows and lumber, and for unspecified lot preparation services, for the Cedar Elm property. *See* ¶¶ **112-120**.

296.    The Bank Defendants had and owed a legal and/or contractual duty and obligation, and/or it was their regular business practice and custom, to ensure that all construction draw requests made by the Zucker Plaintiffs for the Cedar Elm property and paid to the Farish and/or New Summit Defendants were used for their specific intended purpose, including a legal duty and obligation, and/or regular business practice and custom, to inspect the subject property after disbursement of each draw request to ensure that the funds disbursed were used for their intended purpose. *Id.*

297.    The facts concerning the first draw request that were concealed or not disclosed to the Zucker Plaintiffs by the Bank Defendants were material. *Id.*

298.    The Bank Defendants knew that the Zucker Plaintiffs were ignorant of the fact that the Defendants had paid out $168,065 under the first draw request, and/or of the fact that the funds for the first draw request were not used for their intended purpose, and that the Zucker Plaintiffs would rely on the Bank Defendants to verify, inspect and confirm that those funds were used for their intended purposes pursuant to the construction loan contract and/or regular business practice and custom, and that the Zucker Plaintiffs did not have an equal opportunity to discover those facts. *Id.*

299.    The Bank Defendants were deliberately silent when he/she/it/they had a duty to inform the Zucker Plaintiffs of the fact that he/she/it/they had disbursed $168,065 under the first draw request to the Farish and/or New Summit Defendants, which first draw request was presented to the Zucker Plaintiffs at closing as a "blank" form, and the Bank Defendants also had

a contractual duty and obligation, and/or it was a regular business practice and custom, for those Defendants to verify, inspect and confirm that all funds disbursed under all draw requests were used for their intended purpose. *Id.*

300.    The Bank Defendants, by concealing or not disclosing the material facts concerning the first draw request to the Zucker Plaintiffs, deliberately intended to induce the Zucker Plaintiffs to sign the original Construction Loan agreement and the "blank" first draw request at the closing of the Construction Loan in July 2016, as well as to induce the Zucker Plaintiffs to sign the subsequent Debt Modification Agreement in July 2017, and continued to conceal or not disclose those facts that were known, or should have been known, by these Defendants as of July 2016 when they actually paid $168,065 to the Farish and/or New Summit Defendants, and concealed and failed to disclose that the Defendants had not used those funds for their intended purpose by failing to verify, inspect and/or confirm how those funds were used, and yet required, demanded and collected from the Zucker Plaintiffs monthly loan and interest payments under both the original Construction Loan and the Debt Modification Agreement. *Id.*

301.    The acts, conduct and/or omissions of the Bank Defendants, of concealing or failing to disclose material facts concerning disbursement of the first draw request to the Farish and/or New Summit, and of failing to verify, inspect and confirm how those funds were used by the Defendants, was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 121-139*.

**(B)**     **Fraud by Non-Disclosure concerning the Blue Stem Transaction**.

302.    The Bank Defendants concealed and failed to disclose to the Zucker Plaintiffs the fact that he/she/it/they had actual knowledge that the $67,000 interest carry deposit for the

$1,395,000 construction loan executed by Stephen Grace for the Blue Stem property was actually being provided and paid for by the Zucker Plaintiffs through the $460,000 Second Lien Promissory Note and Deed of Trust that was supposed to be secured by the Blue Stem property, and also knew, concealed and failed to disclose to the Zucker Plaintiffs the fact that the Second Lien Note and Deed of Trust executed by Stephen Grace that was supposed to be secured by the Blue Stem property was never actually recorded, and further knew, concealed and failed to disclose the fact that in return for his/her/its/their concealment and failure to disclose these facts, the Bank Defendants received a kick back benefit from the Farish and/or New Summit Defendants in the form of an invitation to Defendant Brown to play golf at the exclusive Vaquero golf club. *See* ¶¶ **157-164.**

303.   The Bank Defendants had and owed a legal and/or contractual duty and obligation, and/or it was their regular business practice and custom, to disclose to the Zucker Plaintiffs the fact that he/she/it/they had used $67,000 of the $460,000 investment made and tendered by the Zucker Plaintiffs to the Farish and/or New Summit Defendants in order to obtain approval the $1,395,000 construction loan made to Stephen Grace for the Blue Stem property, and also had a legal and/or contractual duty and obligation, and/or it was their regular business practice and custom, to disclose to the Zucker Plaintiffs the fact that the Deed of Trust securing payment of the $460,000 Second Lien Promissory Note investment made by the Zucker Plaintiffs for Blue Stem property was not actually recorded in the real property records of Tarrant County, Texas, to secure and protect the investment made by the Zucker Plaintiffs for the Blue Stem property, as well as a duty and obligation to disclose the fact that in return for using a portion of the Zucker Plaintiffs investment sums to obtain loan approval for the construction loan that the Bank Defendants received a kick back benefit in the form of an invitation to play golf at

the exclusive Vaquero golf club. *Id.*

304.    The facts concerning the use of $67,000 of the Zucker Plaintiffs' $460,000 investment for the Blue Stem property by the Bank Defendants to obtain approval of the $1,395,000 construction loan made to Stephen Grace for the Blue Stem property, and the fact that the Zucker Plaintiffs' Second Lien Deed of Trust was not recorded in the real property records of Tarrant County, Texas, which was supposed to secure and protect the interest of the Zucker Plaintiffs concerning the Blue Stem property, and the fact that by using $67,000 of the Zucker Plaintiffs' investment funds to obtain loan approval for the $1,395,000 construction loan made to Stephen Grace resulted in the payment of a kick back by the Farish and/or New Summit Defendants in the form of an invitation to the Bank Defendants to play golf at the exclusive Vaquero golf club, were material. *Id.*

305.    The Bank Defendants knew that the Zucker Plaintiffs were ignorant of the fact that the Defendants had used $67,000 of their $460,000 investment for the Blue Stem property to obtain loan approval for the $1,395,000 construction loan made to Stephen Grace, and also knew that the Zucker Plaintiffs were ignorant of the fact that the $460,000 Second Lien Promissory Note and Deed of Trust executed by Stephen Grace, that was supposed to be secured by the Blue Stem property through recording of the Deed of Trust, was not actually recorded, and also knew that the Zucker Plaintiffs were ignorant of the fact that by using $67,000 of the Zucker Plaintiffs' investment funds the Bank Defendants would be paid a kick back benefit from the Farish and/or New Summit Defendants in the form of an invitation to play golf at the exclusive Vaquero golf club, and that the Zucker Plaintiffs did not have an equal opportunity to discover those facts. *Id.*

306.    The Bank Defendants were deliberately silent when he/she/it/they had a duty to inform the Zucker Plaintiffs of the fact that he/she/it/they had used $67,000 of the Zucker

Plaintiffs $460,000 investment for the Blue Stem property to obtain loan approval of the $1,395,000 construction loan made to Stephen Grace, and of the fact that the $460,000 Second Lien Promissory Note and Deed of Trust executed by Stephen Grace, that was supposed to be secured by the Blue Stem property through recording of the Deed of Trust, was not actually recorded, and of the fact that by using $67,000 of the Zucker Plaintiffs' investment funds, Defendants Brown and/or Texas Bank and Trust were paid a kick back benefit from the Farish and/or New Summit Defendants in the form of an invitation to Defendants Brown and/or Texas Bank and Trust to play golf at the exclusive Vaquero golf club. *Id.*

307.   The Bank Defendants, by concealing or not disclosing the material facts concerning the use of $67,000 of the Zucker Plaintiffs' $460,000 investment to obtain loan approval for the $1,395,000 construction loan made to Stephen Grace, and of concealing and failing to disclose the fact that the Second Lien Deed of Trust made by Stephen Grace to the Zucker Plaintiffs was not actually recorded in the real property records of Tarrant County, Texas, and of concealing and failing to disclose the fact that the Bank Defendants were paid a kick back benefit in the form of an invitation to play golf at the exclusive Vaquero golf club, deliberately intended to induce the Zucker Plaintiffs to provide and pay the $460,000 investment paid by the Zucker Plaintiffs to the Farish and/or New Summit Defendants. *Id.*

308.   The acts, conduct and/or omissions of the Bank Defendants, of concealing or failing to disclose the material fact concerning the use of $67,000 of the Zucker Plaintiffs' $460,000 investment for the Blue Stem property to obtain approval of the $1,395,000 construction loan made to Stephen Grace, and of concealing or failing to disclose the material fact that the $460,000 Promissory Note executed by Stephen Grace to the Zucker Plaintiffs, which was supposed to be secured the recording of the Second Lien Deed of Trust, was never

actually recorded in the real property record of Tarrant County, Texas, and of concealing and failing to disclose the material fact that by using $67,000 of the Zucker Plaintiffs' investment funds that the Bank Defendants were paid a kick back benefit from the Farish and/or New Summit Defendants in the form of an invitation to play golf at the exclusive Vaquero golf club, was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court.  *See ¶¶ 190-193*.

      **3.**    **Fraud by Non-Disclosure Claims of the Zucker Plaintiffs against the Title Defendants**.

      **(A)**    **Fraud by Non-Disclosure concerning the Cedar Elm Transaction**.

      309.    The Title Defendants concealed and failed to disclose to the Zucker Plaintiffs the fact that he/she/it/they did not receive any supporting invoice, itemization, statement or explanation supporting the "blank" first draw request form that was included in the closing loan and document package and instructions from the Bank Defendants, and instead instructed the Zucker Plaintiffs to execute the "blank" first draw request in spite of that glaring omission. *See ¶¶ 99-120*.

      310.    The Title Defendants had and owed a legal duty and obligation to the Zucker Plaintiffs, who were actual parties to the Cedar Elm transaction, to ensure that all information and documentation disseminated and presented to the Zucker Plaintiffs to execute at closing was true, complete and correct, and to disclose to the Zucker Plaintiffs any omission of any material fact concerning any of the documents presented to the Zucker Plaintiffs to execute in connection with the closing. *Id.*

      311.    The omitted facts concerning the blank first draw request that were concealed or not disclosed to the Zucker Plaintiffs by the Title Defendants were material. *Id.*

      312.    The Title Defendants knew that the Zucker Plaintiffs were ignorant of the fact that

the Bank Defendants had failed to include any supporting invoice, statement, itemization or explanation from the Farish and/or New Summit Defendants in support of the blank first draw request, as these defendants had closed dozens of similar transactions involving all of the same parties, i.e. the Farish and/or New Summit Defendants and the Bank Defendants, and knew that the Zucker Plaintiffs would rely on the Bank Defendants to verify, inspect and confirm that those draw funds were actually used for their intended purpose pursuant to the construction loan contract and documents presented to the Zucker Plaintiffs at closing, and that the Zucker Plaintiffs did not have an equal opportunity to discover those facts. *Id.*

313.   The Title Defendants, by concealing or not disclosing the material facts concerning the blank first draw request to the Zucker Plaintiffs, intentionally, knowingly and/or deliberately aided, abetted, and/or enabled the Farish and/or New Summit Defendants, and/or the Bank Defendants, to induce the Zucker Plaintiffs into signing the original construction loan agreement and the "blank" first draw request at closing, and continued to conceal or not disclose those facts that were known by these Defendants, and received a direct pecuniary gain and profit by its/their omission or non-disclosure of those material facts in the form of closing fees, escrow fees, attorney's fees, documentation preparation fees, and splits of the title insurance premiums charged in connection with the closing transaction, all to the detriment of the Zucker Plaintiffs. *Id.*

314.   The acts, conduct and/or omissions of the Title Defendants, of concealing or failing to disclose material facts concerning the blank first draw request form that the Bank Defendants provided to these defendants for the closing of the construction loan transaction for the Cedar Elm property, and of failing to inform the Zucker Plaintiffs of those fact, or failing to confirm with Bank Defendants as to why none of the blanks on the first draw request form were

filled in when presented to the Zucker Plaintiffs to execute, or why there were no supporting invoices, statements, itemizations or explanations attached to the first draw request form, was the direct and proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 121-139*.

        **(B)**      **<u>Fraud by Non-Disclosure concerning the Royalshire Transaction</u>**.

    315.    The Title Defendants concealed and failed to disclose to the Zucker Plaintiffs the fact that he/she/it/they did not record either the $220,000 2nd Mortgage Deed of Trust, nor the $184,000 IRA Deed of Trust executed by Messer Holdings Series LLC to the Zucker Plaintiffs for the Royalshire property, or that neither of the Deeds of Trust executed by Messer Holdings Series LLC to the Zucker Plaintiffs actually included a Trustee, even though the Title Defendants had actual knowledge and awareness of the existence of those documents and instruments, because the Title Defendants was/were holding the Zucker Plaintiffs' investment proceeds that had resulted from the prior sale of Miller Avenue transaction in escrow, and the Farish and/or New Summit Defendants specifically instructed the Title Defendants to apply those sums to the closing of the Royalshire transaction. *See ¶¶ 146-153*.

    316.    The Title Defendants had and owed a legal duty and obligation to the Zucker Plaintiffs, who were actual parties to the Cedar Elm transaction as a second lender and lien holder, to ensure that the Deeds of Trust executed by Messer Holdings Series LLC to the Zucker Plaintiffs were legal and proper, i.e. that an actual trustee was named and included in the text of each instrument, and to properly recorded each instrument in the official real property records of Dallas County, Texas, to perfect and secure those liens against the title to the Royalshire property, and knew that the Zucker Plaintiffs were relying on them to fully perform those duties and obligations. *Id.*

317.    The facts concerning the Title Defendants' failure to ensure that both Deeds of Trust were legally proper and named a trustee, and to record both Deeds of Trust executed to the Zucker Plaintiffs for the Royalshire property, which were concealed or not disclosed to the Zucker Plaintiffs by the Title Defendants were material. *Id.*

318.    The Title Defendants knew that the Zucker Plaintiffs were ignorant of the fact that both of the Deeds of Trust that were supposed to secure the lien interests of the Zucker Plaintiffs concerning the Royalshire property did not actually name a trustee, and were not properly recorded, and also knew that the Zucker Plaintiffs were relying on the Title Defendants to ensure that the Deeds of Trust were proper and legal, and recorded to secure the Zucker Plaintiffs' lien interests, in that these defendants had closed dozens of similar transactions involving all of the same parties, i.e. the Farish and/or New Summit Defendants, and Messer Holdings Series LLC and the Zucker Plaintiffs, and that the Zucker Plaintiffs did not have an equal opportunity to discover those facts. *Id.*

319.    The Title Defendants, by concealing or not disclosing the material facts concerning the failure of the Deeds of Trust to name an actual trustee, and of its/their failure to record both Deeds of Trust that were executed to the Zucker Plaintiffs concerning the Royalshire property, intentionally, knowingly and/or deliberately aided, abetted, and/or enabled the Farish and/or New Summit Defendants to induce the Zucker Plaintiffs into investing both the $220,000 Rollover investment proceeds from the Miler Avenue transaction and the additional $184,000 IRA investment proceeds into the Royalshire property, and received a direct pecuniary gain and profit by its/their omission or non-disclosure of those material facts in the form of closing fees, escrow fees, attorney's fees, documentation preparation fees, and splits of the title insurance premiums charged in connection with the closing transaction, all to the detriment of the Zucker

Plaintiffs. *Id.*

320.    The acts, conduct and/or omissions of the Title Defendants, of concealing or failing to disclose material facts concerning the missing trustee in each Deed of Trust, and of concealing and failing to disclose to the Zucker Plaintiffs that neither of the Deeds of Trust that were supposed have been recorded to perfect the lien interests of the Zucker Plaintiffs were not actually recorded, was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 153-156.*

**(C)    Fraud by Non-Disclosure Claims concerning the Blue Stem Transaction.**

321.    The Title Defendants concealed and failed to disclose to the Zucker Plaintiffs the fact that he/she/it/they did not record the $460,000 2nd Mortgage Deed of Trust executed by Stephen Grace to the Zucker Plaintiffs for the Blue Stem property, or that the Deed of Trust executed by Stephen Grace to the Zucker Plaintiffs did not actually name a Trustee, even though the Title Defendants had actual knowledge and awareness of the existence of those documents and instruments because the Title Defendants closed this transaction. *See ¶¶ 157-170.*

322.    The Title Defendants had and owed a legal duty and obligation to the Zucker Plaintiffs, who were actual parties to the Blue Stem Elm transaction as a second lender and lien holder, to ensure that the Deed of Trust executed by Stephen Grace to the Zucker Plaintiffs was legal and proper, i.e. that an actual trustee was named and included in the text of each instrument, and to properly recorded the instrument in the official real property records of Tarrant County, Texas, to perfect and secure that lien against the title to the Blue Stem property, and knew that the Zucker Plaintiffs were relying on them to fully perform those duties and obligations. *Id.*

323.    The facts concerning the Title Defendants' failure to ensure that the Deed of Trust

executed by Stephen Grace to the Zucker Plaintiffs was legal and proper and named a trustee, and to record the Deed of Trust executed to the Zucker Plaintiffs for the Blue Stem property, that were concealed or not disclosed to the Zucker Plaintiffs by the Title Defendants were material. *Id.*

324.     The Title Defendants knew that the Zucker Plaintiffs were ignorant of the fact that the Deed of Trust that was supposed to secure the lien interest of the Zucker Plaintiffs concerning the Blue Stem property did not actually name a trustee, and was not properly recorded, and also knew that the Zucker Plaintiffs were relying on the Title Defendants to ensure that the Deed of Trust was proper and legal, and recorded to secure the Zucker Plaintiffs' lien interest, in that these defendants had closed dozens of similar transactions involving all of the same parties, i.e. the Farish and/or New Summit Defendants and Stephen Grace and the Zucker Plaintiffs, and that the Zucker Plaintiffs did not have an equal opportunity to discover those facts. *Id.*

325.     The Title Defendants, by concealing or not disclosing the material facts concerning the failure of the Deed of Trust to name an actual trustee, and of its/their failure to record the Deed of Trust that was executed to the Zucker Plaintiffs concerning the Blue Stem property, intentionally, knowingly and/or deliberately aided, abetted, and/or enabled the Farish and/or New Summit Defendants to induce the Zucker Plaintiffs into the $460,000 investment proceeds into the Blue Stem property, and received a direct pecuniary gain and profit by its/their omission or non-disclosure of those material facts in the form of closing fees, escrow fees, attorney's fees, documentation preparation fees, and splits of the title insurance premiums charged in connection with the closing transaction, all to the detriment of the Zucker Plaintiffs. *Id.*

326.    The acts, conduct and/or omissions of the Title Defendants, of concealing or failing to disclose material facts concerning the missing trustee in the Deed of Trust, and of concealing and failing to disclose to the Zucker Plaintiffs the fact that the Deed of Trust that was supposed have been recorded to perfect the lien interest of the Zucker Plaintiffs against the Blue Stem property was not actually recorded, was the direct and proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **190-193**.

## B.    SUB-CLASS OF UNSECURED NOTE INVESTORS' FRAUD BY NON-DISCLOSURE CLAIMS.

### 1.    Fraud by Non-Disclosure Claims of Plaintiff Marsha Frost against the Farish and New Summit Defendants.

327.    The Farish and/or New Summit Defendants concealed and failed to disclose to Plaintiff Marsha Frost that he/she/it/they never intended to and did not actually secure the $100,000 Promissory Note investment made by Plaintiff Marsha Frost to these defendants, which Note was supposed to be secured by *all assets of New Summit Homes and/or Ernani, Inc.* to secure and protect the investment made by Plaintiff Marsha Frost to the Defendants. *See* ¶¶ **188-194**.

328.    The Farish and/or New Summit Defendants had a legal and/or contractual duty and obligation to ensure that the $100,000 Promissory Note investment made by Plaintiff Marsha Frost to the Defendants was actually secured by *all assets of New Summit Homes and/or Ernani, Inc.*, which was supposed to secure the investment made by the Plaintiff Marsha Frost to the defendants. *Id.*

329.    The above facts that were concealed or not disclosed to Plaintiff Marsha Frost by the Farish and/or New Summit Defendants concerning the $100,000 Promissory Note investment

made by Plaintiff Marsha Frost to the defendants were material. *Id.*

330.    The Farish and./or New Summit Defendants knew that Plaintiff Marsha Frost was ignorant of the fact that the Defendants did not actually secure the $100,000 Promissory Note that was supposed to be secured by *all assets of New Summit Homes and/or Ernani, Inc.* and that Plaintiff Marsha Frost was relying on the Defendants representations, promises and inducements that they would, in fact, secure and protect Plaintiff Marsha Frost's investment, and that the Plaintiff Marsha Frost did not have an equal opportunity to discover those facts. *Id.*

331.    The Farish and/or New Summit Defendants were deliberately silent when he/she/it/they had a duty to inform Plaintiff Marsha Frost of the fact that the $100,000 Promissory Note was never actually secured by *all assets of New Summit Homes and/or Ernani, Inc.*, which was supposed to secure and protect Plaintiff Marsha Frost's investment made to the defendants. *Id.*

332.    The Farish and/or New Summit Defendants, by concealing or not disclosing the material fact concerning his/her/its/their failure to secure the $100,000 Promissory Note investment made by Plaintiff Marsha Frost with *all assets of New Summit Homes and/or Ernani, Inc.*, deliberately intended to induce Plaintiff Marsha Frost to enter into and perform under the investment agreement regarding the $100,000 Promissory Note. *Id.*

333.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants, of concealing or failing to disclose the material fact concerning his/her/its/their intentional and knowing failure to secure the $100,000 Promissory Note investment made by Plaintiff Marsha Frost, which was supposed to be secured by *all assets of New Summit Homes and/or Ernani, Inc.*, and his/her/its/their subsequent breach of the Promissory Note and failure to pay all amounts due and owing for the same, was the proximate cause of the actual damages sustained

and incurred by Plaintiff Marsha Frost in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **195-199**.

**2.     Fraud by Non-Disclosure Claims of the Wereszynski Plaintiffs against the Farish and New Summit Defendants**.

334.     The Farish and/or New Summit Defendants concealed and failed to disclose to the Wereszynski Plaintiffs that he/she/it/they never intended to and did not actually secure the $100,000 Promissory Note investment made by Wereszynski Plaintiffs to these defendants, which Note was supposed to be secured by *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold,* to secure and protect the investment made by the Wereszynski Plaintiffs to the defendants. *See* ¶¶ **200-204**.

335.     The Farish and/or New Summit had a legal and/or contractual duty and obligation to ensure that the $100,000 Promissory Note investment made by the Wereszynski Plaintiffs to the Defendants was actually secured by *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold*, which was supposed to secure the investment made by the Wereszynski Plaintiffs to the defendants. *Id.*

336.     The facts that were concealed or not disclosed to the Wereszynski Plaintiffs by the Farish and/or New Summit Defendants concerning the $100,000 Promissory Note investment made by the Wereszynski Plaintiffs to the defendants were material. *Id.*

337.     The Farish and/or New Summit Defendants knew that the Wereszynski Plaintiffs were ignorant of the fact that the Defendants did not actually secure the $100,000 Promissory Note that was supposed to be secured by *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold,* and that the Wereszynski Plaintiffs were relying on the Defendants representations, promises and inducements that they would, in fact, secure and protect the Wereszynski Plaintiffs' investment, and that the Wereszynski Plaintiffs

did not have an equal opportunity to discover those facts. *Id.*

338.    The Farish and/or New Summit Defendants were deliberately silent when he/she/it/they had a duty to inform the Wereszynski Plaintiffs of the fact that the $100,000 Promissory Note was never actually secured by *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold,* which was supposed to secure and protect the Wereszynski Plaintiffs' investment made to the defendants. *Id.*

339.    The Farish and/or New Summit Defendants, by concealing or not disclosing the material fact concerning his/her/its/their failure to secure the $100,000 Promissory Note investment made by Wereszynski Plaintiffs with *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold*, deliberately intended to induce the Wereszynski Plaintiffs to enter into and perform under the investment agreement regarding the $100,000 Promissory Note. *Id.*

340.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants, of concealing or failing to disclose the material fact concerning his/her/its/their intentional and knowing failure to secure the $100,000 Promissory Note investment made by Wereszynski Plaintiffs, which was supposed to be secured by *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold*, and his/her/its/their subsequent breach of the Promissory Note and failure to pay all amounts due and owing for the same, was the direct and proximate cause of the actual damages sustained and incurred by the Wereszynski Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 205-208*.

**X.**

**<u>COUNT FIVE –</u>**
**<u>BREACH OF FIDUCIARY DUTY</u>**

341.    Paragraphs 1-340 are incorporated herein by reference.

342.    Under Texas law, the elements of a cause of action for Breach of Fiduciary Duty are as follows:

*(1)    The plaintiff and defendant had a fiduciary relationship;*
*(2)    The defendant breached its fiduciary duty to the plaintiff;*
*(3)    The defendant's breach resulted in:*
    *a.    injury to the plaintiff, or*
    *b.    benefit to the defendant.*[7]

## A.    SUB-CLASSES OF SECURED INVESTORS AND ROLLOVER NOTE INVESTORS' BREACH OF FIDUCIARY DUTY CLAIMS.

### 1.    Breach of Fiduciary Duty Claims of the Zucker Plaintiffs against the Farish and New Summit Defendants.

#### (A)    Breach of Fiduciary Duty Claims concerning the Cedar Elm Transaction.

343.    Pursuant to TEX. PROP. CODE § 162.001, when Defendant Texas Bank and Trust surreptitiously paid the $168,065 first draw request to the Farish and/or New Summit Defendants for the alleged purchase of windows, doors and lumber, and for unspecified lot preparation services for the Cedar Elm property as described herein, *supra*, those sums were deemed "trust funds" for the benefit of the Zucker Plaintiffs. ***See ¶¶ 112-118***.

344.    The undisclosed payment of the $168,065 first draw request sums by Defendant Texas Bank and Trust to the Farish and/or New Summit Defendants, created a legal, fiduciary duty upon each of those Defendants to safeguard those sums for, on behalf of, and/or for the benefit of the Zucker Plaintiffs. ***Id.***

345.    Instead, the Farish and/or New Summit Defendants wholly breached the fiduciary duty that each owed to the Zucker Plaintiffs by absconding with, stealing and/or converting the $168,065 first draw request funds paid to them for the Cedar Elm property for his/her/its/their

---

[7] *See Burrow v. Arce*, 997 S.w.2d 229, 237 (Tex.1999); *Kinbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513-14 (Tex.1942); *Heritage Gulf Coast Props., Ltd. v. Sandalwood Apts., Inc.*, 416 S.W.3d 642, 650 (Tex.App.-Houston [14th Dist.] 2013, no pet.); *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex.App.-Dallas 2010, no pet.); *Plotkin v. Joekel*, 304 S.W.3d 455, 479 (Tex.App.-Houston [1st Dist.] 2009, pet. denied.

own pecuniary gain, because no windows, doors or lumber was/were ever purchased for the property with those sums, nor did the Defendants pay the sub-contractor that actually perfumed the unspecified lot preparation services as described herein, *supra*. *Id.*

346.    The Farish and/or New Summit Defendants' breach of his/her/its/their fiduciary duty owed to the Zucker Plaintiffs concerning the $168,065 first draw request sums paid to them by Defendant Texas Bank and Trust is the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. ***See*** **¶¶ 119-139.**

      **(B)**      <u>**Breach of Fiduciary Duty Claims concerning the Royalshire Transaction.**</u>

347.    Pursuant to TEX. PROP. CODE § 162.001, when the Title Defendants were instructed by the Farish and/or New Summit Defendants to rollover the Zucker Plaintiffs' $220,000 investment proceeds from the Miller Avenue property to the Royalshire property, and when the Zucker Plaintiffs also tendered the $184,000 IRA investment proceeds to the Farish and/or New Summit Defendants for the Royalshire property as described herein, *supra*, all of those sums were deemed "trust funds" for the benefit of the Zucker Plaintiffs and the subject property. ***See*** **¶¶ 144-150.**

348.    The Zucker Plaintiffs' payment of the $220,000 of Rollover proceeds from the Miller Avenue transaction for the Royalshire transaction, and the additional payment by the Zucker Plaintiffs of the $184,000 IRA investment sums to the Farish and/or New Summit Defendants, created a legal, fiduciary duty upon each of those Defendants to safeguard those sums for, on behalf of, and/or for the benefit of the Zucker Plaintiffs and the subject property. ***Id.***

349.    The Farish and/or New Summit Defendants wholly breached the fiduciary duty that each owed to the Zucker Plaintiffs by absconding with, stealing and/or converting both the

$220,000 Rollover proceeds from the Miller Avenue transaction for the Royalshire transaction, as well as the $184,000 IRA investment proceeds for the Royalshire transaction, tendered and paid to them by the Zucker Plaintiffs for the Royalshire transaction for his/her/its/their own pecuniary gain, because the defendants did not provide any work, labor or services to or for the property with those sums as described herein, *supra*. *Id.*

350.   The Farish and/or New Summit Defendants' breach of his/her/its/their fiduciary duty owed to the Zucker Plaintiffs concerning both the $220,000 Rollover proceeds from the Miller Avenue transaction and the $184,000 IRA investment funds that the Zucker Plaintiffs provided to the Defendants for the Royalshire transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **151-153.**

**(C)   Breach of Fiduciary Duty concerning the Blue Stem Transaction.**

351.    Pursuant to TEX. PROP. CODE § 162.001, when the Zucker Plaintiffs tendered the $460,000 2nd Lien investment proceeds to the Farish and/or New Summit Defendants for the Blue Stem property as described herein, *supra*, all of those sums were deemed "trust funds" for the benefit of the Zucker Plaintiffs. *See* ¶¶ **154-167.**

352.   The Zucker Plaintiffs' tender and payment of the $460,000 2nd Lien investment proceeds to the Farish and/or New Summit Defendants created a legal, fiduciary duty upon each of those Defendants to safeguard those sums for, on behalf of, and/or for the benefit of the Zucker Plaintiffs and the subject property. *Id.*

353.   Instead, the Farish and/or New Summit Defendants wholly breached the fiduciary duty that each owed to the Zucker Plaintiffs by absconding with, stealing and/or converting the $460,000 investment proceeds paid to them by the Zucker Plaintiffs for the Blue Stem

transaction for his/her/its/their own pecuniary gain, because the defendants did not provide any work, labor or services to or for the property with those sums as contracted for and promised under the 2nd Lien Note and Deed of Trust. *Id.*

354.    The Farish and/or New Summit Defendants' breach of his/her/its/their fiduciary duty owed to the Zucker Plaintiffs concerning the $460,000 2nd Lien investment made to the defendants for the Blue Stem transaction is the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 183-186*.

**2.     Breach of Fiduciary Duty Claims of the Zucker Plaintiffs against the Bank Defendants.**

**(A)     Breach of Fiduciary Duty Claims concerning the Cedar Elm Transaction**.

355.    When Defendant Texas Bank and Trust surreptitiously, and without any notice or disclosure to the Zucker Plaintiffs, paid the $168,065 first draw request to the Farish and/or New Summit Defendants for the alleged purchase of windows, doors and lumber, and for unspecified lot preparation services for the Cedar Elm property as described herein, *supra*, without any invoice, statement, itemization or explanation attached to such first draw request, those sums were deemed "trust funds" for the benefit of the Zucker Plaintiffs and the subject property. *See ¶¶ 112-118*.

356.    The undisclosed payment of the $168,065 first draw request sums by the Bank Defendants to the Farish and/or New Summit Defendants created a legal, fiduciary duty upon the Bank Defendants to safeguard those sums for, on behalf of, and/or for the benefit of the Zucker Plaintiffs and the subject property. *Id.*

357.    Instead, the Bank Defendants wholly breached his/its/their fiduciary duty that each owed to the Zucker Plaintiffs by failing to safeguard those sums, and failing to timely

inspect the subject property to confirm what the Farish and/or New Summit Defendants had actually done with those sums, and allowed and enabled those Defendants to abscond with, steal and/or convert the $168,065 first draw request funds paid to them for the Cedar Elm property for his/her/its/their own pecuniary gain, because no windows, doors or lumber was/were ever purchased for the property with those sums, nor did any of the Defendants pay the sub-contractor that actually perfumed the unspecified lot preparation services as described herein, *supra*. ***Id.***

358.   The Bank Defendants' breach of his/its/their fiduciary duty owed to the Zucker Plaintiffs concerning the $168,065 first draw request sums paid to the Farish and/or New Summit Defendants and his/its/their failure to timely inspect and confirm what those Defendants had done with those sums, and allowing and enabling those defendants to abscond with, steal and convert those sums for his/her/its/their pecuniary gain and benefit, is the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. ***See ¶¶ 119-139.***

**(B)   Breach of Fiduciary Duty Claims concerning the Blue Stem Transaction.**

359.   On May 23, 2016, when the Zucker Plaintiffs provided the $460,000 2nd Lien investment proceeds for the Blue Stem property to the Farish and/or New Summit Defendants, and at least $67,000 of those sums were then pledged and provided to the Bank Defendants for the interest carry costs for the $1,395,000 construction loan created and made by Stephen Grace to Defendant Texas Bank and Trust, a fact that the Bank Defendants had actual knowledge and awareness of and actually discussed with Defendant Jerry Farish via email, those sums were deemed "trust funds" for the benefit of the Zucker Plaintiffs and the subject property. ***See ¶¶ 154-167.***

360.   The use of $67,000 of the Zucker Plaintiffs' $460,000 2nd Lien investment

proceeds tendered to the Farish and/or New Summit Defendants as the interest carrying cost requirement for the $1,395,000 construction loan made by Stephen Grace to Defendant Texas Bank and Trust for the Blue Stem property, created a legal, fiduciary duty upon the Bank Defendants to safeguard those sums for, on behalf of, and/or for the benefit of the Zucker Plaintiffs and the subject property. *Id.*

361.   Instead, the Bank Defendants wholly breached his/its/their fiduciary duty that each owed to the Zucker Plaintiffs by failing to safeguard those sums, and by authorizing disbursement of $194,400 to the Farish and/or New Summit Defendants for the alleged services for the property as described in the invoice attached to the disbursement (*see* Exhibit "J"), and then failed to timely inspect the subject property to confirm what the Farish and/or New Summit Defendants had actually done with those sums, and allowed and enabled those defendants to abscond with, steal and/or convert the $460,000 paid by the Zucker Plaintiffs for the Blue Stem property for his/her/its/their own pecuniary gain, because no work, labor, materials or services were ever provided by those defendants for the property with those sums as described herein, *supra*. *Id.*

362.   The Bank Defendants' breach of his/its/their fiduciary duty owed to the Zucker Plaintiffs concerning the $460,000 investment sums paid to the Farish and/or New Summit Defendants for the Blue Stem transaction, and his/its/their failure to timely inspect and confirm what those defendants had done with those sums, and allowing and enabling those Defendants to abscond with, steal and/or convert those sums for his/her/its/their pecuniary gain and benefit is the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **183-186**.

## XII.

## COUNT SIX –
## NEGLIGENT MISREPRESENTATION

363.   Paragraphs 1-362 are incorporated herein by reference.

364.   Under Texas law, the elements of a cause of action for Negligent Misrepresentation are as follows:

365.   *(1)*   *the defendant made a representation to the plaintiff in the course of the defendant's business or in a transaction in which the defendant had an interest;*

*(2)*   *The defendant supplied false information for the guidance of others;*

*(3)*   *The defendant did not exercise reasonable care or competence in obtaining or communicating the information;*

*(4)*   *The plaintiff justifiably relied on the representation; and,*

*(5)*   *The defendant's negligent misrepresentation proximately caused the plaintiff's injury.*[8]

## A.   SUB-CLASSES OF SECURED INVESTORS AND ROLLOVER NOTE INVESTORS' NEGLIGENT MISREPRESENTATION CLAIMS.

### 1.   Negligent Misrepresentation Claims of the Zucker Plaintiffs against the Farish and New Summit Defendants.

#### (A)   Negligent Misrepresentation Claims concerning the Cedar Elm Transaction.

366.   The Farish and/or New Summit Defendants represented to the Zucker Plaintiffs that they would use all draw funds from the construction loan made by the Zucker Plaintiffs to Defendant Texas Bank and Trust to construct the home on the Cedar Elm property pursuant to the General Agreement and Distribution of Net Profits Agreements executed by these Defendants and the Zucker Plaintiffs, which transaction was part these Defendants' normal business operations and in which transaction these Defendants had a pecuniary interest. ***See ¶¶***

---

[8] *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999) (elements 1-5); *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997) (element 4); *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (elements 1-5); *Camp Mystic v. Eastland*, 390 S.W.3d 444, 458 (Tex.App.-San Antonio 2012, pet. granted, judgm't vacated w.r.m.) (elements 1-5).

**112-118**.

367.    The Farish and/or New Summit Defendants supplied false information to the Zucker Plaintiffs concerning the Cedar Elm transaction, and/or failed to inform the Zucker Plaintiffs that he/she/it/they had obtained and supplied false information to Defendant Texas Bank and Trust and had been paid $164,065 under Draw Request No. 2, of which the Zucker Plaintiffs had absolutely no knowledge or awareness, and/or that these Defendants had not used the $164,065 sums for the purchase of doors, windows, lumber and unspecified lots preparation services for the Cedar Elm property as represented under Draw Request No. 2. *Id.*

368.    The Farish and/or New Summit Defendants did not use reasonable care or competence concerning the false information obtained and supplied to the Zucker Plaintiffs concerning the Cedar Elm transaction. *Id.*

369.    The Zucker Plaintiffs justifiably relied upon the false information obtained and supplied by the Farish and/or New Summit Defendants concerning the Cedar Elm transaction. *Id.*

370.    The Farish and/or New Summit Defendants negligent misrepresentations concerning the Cedar Elm transaction was/were the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* **¶¶ 119-139.**

(B)    **Negligent Misrepresentation Claims concerning the Royalshire Transaction.**

371.    The Farish and/or New Summit Defendants represented to the Zucker Plaintiffs that both the $220,000 Rollover Note investment from the Miller Avenue transaction and the additional $184,000 IRA investment sums provided by the Zucker Plaintiffs for the Royalshire transaction would be secured as valid, second liens against the Royalshire property, which

transaction was part these Defendants' normal business operations and in which transaction these Defendants had a pecuniary interest. *See* ¶¶ **146-153**.

372.    The Farish and/or New Summit obtained and supplied false information to the Zucker Plaintiffs concerning the Royalshire transaction, and/or failed to inform the Zucker Plaintiffs that he/she/it/they had supplied false information to others, in the form of the improper, useless and/or worthless Deed of Trust instruments drafted, created and provided by the these Defendants to the Zucker Plaintiffs for the Royalshire transaction, which did not even name a trustee, and/or these Defendants' false promises and assurances made to the Zucker Plaintiffs that the Deeds of Trust would be recorded as valid, secured liens against the title to the Royalshire property. *Id.*

373.    The Farish and/or New Summit Defendants did not use reasonable care or competence concerning in obtaining or supplying the false information provided to the Zucker Plaintiffs concerning the Royalshire transaction. *Id.*

374.    The Zucker Plaintiffs justifiably relied upon the false information obtained and supplied by that Farish and/or New Summit Defendants concerning the Royalshire transaction. *Id.*

375.    The Farish and/or New Summit Defendants negligent misrepresentations concerning the Royalshire transaction were was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **153-156.**

(C)    **Negligent Misrepresentation Claims concerning the Blue Stem Transaction.**

376.    The Farish and/or New Summit Defendants represented to the Zucker Plaintiffs that both the $460,000 investment provided by the Zucker Plaintiffs for the Blue Stem

transaction would be secured as valid, second lien against the Blue Stem property, which transaction was part these Defendants' normal business operations and in which transaction these Defendants had a pecuniary interest. *See* ¶¶ **157-164**.

377.     The Farish and/or New Summit Defendants obtained and supplied false information to the Zucker Plaintiffs concerning the Blue Stem transaction, and/or failed to inform the Zucker Plaintiffs that he/she/it/they had supplied false information to others, in the form of the improper, useless and/or worthless Deed of Trust instrument drafted, created and provided by these Defendants to the Zucker Plaintiffs for the Blue Stem transaction, which did not even name an actual trustee, and/or these Defendants' false promises and assurances made to the Zucker Plaintiffs that the Deed of Trust would be recorded as valid, secured lien against the title to the Blue Stem property. *Id.*

378.     The Farish and/or New Summit Defendants did not use reasonable care or competence in obtaining or providing the false information supplied to the Zucker Plaintiffs concerning the Blue Stem transaction. *Id.*

379.     The Zucker Plaintiffs justifiably relied upon the false information obtained and supplied by the Farish and/or New Summit concerning the Blue Stem transaction. *Id.*

380.     The Farish and/or New Summit Defendants' negligent misrepresentations concerning the Blue Stem transaction was/were the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **183-186**.

**2.     Negligent Misrepresentation Claims of the Zucker Plaintiffs against the Bank Defendants**.

**(A)     Negligent Misrepresentation concerning the Cedar Elm Transaction**.

381.     The Bank Defendants represented to the Zucker Plaintiffs that he/she/it/they must

sign all closing and loan documents concerning the Cedar Elm transaction, including the "blank" first draw request form, and obtained and supplied the blank first draw request form to the Title Defendants with instructions to have the Zucker Plaintiffs execute the same, which transaction was part these Defendants' normal business operations and in which transaction these Defendants had a pecuniary interest. *See ¶¶ **112-118**.

382.    The Bank Defendants obtained and supplied false information to the Zucker Plaintiffs and to the Title Defendants concerning the blank first draw request included in the closing instructions and documents for the Zucker Plaintiffs to execute at the closing of the Cedar Elm transaction. *Id.*

383.    The Bank Defendants did not exercise reasonable care or competence in obtaining and supplying the false information to the Zucker Plaintiffs concerning the Cedar Elm transaction. *Id.*

384.    The Zucker Plaintiffs justifiably relied on the false information obtained and supplied by the Bank Defendants and executed the blank first draw request form as part of the closing of the purchase and construction loan transaction for the Cedar Elm property. *Id.*

385.    The Bank Defendants' negligent misrepresentations obtained and supplied to the Zucker Plaintiffs concerning the closing of the Cedar Elm transaction was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ **119-139.**

**(B)    Negligent Misrepresentation Claims concerning the Blue Stem Transaction.**

386.    The Bank Defendants represented to the Zucker Plaintiffs, through the email to the Farish and/or New Summit Defendants, that the $67,000 interest carry deposit for the $1,395,000 construction loan executed by Stephen Grace for the Blue Stem property had been

obtained and secured, when in fact the $67,000 interest carry deposit was actually being provided and paid for by the Zucker Plaintiffs through the $460,000 Second Lien Promissory Note and Deed of Trust investment that was supposed to be secured by the Blue Stem property, which transaction was part of the Bank Defendants' normal business, and in which transaction these Defendants had a pecuniary interest. *See* ¶¶ **158-164.**

387.    The Bank Defendants obtained and supplied false information to the Zucker Plaintiffs concerning the $67,000 interest carry deposit for the Blue Stem transaction. *Id.*

388.    The Bank Defendants Brown did not exercise reasonable care or competence in obtaining and supplying the information to the Zucker Plaintiffs and /or to others concerning the Blue Stem transaction. *Id.*

389.    The Zucker Plaintiffs justifiably relied on the false information obtained and supplied by the Bank Defendants concerning the Blue Stem property. *Id.*

390.    The Bank Defendants' negligent misrepresentations concerning the Blue Stem transaction was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **183-186**.

**3.    Negligent Misrepresentation Claims of the Zucker Plaintiffs against the Title Defendants.**

**(A)    Negligent Misrepresentation Claims concerning the Cedar Elm Transaction**.

391.    As part of the closing of the Cedar Elm transaction, the Title Defendants represented to the Zucker Plaintiffs that the Zucker Plaintiffs must sign all closing and loan documents, including the "blank" first draw request form that was included in the closing loan and document package and instructions from the Bank Defendants, and failed to raise any question or concern, or in any manner point out to the Zucker Plaintiffs the potential consequences that could result regarding execution of a blank closing or loan document, which

transaction was part of the Title Defendants' normal business operations, and in which transaction the Title Defendants had a pecuniary interest. *See* **¶¶ 111, 112, and 116**.

392.    The Title Defendants obtained and supplied false information to the Zucker Plaintiffs during the closing of the Cedar Elm transaction, and/or failed to inform the Zucker Plaintiffs of the potential consequences of executing "blank" closing and loan documents as part of the closing of the Cedar Elm transaction. ***Id.***

393.    The Title Defendants did not exercise reasonable care or competence in obtaining and supplying false information to the Zucker Plaintiffs as part of the closing of the Cedar Elm transaction. ***Id.***

394.    The Zucker Plaintiffs justifiably relied on the false information obtained and supplied by the Title Defendants concerning the Cedar Elm transaction.  ***Id.***

395.    The Title Defendants' negligent misrepresentations made to the Zucker Plaintiffs as part of the closing of the Cedar Elm transaction was/were the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* **¶¶ 119-139.**

**(B)**    **Negligent Misrepresentation Claims concerning the Royalshire Transaction**.

396.    The Title Defendants knew, and had actual knowledge and awareness of the fact, based upon the emails from both the Farish and/or New Summit Defendants and the Zucker Plaintiffs (Exhibit "J"), wherein the Title Defendants were instructed to move money over from its/their escrow account that contained the Zucker Plaintiffs' proceeds from the sale of the Miller Avenue transaction to fund the Royalshire transaction, and also knew and had actual knowledge and awareness of the fact that the Zucker Plaintiffs' $220,000 Rollover Note and 2nd Mortgage Deed of Trust and the additional $184,000 IRA Note and 2nd Mortgage Deed of Trust executed

by Messer Holdings Series LLC were each supposed to be secured against the title to the Royalshire property, and/or failed to disclose to the Zucker Plaintiffs the fact that neither of those Deeds of Trust actually named or included a Trustee thereby rendering them useless to securitize the investments made by the Zucker Plaintiffs for subject property, and further failed to ensure that both of the Deeds of Trust were actually recorded in the official real property records of Dallas County, Texas, to secure the second liens of the Zucker Plaintiffs against the title to the Royalshire property, and also failed to ever disclose any of these facts to the Zucker Plaintiffs, which closing transaction was part of the Title Defendants' normal business operations, and in which transaction the Title Defendants had a pecuniary interest. *See* ¶¶ **146-153**.

397.    The Title Defendants obtained and supplied false information to the Zucker Plaintiffs as part of the closing of the Royalshire transaction. *Id.*

398.    The Title Defendants did not exercise reasonable care or competence in obtaining and supplying false information to the Zucker Plaintiffs as part of the closing of the Royalshire transaction. *Id.*

399.    The Zucker Plaintiffs justifiably relied on the false information obtained and supplied by the Title Defendants concerning the Royalshire transaction.  *Id.*

400.    The Title Defendants' negligent misrepresentations made to the Zucker Plaintiffs as part of the closing of the Royalshire transaction was/were the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **153-156.**

(C)    <u>**Negligent Misrepresentation Claims concerning the Blue Stem Transaction**</u>.

401.    The Title Defendants knew, and had actual knowledge and awareness of the fact, as part of the closing of the Blue Stem transaction, that the $460,000 Promissory Note and 2nd

Mortgage Deed of Trust executed by Stephen Grace to the Zucker Plaintiffs was supposed to be secured as a second lien against the title to the Blue Stem property, and failed to disclose to the Zucker Plaintiffs that the Deed of Trust did not include or name a trustee, which rendered the instrument useless to secure the Zucker Plaintiffs' lien rights, and also failed to actually record the Deed of Trust in the official real property records of Tarrant County, Texas, and failed to disclose those fact to the Zucker Plaintiffs, which transaction was conducted and closed by the Title Defendants as part of its/their normal business operations, and in which transaction the Title Defendants had a pecuniary interest. *See* ¶¶ **157-170**.

402.     The Title Defendants obtained and supplied false information to the Zucker Plaintiffs as part of the closing of the Blue Stem transaction. *Id.*

403.     The Title Defendants did not exercise reasonable care or competence in obtaining and supplying false information to the Zucker Plaintiffs as part of the closing of the Blue Stem transaction. *Id.*

404.     The Zucker Plaintiffs justifiably relied on the false information obtained and supplied by the Title Defendants concerning the Blue Stem transaction.  *Id.*

405.     The Title Defendants' negligent misrepresentations made to the Zucker Plaintiffs as part of the closing of the Blue Stem transaction was/were the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **183-186**.

**B.     SUB-CLASS OF UNSECURED NOTE INVESTORS' NEGLIGENT MISREPRESENTATION CLAIMS.**

**1.     Plaintiff Marsha Frost's Negligent Misrepresentation Claims against the Farish and New Summit Defendants.**

406.     The Farish and/or New Summit Defendants represented to Plaintiff Marsha Frost

that the $100,000 Promissory Note investment would be secured by *all assets of New Summit Homes and/or Ernani, Inc.* to secure and protect the investment made by Plaintiff Marsha Frost to these Defendants, which investment transaction was conducted as part of the Defendants' normal business operations, and in which transaction these Defendants had a pecuniary interest. *See ¶¶ 188-194*.

407.    The Farish and/or New Summit Defendants obtained and supplied false information to Plaintiff Marsha Frost concerning the $100,000 Promissory Note. *Id.*

408.    The Farish and/or New Summit Defendants did not exercise reasonable care or competence in obtaining and supplying false information to Plaintiff Marsha Frost concerning the $100,000 Promissory Note transaction. *Id.*

409.    Plaintiff Marsha Frost justifiably relied on the false information obtained and supplied by the Farish and/or New Summit Defendants concerning the $100,000 Promissory Note transaction. *Id.*

410.    The Farish and/or New Summit Defendants' negligent misrepresentations made to Plaintiff Marsha Frost as part of the $100,000 Promissory Note transaction was the proximate cause of the actual damages sustained and incurred by Plaintiff Marsha Frost in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 195-199*.

**2.    The Wereszynski Plaintiffs' Negligent Misrepresentation Claims against the Farish and New Summit Defendants.**

411.    The Farish and/or New Summit Defendants represented to the Wereszynski Plaintiffs that the $100,000 Promissory Note investment transaction would be secured by *2% of all gross commissions earned by New Summit Realty from the sale of New Summit  Homes  sold,* to secure and protect the investment made by the Wereszynski Plaintiffs to these defendants, which investment transaction was conducted as part of the Defendants' normal business

operations, and in which transaction these Defendants had a pecuniary interest. *See* ¶¶ **200-204.**

412.   The Farish and/or New Summit Defendants obtained and supplied false information to the Wereszynski Plaintiffs concerning the $100,000 Promissory Note. *Id.*

413.   The Farish and/or New Summit Defendants did not exercise reasonable care or competence in obtaining and supplying false information to the Wereszynski Plaintiffs concerning the $100,000 Promissory Note transaction. *Id.*

414.   The Wereszynski Plaintiffs justifiably relied on the false information obtained and supplied by the Farish and/or New Summit Defendants concerning the $100,000 Promissory Note transaction.  *Id.*

415.   The Farish and/or New Summits Defendants' negligent misrepresentations made to the Wereszynski Plaintiffs as part of the $100,000 Promissory Note transaction was the proximate cause of the actual damages sustained and incurred by the Wereszynski Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **205-208**.

## XIII.

### COUNT SEVEN –
### GROSS NEGLIGENCE

416.   Paragraphs 1-415 are incorporated herein by reference.

417.   Under Texas law, the elements of a cause of action for Gross Negligence are as follows:

418.   *"Gross negligence" means an act or omission:*
    *(A) which when viewed objectively from the standpoint of the actor at the time*
       *of its occurrence involves an extreme degree of risk, considering the*
       *probability and magnitude of the potential harm to others; and*
    *(B) of which the actor has actual, subjective awareness of the risk involved,*
       *but nevertheless proceeds with conscious indifference to the rights, safety,*
       *or welfare of others.*[9]

---

[9] TEX. CIV. PRAC. & REM. CODE § 41.001(11). See also TEX. CIV. PRAC. & REM. CODE

## A.   SUB-CLASS OF SECURED INVESTORS' AND ROLLOVER NOTE INVESTORS' GROSS NEGLIGENCE CLAIMS.

### 1.   Gross Negligence Claims of the Zucker Plaintiffs against the Farish and New Summit Defendants.

#### (A)   Gross Negligence Claims concerning the Cedar Elm Transaction.

419.   The acts, conduct or omissions of the Farish and/or New Summit Defendants concerning the Cedar Elm transaction as described herein, *supra*, of intentionally, knowingly and deceptively altering and changing the blank first draw request form that was executed by the Zucker Plaintiffs at closing, and then submitting the altered, changed and fraudulent draw request form to the Bank Defendants and of requesting $168,065 under the fraudulent Draw Request No. 2, and of providing a false invoice, statement, itemization or explanation to the fraudulent Draw Request No. 2, and of then failing to ever purchase or deliver any doors, windows and lumber to the subject property, and of failing to provide the unspecified lot preparation services for the subject property, all as described in the fraudulent Draw Request No. 2 form, and instead absconding with, stealing and/or converting those sums for their own pecuniary gain and benefit involved an extreme degree of risk of potential harm to the Zucker Plaintiffs. *See* ¶¶ **112-118**.

420.   The Farish and/or New Summit Defendants each had actual, subjective awareness of the risks involved concerning the Cedar Elm transaction of altering and changing the blank first draw request form executed by the Zucker Plaintiffs at closing, and submitting the altered, changed and fraudulent draw request form and requesting $168,065, and of then failing or refusing to ever purchase or deliver any doors, windows and lumber to the property, and of failing to provide the unspecified lot preparation services for the subject property, and instead

§ 41.003(a)(3); *Bennett v. Reynolds*, 315 S.W.3d 867, 871 n. 13 (Tex.2010); *see also Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981).

absconding with, stealing and/or converting those sums for their own pecuniary gain and benefit, and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Zucker Plaintiffs. *Id.*

421.    The gross negligence of the Farish and/or New Summit Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs concerning the Cedar Elm transaction in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 119-139.*

**(B)    Gross Negligence concerning the Royalshire Transaction.**

422.    The acts, conduct or omissions of the Farish and/or New Summit Defendants concerning the Royalshire transaction as described herein, *supra*, of inducing the Zucker Plaintiffs to rollover their investment proceeds from the Miller Avenue transaction into the Royalshire transaction and to provide the additional $184,000 IRA investment, and of representing to the Zucker Plaintiffs that both of these investments would be secured by the Royalshire property as valid, second liens, and of then failing to properly draft the Deeds of trust and rendering them useless and ineffective by failing to name an actual trustee, and of failing to ensure that both Deeds of trust were actually recorded against the title to the Royalshire property, and of then absconding with, stealing and converting those sums for their own pecuniary gain and benefit, each involved an extreme degree of risk of potential harm to the Zucker Plaintiffs. *See ¶¶ 146-153.*

423.    The Farish and/or New Summit Defendants each had actual, subjective awareness of the risks involved to the Zucker Plaintiffs concerning the Royalshire transaction of inducing the Zucker Plaintiffs to rollover their investment proceeds that resulted from the Miller Avenue transaction into the Royalshire transaction, and of inducing the Zucker Plaintiffs to provide the

additional $184,000 IRA investment, and representing to the Zucker Plaintiffs that both of these investments would be secured by the Royalshire property as valid, second liens, and of then failing to properly draft the Deeds of trust and rendering them useless and ineffective by failing to name an actual trustee, and of failing to ensure that both Deeds of trust were actually recorded against the title to the Royalshire property, and of then absconding with, stealing and converting those sums for their own pecuniary gain and benefit, and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Zucker Plaintiffs. *Id.*

424.    The gross negligence of the Farish and/or New Summit Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs concerning the Royalshire transaction in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 153-156.*

(C)    **Gross Negligence concerning the Blue Stem Transaction**.

425.    The acts, conduct or omissions of the Farish and/or New Summit Defendants concerning the Blue Stem transaction as described herein, *supra*, of inducing the Zucker Plaintiffs to invest $460,000, and representing to the Zucker Plaintiffs that this investment would be secured by the Blue Stem property as a valid, second lien, and of then failing to properly draft the Deed of trust and rendering it useless and ineffective by failing to name an actual trustee, and of failing to ensure that the Deed of trust was actually recorded against the title to the Blue Stem property, and of then absconding with, stealing and converting those sums for their own pecuniary gain and benefit, each involved an extreme degree of risk of potential harm to the Zucker Plaintiffs. *See ¶¶ 157-170.*

426.    The Farish and/or New Summit Defendants each had actual, subjective awareness

of the risks involved concerning the Blue Stem transaction of inducing the Zucker Plaintiffs to invest $460,000, and representing to the Zucker Plaintiffs that this investment would be secured by the Blue Stem property as a valid, second lien, and of then failing to properly draft the Deed of Trust and rendering it useless and ineffective by failing to name an actual trustee, and of failing to ensure that the Deed of Trust was actually recorded against the title to the Blue Stem property, and of then absconding with, stealing and converting those sums for their own pecuniary gain and benefit, and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Zucker Plaintiffs concerning the Blue Stem transaction. *Id.*

427.    The gross negligence of the Farish and/or New Summit Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs concerning the Blue Stem transaction in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **183-186.**

**2.    Gross Negligence Claims of the Zucker Plaintiffs against the Bank Defendants**.

**(A)    Gross Negligence concerning the Cedar Elm Transaction**.

428.    The acts, conduct or omissions of the Bank Defendants concerning the Cedar Elm transaction as described herein, *supra*, of demanding that the Zucker Plaintiffs execute the blank first draw request form at closing, and of then paying the Farish and/or New Summit Defendants the $168,065 for doors, windows, lumber and unspecified lots preparation services under the false, fraudulent and altered Draw Request No. 2, and of then failing to inspect, verify and confirm that the Farish and/or New Summit Defendants had used those sums for their alleged purposes and/or had actually purchased doors, windows and lumber for the Cedar Elm property, and of failing to disclose the payment of those sums and its/their lack of follow up inspection and

verification to the Zucker Plaintiffs, and of aiding, abetting, allowing or enabling the Farish and/or New Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit, each involved an extreme degree of risk of potential harm to the Zucker Plaintiffs. *See* ¶¶ **112-118**.

429.    The Bank Defendants each had actual, subjective awareness of the risks involved concerning the Cedar Elm transaction of demanding that the Zucker Plaintiffs execute the blank first draw request form at closing, and of then paying the Farish and/or New Summit Defendants the $168,065 for doors, windows, lumber and unspecified lots preparation services under the false, fraudulent and altered Draw Request No. 2, and of then failing to inspect, verify and confirm that the Farish and/or New Summit Defendants had used those sums for their alleged purposes to purchase doors, windows and lumber for the Cedar Elm property, and of failing to disclose the payment of those sums and its/their lack of follow up inspection and verification to the Zucker Plaintiffs, and of aiding, abetting, allowing or enabling the Farish and/or New Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit, and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Zucker Plaintiffs. *Id.*

430.    The gross negligence of the Bank Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs concerning the Cedar Elm transaction in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **119-139.**

**(B)**    **Gross Negligence Claims concerning the Blue Stem Transaction.**

431.    The acts, conduct or omissions of the Bank Defendants concerning the Blue Stem transaction as described herein, *supra*, of representing to the Zucker Plaintiffs, through the email to the Farish and/or New Summit Defendants that the $67,000 interest carry deposit for the

$1,395,000 construction loan executed by Stephen Grace for the Blue Stem property had been obtained and secured, when in fact the $67,000 interest carry deposit was actually being provided and paid for by the Zucker Plaintiffs through the $460,000 Second Lien Promissory Note and Deed of Trust investment that was supposed to be secured by the Blue Stem property, and of then requesting the kick back benefit from the Farish and/or New Summit Defendants of an invitation to play golf at the exclusive Vaquero golf course, and of aiding, abetting, allowing or enabling the Farish and/or New Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit, each involved an extreme degree of risk of potential harm to the Zucker Plaintiffs. *See* **¶¶ 157-170.**

432.     The Bank Defendants each had actual, subjective awareness of the risk involved concerning the Blue Stem transaction of representing to the Zucker Plaintiffs, through the email to the Farish and/or New Summit Defendants that the $67,000 interest carry deposit for the $1,395,000 construction loan executed by Stephen Grace for the Blue Stem property had been obtained and secured, when in fact the $67,000 interest carry deposit was actually being provided and paid for by the Zucker Plaintiffs through the $460,000 Second Lien Promissory Note and Deed of Trust investment that was supposed to be secured by the Blue Stem property, and of then requesting the kick back benefit from the Farish and/or New Summit Defendants of an invitation to play golf at the exclusive Vaquero golf course, and of aiding, abetting, allowing or enabling the Farish and/or New Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit, and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Zucker Plaintiffs. ***Id.***

433.     The gross negligence of the Bank Defendants was the proximate cause of the

actual damages sustained and incurred by the Zucker Plaintiffs concerning the Blue Stem transaction in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **183-186.**

**3.** **Gross Negligence Claims of the Zucker Plaintiffs against the Title Defendants.**

**(A)** **Gross Negligence Claims concerning the Cedar Elm Transaction.**

434.    The acts, conduct or omissions of the Title Defendants as part of the closing of the Cedar Elm transaction, of demanding that the Zucker Plaintiffs sign all closing and loan documents, including the "blank" first draw request form that was included in the closing loan and document package and instructions from the Bank Defendants, and of failing to raise any question or concerns to the Zucker Plaintiffs, or in any manner point out the potential consequences to the Zucker Plaintiffs of executing a blank closing or loan document, each involved an extreme degree of risk of potential harm to the Zucker Plaintiffs. *See* ¶¶ **112-118**.

435.    The Title Defendants each had actual, subjective awareness of the risk involved concerning the Cedar Elm transaction of demanding that the Zucker Plaintiffs sign all closing and loan documents, including the "blank" first draw request form that was included in the closing loan and document package and instructions from the Bank Defendants, and of failing to raise any question or concern to the Zucker Plaintiffs, or in any manner point out the potential consequences to the Zucker Plaintiffs of executing a blank closing or loan document, and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Zucker Plaintiffs. *Id.*

436.    The gross negligence of the Title Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs concerning the Cedar Elm transaction in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **119-139.**

**(B)**      **Gross Negligence Claims concerning the Royalshire Transaction.**

437.      The acts, conduct or omissions of the Title Defendants as part of the closing of the Royalshire transaction as described above, *supra*, of applying the $220,000 rollover proceeds from the Miller Avenue transaction being held in its/their escrow account to the Royalshire transaction, and of failing to ensure that both the $220,000 2nd Mortgage Deed of Trust and $184,000 IRA 2nd Mortgage Deed of Trust were proper, valid instruments that would secure these investments, and of failing to ensure that both 2nd Mortgage Deeds of Trust were actually recorded against the title to the Royalshire property to protect the lien rights and interests of the Zucker Plaintiffs, and of aiding, abetting, allowing or enabling the Farish and/or New Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit, each involved an extreme degree of risk of potential harm to the Zucker Plaintiffs. *See* *¶¶ 146-153*.

438.      The Title Defendants each had actual, subjective awareness of the risks involved concerning the Royalshire transaction of applying the $220,000 rollover proceeds from the Miller Avenue transaction being held in its/their escrow account to the Royalshire transaction, and of failing to ensure that both the $220,000 2nd Mortgage Deed of Trust and $184,000 IRA 2nd Mortgage Deed of Trust were proper, valid instruments that would secure these investments, and of failing to ensure that both 2nd Mortgage Deeds of Trust were actually recorded against the title to the Royalshire property to protect the lien rights and interests of the Zucker Plaintiffs, and of aiding, abetting, allowing or enabling the Farish and/or New Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit, and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Zucker Plaintiffs. *Id.*

439.    The gross negligence of the Title Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs concerning the Royalshire transaction in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **153-156.**

**(C)    Gross Negligence Claims concerning the Blue Stem Transaction.**

440.    The acts, conduct or omissions of the Title Defendants as part of the closing of the Blue Stem transaction as described above, *supra*, of failing to ensure that the $460,000 2nd Mortgage Deed of Trust prepared and provided by the Farish and/or New Summit Defendants to Stephen Grace to execute to the Zucker Plaintiffs was a proper, valid instrument that would secure the lien rights and interests of the Zucker Plaintiffs against the title to the Blue Stem property, which instrument did not even name a trustee, and of failing to record the 2nd Mortgage Deed of Trust in the official real property records of Tarrant County, Texas to protect the lien rights and interests of the Zucker Plaintiffs in the Blue Stem property, and of aiding, abetting, allowing or enabling the Farish and/or New Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit, each involved an extreme degree of risk of potential harm to the Zucker Plaintiffs. *See* ¶¶ **157-170.**

441.    The Title Defendants each had actual, subjective awareness of the risks involved concerning the Blue Stem transaction of failing to ensure that the 2nd Mortgage Deed of Trust prepared and provided by Farish and/or New Summit Defendants to Stephen Grace to execute to the Zucker Plaintiffs was a proper, valid instrument that would secure $460,000 investment made by the Zucker Plaintiffs for the Blue Stem property, which instrument did not even name a trustee, and of failing to record the 2nd Mortgage Deed of Trust in the official real property records of Tarrant County, Texas to protect the lien rights and interests of the Zucker Plaintiffs in the Blue Stem property, and of aiding, abetting, allowing or enabling the Farish and/or New

Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit, and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Zucker Plaintiffs. *Id.*

442.    The gross negligence of the Title Defendants was the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs concerning the Blue Stem transaction in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **183-186.**

**B.      SUB-CLASS OF UNSECURED NOTE INVESTORS' GROSS NEGLIGENCE CLAIMS.**

**1.      Gross Negligence Claims of Plaintiff Marsha Frost against the Farish and New Summit Defendants.**

443.    The acts, conduct or omissions of the Farish and/or New Summit Defendants concerning the $100,000 Promissory Note investment made by Plaintiff Marsha Frost as described herein above, *supra*, of inducing Plaintiff Marsh Frost to provide this investment, and failing to actually secure her investment by *all assets of New Summit Homes and/or Ernani, Inc.***,** each involved an extreme degree of risk of potential harm to the Plaintiff Marsha Frost. *See* ¶¶ **188-194**.

444.    The Farish and/or New Summit each had actual, subjective awareness of the risks involved concerning Plaintiff Marsha Frost's $100,000 Promissory Note investment transaction, of inducing Plaintiff Marsh Frost to provide this investment and of failing to actually secure her investment by *all assets of New Summit Homes and/or Ernani, Inc.,* and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of Plaintiff Marsha Frost. *Id.*

445.    The gross negligence of the Farish and/or New Summit Defendants concerning the $100,000 Promissory Note investment made by Plaintiff Marsha Frost was the proximate

cause of the actual damages sustained and incurred by Plaintiff Marsha Frost in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **195-199**.

> **2.** **Gross Negligence Claims of the Wereszynski Plaintiffs against the Farish and New Summit Defendants.**

446.   The acts, conduct or omissions of the Farish and/or New Summit Defendants concerning the $100,000 Promissory Note investment made by the Wereszynski Plaintiffs as described herein above, *supra*, of inducing the Wereszynski Plaintiffs to provide this investment, and of failing to actually secure their investment by *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold,* each involved an extreme degree of risk of potential harm to the Wereszynski Plaintiffs. *See* ¶¶ **200-204.**

447.   The Farish and/or New Summit Defendants each had actual, subjective awareness of the risks involved concerning the Wereszynski Plaintiffs' $100,000 Promissory Note investment transaction, of inducing the Wereszynski Plaintiffs to provide this investment and failing to actually secure her investment by *2% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold,* and nevertheless proceeded to engage in those acts, conduct or omissions with a conscious indifference as to the rights, safety and welfare of the Wereszynski Plaintiffs. *Id.*

448.   The gross negligence of the Farish and/or New Summit Defendants concerning the $100,000 Promissory Note investment made by the Wereszynski Plaintiffs was the proximate cause of the actual damages sustained and incurred by the Wereszynski Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **205-208**.

**XIV.**

**COUNT EIGHT –**
**CONVERSION**

449.    Paragraphs 1-448 are incorporated herein by reference.

450.    Under Texas law, the elements of a cause of action for Conversion are as follows:

> (1)    *The plaintiff owned, possessed, or had the right to immediate possession of property;*
> (2)    *The property was personal property;*
> (3)    *The defendant wrongfully exercised dominion or control over the property;*
> (4)    *The plaintiff suffered injury.*[10]

**A.    SUB-CLASS OF SECURED INVESTORS' AND ROLLOVER NOTE INVESTORS' CONVERSION CLAIMS.**

    **1.    Conversion Claims of the Zucker Plaintiffs against the Farish and New Summit Defendants, and Defendant Hatfield.**

    **(A)    Conversion Claims concerning the Cedar Elm Transaction**.

451.    As part of the Cedar Elm transaction, the Zucker Plaintiffs and the Farish and/or New Summit Defendants contracted for, entered into and executed the General Agreement and Distribution of Net Profit Agreements for the Cedar Elm property (Exhibit "B"), under which the Zucker Plaintiffs wired investment monies to these Defendants as follows: July 19, 2016 - $35,000; July 21, 2016 - $200,000, and August 18, 2016 - $95,000, all of which sums were the personal property of the Zucker Plaintiffs.  *See ¶¶ 99-110*.

452.    As part of the Cedar Elm transaction, the Farish and/or New Summit Defendants, without any knowledge, consent or disclosure to the Zucker Plaintiffs, forged, altered, and/or changed the blank first draw request form executed by the Zucker Plaintiffs at closing and

---

[10] *See, e.g. Green Int'l v. Solis*, 851 S.W.2d 384, 391 (Tex.1997); *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147 (Tex.1997); Bandy v. First State Bank, 835 S.W.2d 609, 622 (Tex.1992); *Waisath v. Lack's Stores*, 474 S.W.2d 444, 447 (Tex.1971); *Presley v. Cooper*, 284 S.W.2d 138, 141 (Tex.1955); Lawyers Title Co. v. J.G. Cooper Dev., Inc., 424 S.W.3d 713, 718 (Tex.App.-Dallas 2014, pet. denied); *Cuidado Casero Home Health v. Ayuda Home Health Care Servs.*, 404 S.W.3d 737, 748 (Tex.App-El Paso 2013, no pet.).

converted it into the fraudulent Draw Request No. 2, which then allowed these Defendants to be disbursed $168,065 by the Bank Defendants, and which sums were supposed to be used to purchase doors, windows, lumber and for unspecified lot preparation services for the Cedar Elm property, and which sums were also the personal property of the Zucker Plaintiffs through the construction loan made by them for the Cedar Elm property. *Id.*

453.    The Farish and/or New Summit Defendants, with the direct or indirect help, aide and/or assistance of Defendant Hatfield, wrongfully exercised dominion or control over both the investment sums paid by the Zucker Plaintiffs in the amounts of $35,000, $200,000, and $95,000 respectively, as well as the $168,065 disbursed to him/her/it/them by the Bank Defendants under the fraudulent Draw Request No. 2, all of which sums were absconded with, stolen and converted by all of these Defendants for their own pecuniary gain and benefit. ***Id. See also*** ¶¶ **216-217.**

454.    The acts, conduct or omissions of the Farish and/or New Summit Defendants, with the help, aide and/or assistance of Defendant Hatfield, of absconding with, stealing and/or converting the Zucker Plaintiffs investment monies and draw request proceeds for the Cedar Elm transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. ***See*** ¶¶ **119-139.**

(B)    **Conversion Claims concerning the Royalshire Transaction.**

455.    As part of the Royalshire transaction, the Zucker Plaintiffs and the Farish and/or New Summit Defendants, contracted for, entered into and agreed that the Zucker Plaintiffs would invest both the $220,000 rollover proceeds from the Miller Avenue transaction, as well as the additional $184,000 IRA investment, and that both of these investments would be secured as second liens against the title to the Royalshire property, all of which sums were the personal

property of the Zucker Plaintiffs. *See* ¶¶ **146-153**.

456.    The Farish and/or New Summit Defendants, with the direct or indirect help, aide and/or assistance of Defendant Hatfield, wrongfully exercised dominion or control over both the $220,000 rollover investment and the additional $184,000 IRA investment paid by the Zucker Plaintiffs for the Royalshire transaction, all of which sums were absconded with, stolen and/or converted by all of these Defendants for their own pecuniary gain and benefit. *Id. See also* ¶¶ **216-217.**

457.    The acts, conduct or omissions of the Farish and/or New Summit Defendants, with the help, aide and/or assistance of Defendant Hatfield, of absconding with, stealing and/or converting all of the Zucker Plaintiffs investment monies for the Royalshire transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **153-156.**

(C)    **Conversion Claims concerning the Blue Stem Transaction.**

458.    As part of the Blue Stem transaction, the Zucker Plaintiffs and the Farish and/or New Summit Defendants, contracted for, entered into and agreed that the Zucker Plaintiffs would invest $460,000 and that this investment would be secured as second lien against the title to the Blue Stem property, all of which sums were the personal property of the Zucker Plaintiffs. *See* ¶¶ **157-170.**

459.    The Farish and/or New Summit Defendants, with the direct or indirect help, aide and/or assistance of Defendant Hatfield, wrongfully exercised dominion or control over the $460,000 investment sums paid by the Zucker Plaintiffs for the Blue Stem transaction, all of which sums were absconded with, stolen and/or converted by all of these Defendants for their own pecuniary gain and benefit. *Id. See also* ¶¶ **216-217.**

460.    The acts, conduct or omissions of the Farish and/or New Summit Defendants, with the help, aide and/or assistance of Defendant Hatfield, of absconding with, stealing and/or converting all of the Zucker Plaintiffs investment for the Blue Stem transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **183-186.**

## B.    SUB-CLASS OF UNSECURED NOTE INVESTORS' CONVERSION CLAIMS.

### 1.    Plaintiff Marsha Frost's Conversion Claims against the Farish and New Summit Defendants, and Defendant Hatfield.

461.    Plaintiff Marsha Frost and the Farish and/or New Summit Defendants, contracted for, entered into and agreed that Plaintiff Marsha Frost would invest $100,000, and that this investment would be secured by *all assets of New Summit Homes and/or Ernani, Inc.*, all of which sums were the personal property of Plaintiff Marsha Frost. *See* ¶¶ **188-194**.

462.    The Farish and/or New Summit Defendants, with the direct or indirect help, aide and/or assistance of Defendant Hatfield, wrongfully exercised dominion or control over the $100,000 investment sums paid by Plaintiff Marsha Frost to these Defendants, and a large portion of these sums ($32,500 was all that was actually paid back by these Defendants) were absconded with, stolen and/or converted by all of these Defendants for their own pecuniary gain and benefit. *Id. See also* ¶¶ **216-217.**

463.    The acts, conduct or omissions of the Farish and/or New Summit Defendants, with the help, aide and/or assistance of Defendant Hatfield, of absconding with, stealing and/or converting a large portion of Plaintiff Marsha Frost's investment sums is the proximate cause of the actual damages sustained and incurred by Plaintiff Marsha Frost in excess of the minimum jurisdictional limits of this Court. *See* ¶¶ **195-199**.

**2.     The Wereszynski Plaintiffs' Conversion Claims against the Farish and New Summit Defendants, and Defendant Hatfield.**

464.    The Wereszynski Plaintiffs and the Farish and/or New Summit Defendants, contracted for, entered into and agreed that the Wereszynski Plaintiffs would invest $100,000, and that this investment would be secured by *% of all gross commissions earned by New Summit Realty from the sale of New Summit Homes sold*, all of which sums were the personal property of the Wereszynski Plaintiffs. *See ¶¶ 200-204.*

465.    The Farish and/or New Summit Defendants, with the direct or indirect help, aide and/or assistance of Defendant Hatfield, wrongfully exercised dominion or control over the $100,000 investment sums paid by the Wereszynski Plaintiffs to these Defendants, all of which sums were absconded with, stolen and/or converted by all of these Defendants for their own pecuniary gain and benefit. *Id. See also ¶¶ 216-217.*

466.    The acts, conduct or omissions of the Farish and/or New Summit Defendants, with the help, aide and/or assistance of Defendant Hatfield, of absconding with, stealing and/or converting the Wereszynski Plaintiffs' investment sums is the proximate cause of the actual damages sustained and incurred by the Wereszynski Plaintiffs in excess of the minimum jurisdictional limits of this Court. *See ¶¶ 205-208.*

**XV.**

**COUNT NINE –
VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER
PROTECTION ACT ("DTPA")**

467.    Paragraphs 1-466 are incorporated herein by reference.

468.    Under Texas law, the DTPA statute allows a plaintiff to bring an action against

any person who uses or employs false, misleading, or deceptive acts or practices,[11] and defines a "person" as an individual, corporation, association, or other group, however organized.[12]

## A.   SUB-CLASS OF SECURED INVESTORS' AND ROLLOVER NOTE INVESTORS' DTPA CLAIMS.

### 1.   The Zucker Plaintiffs' DTPA Claims against the Farish and New Summit Defendants.

#### (A)   DTPA Claims concerning the Cedar Elm Transaction.

469.    At all material times hereto, the Zucker Plaintiffs were a "consumer" as that term is defined under the Texas DTPA.

470.    As part of the Cedar Elm transaction, the Zucker Plaintiffs and the Farish and/or New Summit Defendants, contracted for, entered into and executed the General Agreement and Distribution of Net Profit Agreements for the Cedar Elm property (Exhibit "B"), under which the Zucker Plaintiffs wired investment monies to these Defendants as follows: July 19, 2016 - $35,000; July 21, 2016 - $200,000, and August 18, 2016 - $95,000, for the purpose of these Defendants developing and building a luxury home on the vacant lot of the Cedar Elm property. *See ¶¶ 99-110*.

471.    As part of the Cedar Elm transaction, the Farish and/or New Summit Defendants, without any knowledge, consent or disclosure to the Zucker Plaintiffs, forged, altered, and/or changed the blank first draw request form executed by the Zucker Plaintiffs at closing and converted it into the fraudulent Draw Request No. 2, which then allowed these Defendants to be disbursed $168,065 by the Bank Defendants, which sums were supposed to be used by these Defendants to purchase doors, windows, lumber and for unspecified lot preparation services for

---

[11] See TEX. BUS. & COM. CODE § 17.50(a)(1); *Miller v. Keyser*, 90 S.W.3d 712, 715 (Tex.2002); *Brown & Brown v. Omni Metals, Inc.*, 317 S.W.3d 361, 379-80 (Tex.App.-Houston [1st Dist.] 2010, pet. denied).
[12] See TEX. BUS. & COM. CODE § 17.45(3); Miller, 90 S.W.3d at 715; *see also Potere, Inc. v. National Rlty. Serv.*, 667 S.W.2d 252, 256 (Tex.App.-Houston [14th Dist.] 1984, no writ).

the subject property. *Id.*

472.    The Farish and/or New Summit Defendants, after the Zucker Plaintiffs paid the investment sums and closed the purchase and construction loan transaction for the Cedar Elm property, absconded with, stole and/or converted all of the Zucker Plaintiffs' investment sums, as well as the $168,065 draw sums paid to them by the Bank Defendants, and never actually provided any work, labor or services for the Cedar Elm property. *Id.*

473.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants as described herein, *supra*, concerning the Cedar Elm transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

*(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*
*(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;*
*(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*
*(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;*
*(22) representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and,*
*(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. Id.*

474.    The false, misleading or deceptive acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning the Cedar Elm transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See ¶¶ 119-139.*

**(B)    DTPA Claims concerning the Royalshire Transaction.**

475.    As part of the Royalshire transaction, the Zucker Plaintiffs and the Farish and/or

New Summit Defendants, contracted for, entered into and agreed that the Zucker Plaintiffs would invest both the $220,000 rollover proceeds from the Miller Avenue transaction, as well as the additional $184,000 IRA investment, and these Defendants created, drafted, and delivered the Promissory Notes and Deeds of Trust instruments to Messer Holdings Series LLC to execute, and further promised the Zucker Plaintiffs that both Deeds of Trust would be recorded in the official real property records of Dallas County, Texas, to fully secure these investments as valid, second liens against the title to the Royalshire property. *See* **¶¶ 146-153**.

476.    The Farish and/or New Summit Defendants, after the Zucker Plaintiffs paid the investment sums and fully performed under the $220,000 Promissory Note and 2nd Mortgage Deed of Trust, as well as under the $184,000 IRA Investment Note and 2nd Mortgage Deed of Trust for the Royalshire property, absconded with, stole and converted all of the Zucker Plaintiffs' investment sums and never actually provided any work, labor or services, and never actually recorded either of the 2nd Mortgage Deeds of Trust against the title to the Royalshire property. ***Id.***

477.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning the Royalshire transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

*(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*
*(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;*
*(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*
*(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;*
*(22) representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and,*
*(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the*

*consumer into a transaction into which the consumer would not have entered had the information been disclosed.* **Id.**

478.    The false, misleading or deceptive acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning the Royalshire transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See* **¶¶ 153-156.**

        **(C)**      **DTPA Claims concerning the Blue Stem Transaction.**

479.    As part of the Blue Stem transaction, the Zucker Plaintiffs and the Farish and/or New Summit Defendants, contracted for, entered into and agreed that the Zucker Plaintiffs would invest $460,000, and that this investment would be secured as a valid second lien against the title to the Blue Stem property, and these Defendants created, drafted, and delivered the Promissory Note and Deed of Trust instruments to Stephen Grace to execute, and these Defendants further promised the Zucker Plaintiffs that the Deed of Trust lien would be recorded in the official real property records of Tarrant County, Texas, to fully secure this investment as a valid, second lien against the title to the Blue Stem property. *See* **¶¶ 157-170.**

480.    The Farish and/or New Summit, after the Zucker Plaintiffs paid the investment sums and fully performed under the $460,000 Promissory Note and 2nd Mortgage Deed of Trust for the Blue Stem property, absconded with, stole and converted all of the Zucker Plaintiffs' investment sums and never actually provided any work, labor or services, and never recorded the 2nd Mortgage Deed of Trust lien against the title to the Blue Stem property. **Id.**

481.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning the Blue Stem transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

---

*(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*

*(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;*

*(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*

*(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;*

*(22) representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and,*

*(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.* **Id.**

482.     The false, misleading or deceptive acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning the Blue Stem transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See* **¶¶ 183-186.**

    **2.**    **The Zucker Plaintiffs' DTPA Claims against the Bank Defendants.**

    **(A)**    **DTPA Claims concerning the Cedar Elm Transaction.**

483.     As part of the Cedar Elm transaction, the Zucker Plaintiffs and the Bank Defendants Brown contracted for, entered into and agreed that the Zucker Plaintiffs would obtain a construction loan and open a checking account, and that the proceeds of the construction loan in the checking account would be disbursed to the Farish and/or New Summit Defendants, as contractor/developer, for the sole purpose of constructing a luxury home on the Cedar Elm property, and that all draw funds would have to be authorized and approved by both the Zucker Plaintiffs and the Bank Defendants, and that once disbursed the Bank Defendants would follow up, inspect and verify that all draw funds disbursed to the contractor/developer would be used for their intended purpose. *See* **¶¶ 99-110.**

484.    After the closing and funding of the construction loan for the Cedar Elm property, the Bank Defendants, even though he/it/they had demanded that the Zucker Plaintiffs execute the blank first draw request form as part of the closing, and without any disclosure or notice to the Zucker Plaintiffs, authorized and paid the Farish and/or New Summit Defendants $168,065 for doors, windows, lumber and unspecified lot preparation services under the false, fraudulent and altered Draw Request No. 2, and then failed to follow up and inspect, verify and confirm that sums were used for their alleged purpose, and/or that those Defendants had actually purchased doors, windows and lumber for the Cedar Elm property, and continued to hide, secret and/or keep these facts from the Zucker Plaintiffs, even during subsequent negotiations and execution of the Debt Modification Agreement over one year later, which extended the term of the construction loan, and thereby aided, abetted, allowed and/or enabled the Farish and/or New Summit Defendants to abscond with, steal and/or convert all of those sums for their own pecuniary gain and benefit. *Id.*

485.    The acts, conduct and/or omissions of the Bank Defendants concerning the Cedar Elm transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

*(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*
*(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;*
*(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*
*(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;*
*(22) representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and,*
*(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. Id.*

486.    The false, misleading or deceptive acts, conduct and/or omissions of the Bank

Defendants concerning the Cedar Elm transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See ¶¶ 119-139.*

    (B)    **DTPA Claims concerning the Blue Stem Transaction.**

487.    As part of the Blue Stem transaction, the Bank Defendants Brown represented to the Zucker Plaintiffs, through the email to the Farish and/or New Summit, that the $67,000 interest carry deposit for the $1,395,000 construction loan executed by Stephen Grace for the Blue Stem property had been obtained and secured, when in fact the $67,000 interest carry deposit was actually being provided and paid for by the Zucker Plaintiffs through the $460,000 Second Lien Promissory Note and Deed of Trust investment that was supposed to be secured by the Blue Stem property. *See ¶¶ 157-170.*

488.    The Bank Defendants represented to the Zucker Plaintiffs, through the email to the Farish and/or New Summit Defendants, that the $67,000 interest carry deposit for the $1,395,000 construction loan executed by Stephen Grace for the Blue Stem property had been obtained and secured, when in fact the $67,000 interest carry deposit was actually being provided and paid for by the Zucker Plaintiffs through the $460,000 Second Lien Promissory Note and Deed of Trust investment that was supposed to be secured by the Blue Stem property, and in return received the kick back benefit of an invitation to play golf at the exclusive Vaquero golf course, and thereby aided, abetted, allowed and/or enabled the Farish and/or New Summit Defendants to abscond with, steal and/or convert those sums for their own pecuniary gain and benefit. *Id.*

489.    The acts, conduct and/or omissions of the Bank Defendants concerning the Blue

Stem transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

*(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*

*(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*

*(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;*

*(22) representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and,*

*(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.* **Id.**

490.    The false, misleading or deceptive acts, conduct and/or omissions of the Bank Defendants concerning the Blue Stem transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See* **¶¶ 183-186.**

3.    **The Zucker Plaintiffs' DTPA Claims against the Title Defendants.**

(A)    **DTPA Claims concerning the Cedar Elm Transaction.**

491.    As part of the closing of the Cedar Elm transaction, the Title Defendants demanded that the Zucker Plaintiffs sign all closing and loan documents, including the "blank" first draw request form that was included in the closing loan and document package and instructions from the Bank Defendants, and failed to raise any question or concern, or in any manner to point out to the Zucker Plaintiffs that the document was "blank" and/or of the potential consequences that could result regarding execution of a blank closing or loan document. *See* **¶¶ 99-110**.

492.    After the closing of the Cedar Elm transaction, the Farish and/or New Summit Defendants falsely and misleadingly obtained payment of $168,065 for doors, windows, lumber

and unspecified lot preparation services under the false, forged, altered and fraudulent Draw Request No. 2, which acts, conduct or omissions the Title Defendants could have prevented by simply raising the question or issue, or bringing it to the attention of the Zucker Plaintiffs and the Bank Defendants during the closing of the transaction, and thereby aided, abetted, allowed or enabled the Farish and/or New Summit Defendants to abscond with, steal and convert those sums for their own pecuniary gain and benefit. *Id.*

493.    The acts, conduct and/or omissions of the Title Defendants concerning the Cedar Elm transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

> *(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*
> *(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*
> *(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. Id.*

494.    The false, misleading or deceptive acts, conduct and/or omissions of the Title Defendants concerning the Cedar Elm transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See* **¶¶ 119-139.**

**(B)    DTPA Claims concerning the Royalshire Transaction.**

495.    As part of the closing of the Royalshire transaction, the Title Defendants applied the $220,000 rollover proceeds from the Miller Avenue transaction being held in its/their escrow account to the Royalshire transaction, and then wholly failed to ensure that both the $220,000 2nd Mortgage Deed of Trust and $184,000 IRA 2nd Mortgage Deed of Trust were valid, legal instruments that secured these investments made by the Zucker Plaintiffs, because neither of

these deeds of trust even named a trustee, and also failed to ensure that both Deeds of Trust were actually recorded against the title to the Royalshire property to protect the lien rights and interests of the Zucker Plaintiffs, and thereby aided, abetted, allowed or enabled the Farish and/or New Summit Defendants to abscond with, steal and/or convert all of those investment sums for their own pecuniary gain and benefit. *See ¶¶ 146-153*.

496.    The acts, conduct and/or omissions of the Title Defendants Brown concerning the Royalshire transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

> *(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*
> *(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*
> *(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. **Id.***

497.    The false, misleading or deceptive acts, conduct and/or omissions of the Title Defendants concerning the Royalshire transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See ¶¶ 153-156.*

**(C)    DTPA Claims concerning the Blue Stem Transaction**.

498.    As part of the closing of the Blue Stem transaction, the Title Defendants failed to ensure that the $460,000 2nd Mortgage Deed of Trust prepared and provided by the Farish and/or New Summit Defendants was a valid and legal instrument that would secure payment of the $460,000 investment made by the Zucker Plaintiffs for the Blue Stem property, which instrument did not even name a trustee, and wholly failed to record the 2nd Mortgage Deed of Trust in the official real property records of Tarrant County, Texas to protect the lien rights and

interests of the Zucker Plaintiffs, thereby aiding, abetting, allowing and/or enabling the Farish and/or New Summit Defendants to abscond with, steal and/or convert those sums for their own pecuniary gain and benefit. *See ¶¶ 157-170.*

499.   The acts, conduct and/or omissions of the Title Defendants concerning the Blue Stem transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

*(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*
*(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*
*(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. Id.*

500.   The false, misleading or deceptive acts, conduct and/or omissions of the Title Defendants concerning the Blue Stem transaction is/are the proximate cause of the actual damages sustained and incurred by the Zucker Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See ¶¶ 183-186.*

**B.   SUB-CLASS OF UNSECURED NOTE INVESTORS' DTPA CLAIMS.**

**1.   Plaintiff Marsha Frost's DTPA Claims against the Farish and New Summit Defendants.**

501.   Plaintiff Marsha Frost and the Farish and/or New Summit Defendants, contracted for, entered into and agreed that the Plaintiff Marsha Frost would invest $100,000, and that her investment would be secured by *all assets of New Summit Homes and/or Ernani, Inc.,* which statements and representations were false, misleading and/or deceptive. *See ¶¶ 188-194.*

502.   Plaintiff Marsha Frost relied on the false, misleading and deceptive statements and representations made by the Farish and/or New Summit Defendants and tendered the

$100,000 investment. *Id.*

503.     The Farish and/or New Summit Defendants wholly defaulted under the investment agreement made with Plaintiff Marsha Frost, and only paid a fraction of the principal amount of the investment back, and never actually secured the investment by *all assets of New Summit Homes and/or Ernani, Inc.,* and thereby absconded with, stole and/or converted those sums for their own pecuniary gain and benefit. *Id.*

504.     The acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning Plaintiff Marsha Frost's $100,000 Unsecured Promissory Note transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

> *(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*
> *(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*
> *(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. Id.*

505.     The false, misleading or deceptive acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning the $100,000 Unsecured Promissory Note transaction is/are the proximate cause of the actual damages sustained and incurred by Plaintiff Marsha Frost in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. *See* ¶¶ **195-199.**

### 2.     The Wereszynski Plaintiffs' DTPA Claims against the Farish and New Summit Defendants.

506.     The Wereszynski Plaintiffs and the Farish and/or New Summit Defendants, contracted for, entered into and agreed that the Wereszynski Plaintiffs would invest $100,000, and these Defendants represented that their investment would be secured by *2% of all gross*

*commissions earned by New Summit Realty from the sale of New Summit Homes sold,* which statements and representations were false, misleading and/or deceptive. *See ¶¶ **200-204.***

507.    The Farish and/or New Summit Defendants wholly defaulted under the investment agreement made with Wereszynski Plaintiffs, and never paid any of the investment back, and never actually secured the investment by *all assets of New Summit Homes and/or Ernani, Inc.,* and thereby absconded with, stole and/or converted those sums for their own pecuniary gain and benefit. ***Id.***

508.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning the Wereszynski Plaintiffs' $100,000 Unsecured Promissory Note transaction constitute violations of Section 17.46 of the Texas DTPA, to wit:

*(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;*
*(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;*
*(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. **Id.***

509.    The false, misleading or deceptive acts, conduct and/or omissions of the Farish and/or New Summit Defendants concerning the $100,000 Unsecured Promissory Note transaction is/are the proximate cause of the actual damages sustained and incurred by the Wereszynski Plaintiffs in excess of the minimum jurisdictional limits of this Court, including treble and exemplary damages as authorized under the Texas DTPA. ***See ¶¶ 205-208.***

## XVI.

### COUNT TEN –
### CONSPIRACY TO VIOLATE THE RACKETEERING INFLUENCED
### CORRUPT ORGANIZATIONS ACT (RICO)

510.    Paragraphs 1-509 are incorporated herein by reference.

511.     Under Federal law, *"any person injured in his business or property by reason of a violation of section 1962 of Title 18 of the United State Code may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ..."*[13]

512.     Further, *"...it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity through or collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."*[14]

513.     Based upon all of the foregoing salient facts, each of the Representative Class Plaintiffs hereby state that the Farish and/or New Summit Defendants, with the direct and/or indirect assistance from Defendant Hatfield, the Bank Defendants and/or the Title Defendants, engaged in a pattern of racketeering activities through the fraudulent Ponzi scheme, and which racketeering activities connect to the acquisition, establishment, conduct, or control of an enterprise.

514.     Based upon all of the foregoing salient facts, the Farish and/or New Summit Defendants' pattern of criminal conduct, includes, but is not limited to:

(a)     Committing wire fraud in some forty (40) different transactions as described herein, *supra*, in violation of 18 U.S.C. § 1343; and,

(b)     Committing conspiracy to commit wire fraud in at least forty (40) different

---

[13] See 18 U.S.C. § 1964(c).
[14] See 18 U.S.C. § 1962(a)

transactions as described herein, *supra*, in violation of 18 U.S.C. § 1371; and,

(c)      Fraudulently claiming an interest in one or more parcels of real property, including, but not limited to the Cedar Elm, Royalshire and Blue Stem properties all as identified and described herein; and,

(d)      Laundering money and conspiring to launder money through one or more of his/her/its/their enterprises in violation of 18 U.S.C. § 1956, including but not limited to Ernani, Inc. dba New Summit Homes, Inc.; New Summit Homes, Inc.; Ermani, LLC dba New Summit Homes, Inc.; New Summit Realty; and/or New Summit Jill Farish Realty, all as identified and described herein.

515.     The acts, conduct and/or omissions of the Farish and/or New Summit Defendants as described herein, *supra*, which constitute violations of the RICO Conspiracy statute is/are the proximate cause of the actual damages sustained and incurred by all of the Representative Class Plaintiffs in excess of the minimum jurisdictional limits of this Court, including threefold the actual damages incurred as authorized under RICO.

## XVII.

### COUNT ELEVEN –
### VIOLATIONS OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT

516.     Paragraphs 1-515 are incorporated herein by reference.

517.     The Texas Uniform Fraudulent Transfer Act ("TUFTA"), provides in pertinent part as follows:

> (a)  *A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:*
> > (1) *with actual intent to hinder, delay, or defraud any creditor of the debtor;  or*
> > (2) *without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:*

*(A)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;  or*

*(B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.*

*(b)  In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:*

*(1)  the transfer or obligation was to an insider;*

*(2)  the debtor retained possession or control of the property transferred after the transfer;*

*(3)  the transfer or obligation was concealed;*

*(4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;*

*(5)  the transfer was of substantially all the debtor's assets;*

*(6)  the debtor absconded;*

*(7)  the debtor removed or concealed assets;*

*(8)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;*

*(9)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;*

*(10)  the transfer occurred shortly before or shortly after a substantial debt was incurred;  and*

*(11)  the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.*[15]

518.    The acts, conduct and/or omissions of the Farish and/or New Summit Defendants as described herein, *supra*, of absconding with, stealing and/or converting each of the class investors' investments, with the direct and/or indirect help, aide and/or assistance of Defendant Hatfield, the Bank Defendants and the Title Defendants, also constitute violations of TUFTA, and is/are the proximate cause of the actual damages sustained and incurred by all of the Representative Class Plaintiffs in excess of the minimum jurisdictional limits of this Court.

519.    On or about 2017, after creation and implementation of the fraudulent Ponzi scheme as described ehrein, supra, the Farish and/or New Summit Defendants used the class investors' investment sums to purchase, acquire, lease, sell, assign ot transfer numerous parcels

---

[15] See TEX. BUS. & COM. CODE § 24.005.

of real property or tracts of land located in the State of Texas, including but not limited to the following:

1.      9414 Thornberry Lane, Dallas, Texas 75220.

2.      Lot 10, Block D/5473, KELLMAN PARK LANE ADDITION REVISED, Volume 15, Page 227, Dallas County, Texas.

3.      6816 Park Lane, Dallas, Texas 75225.

4.      8518 Lakemont Drive, Dallas, Texas 75209.

5.      4674 College Park Drive, Dallas, Texas 75229.

6.      Lot 12, Block A/5056, CRESTHAVEN PLACE, Volume 9, Page 121, Dallas County, Texas.

520.    Additional specific examples of the Farish and/or New Summit Defendants' violations of TUFTA, include, but are not limited to the following:

1.      Defendant Nicholas Farish purchased an RV and Lexus 350 automobile using the proceeds of the class investors' investment sums as follows:

(a)     On or about late June 2018, Defendant Nicholas Farish and his wife, purchased a Winnebago Intent 31P RV, temporary Texas license plate no. 19093T6, with the intent to use the RV to leave the State of Texas and travel the United States for an unspecified period of time. *See* YouTube video made and published by Defendant Nicholas Farish at https://youtu.be/ZlySyX3DWbg.

(b)     On or about July 5, 2018, Defendant Nicholas Farish and his wife, hitched their Lexus 350, Texas license plate no. JTV 5806, to the RV, with the intent to leave the State of Texas. *See* YouTube video made and published by Defendant Nicholas Farish at https://youtu.be/1YRTR_S378M.

(c)     On or about July 9, 2018, Defendant Nicholas Farish and his wife published a photo of them at the Texas/New Mexico State line in possession of both the RV and the Lexus

350 in tow.

(d)     Both the RV and the Lexus 350 vehicles were purchased by Defendant Nicholas Farish and his wife using the investment sums of the class investors, none of which was disclosed to the class investors.

3.     On or about 2018, Defendant Nathan Farish purchased a 2017 Ford F-250 Truck, Texas License Plate No. JGM-5893, using the proceeds of the class investors' investment sums and which purchase was not disclosed to the class investors.

4.     On or about 2018, Defendant Jerry Farish purchased a 2017 Ford F-150 Truck, Texas License Plate No. GDF0056, using the proceeds of the class investors' investment sums and which purchase was not disclosed to the class investors.

## XVIII.

## COUNT TWELVE -
## EXEMPLARY DAMAGES

521.     Paragraphs 1-520 are incorporated herein by reference.

522.     Representative Class Plaintiffs would further show that the various acts, conduct and/or omissions of each of the Defendants complained of herein were committed knowingly, willfully, intentionally, and with actual awareness, and with the specific and pre-determined intention of enriching said Defendants at the expense of Plaintiffs. In order to punish all of the Defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Representative Class Plaintiffs also seek recovery from all of the Defendants for exemplary damages as provided by TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1), and under the Texas DTPA, TEX. BUS & COM. CODE § 17.41 et seq.

## XIX.

## COUNT THIRTEEN -
## ATTORNEY'S FEES AND COSTS

523.    Representative Class Plaintiffs hereby request reimbursement of all costs and reasonable and necessary attorney's fees incurred by or on behalf of the Representative Class Plaintiffs herein, including all fees necessary in the event of an appeal of this cause to the U.S. Fifth Circuit Court of Appeals, and/or U.S. Supreme Court, as the Court deems equitable and just, and as provided for by: (a) the Texas DTPA, TEX. BUS. & COM. CODE § 17.41 et seq. (b) TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1); (c) the TUFTA, TEX. BUS. & COM. CODE § 24.005, and (d) common law.

## XX.

## JURY DEMAND

524.    The Representative Class Plaintiffs hereby request that all issues of fact be tried before a jury.

## XXI.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, the Representative Class Plaintiffs respectfully pray that all of the Defendants be cited to appear and answer herein, and that the Plaintiffs be granted immediate relief in the form of a Temporary Restraining Order and Permanent Injunction for the reasons described herein, and that upon certification of the class as required by law and upon the final trial of this cause, that judgment be entered in favor of the Plaintiffs, and against all Defendants, jointly and/or severally, for Breach of Contract, Statutory Fraud in a Real Estate Transaction, Fraud by Non-Disclosure, Breach of Fiduciary Duty, Negligent Misrepresentation, Gross Negligence, Conversion, and for all violations of the Texas

DTPA, Federal RICO and Texas TUFTA statutes, and all for all economic and actual damages requested hereinabove in an amount in excess of the minimum jurisdictional limits of the Court, together with pre-judgment and post-judgment interest at the maximum rate allowed by law, and further that the Court award the Plaintiffs treble or three (3) times the amount of actual damages sustained and incurred pursuant to the Texas DTPA and Federal RICO statutes as requested herein; and that the Court award the Plaintiffs exemplary damages pursuant to the Texas Civil Practices and Remedies Code; and for an award of all attorney's fees and costs of court incurred, and for such other and further relief, at law or in equity, to which the Plaintiffs may be justly entitled.

Respectfully submitted,

*/s/ John G. Helstowski*
John G. Helstowski
Texas State Bar No. 24078653
J. GANNON HELSTOWSKI LAW FIRM
13601 Preston Road, Suite E920
Dallas, Texas 75240
Telephone: (817) 382-3125
Facsimile: (817) 382-1799
Email: jgh@jghfirm.com
Lead Attorney-in-Charge for Plaintiffs

## <u>VERIFICATION</u>

STATE OF ARIZONA          §
                          §
COUNTY OF MARICOPA        §

     BEFORE ME, the undersigned notary public, on this day personally appeared ROBERT EDWARD ZUCKER who, after being duly sworn upon his oath, testified as follows:

     "My name is ROBERT EDWARD ZUCKER. I am the one of the Representative Class Plaintiffs named in the attached and foregoing Plaintiffs' Class Action Complaint and Application for Temporary Restraining Order and Permanent Injunction ("Complaint"). I am over the age of 21 years and have never been convicted of a felony or other crime involving moral turpitude. I have personal knowledge of all of the facts set forth in the Complaint as to both the general factual allegations, as well as the specific factual allegations for the Sub-Class of Plaintiffs whom I represent, and hereby state that every factual statement set forth therein is true and correct.

     FURTHER AFFIANT SAYETH NOT."

     EXECUTED this _____ day of July, 2018.


                                                       ROBERT EDWARD ZUCKER


     **SUBSCRIBED AND SWORN BEFORE ME** on this **6TH** day of July, 2018, by ROBERT EDWARD ZUCKER, to certify which witness my hand and official seal.

NOTARY PUBLIC
STATE OF ARIZONA
Maricopa County
COLLIN KESSLER ROSS
My Commission Expires January 15, 2019

Notary Public in and for the State of ~~Texas~~ ARIZONA

COLLIN KESSLER ROSS
Printed Name of Notary Public

My Commission Expires on: 1/15/19

(seal)

## VERIFICATION

STATE OF CALIFORNIA      §
                                     §

COUNTY OF _____ §

       BEFORE ME, the undersigned notary public, on this day personally appeared MARSHA FROST who, after being duly sworn upon her oath, testified as follows:

       "My name is MARSHA FROST. I am the one of the Representative Class Plaintiffs named in the attached and foregoing Plaintiffs' Class Action Complaint and Application for Temporary Restraining Order and Permanent Injunction ("Complaint"). I am over the age of 21 years and have never been convicted of a felony or other crime involving moral turpitude. I have personal knowledge of all of the facts set forth in the Complaint as to both the general factual allegations, as well as the specific factual allegations for the Sub-Class of Plaintiffs whom I represent, and hereby state that every factual statement set forth therein is true and correct.

       FURTHER AFFIANT SAYETH NOT."

       EXECUTED this ___5___ day of July, 2018.


                                          MARSHA FROST


       **SUBSCRIBED AND SWORN BEFORE ME** on this ___ day of July, 2018, by MARSHA FROST, to certify which witness my hand and official seal.

                         See attached certificate

               Notary Public in and for the State of Texas

               Printed Name of Notary Public

               My Commission Expires on: ___Sept 26 2019___

(seal)


---

PLAINTIFFS' CLASS ACTION COMPLAINT –                    Page

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**     GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

_____          _____
*Signature of Document Signer No. 1*        *Signature of Document Signer No. 2 (if any)*

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of __Los Angeles__

Subscribed and sworn to (or affirmed) before me

on this __5__ day of __July__, 20 __18__
   *Date*   *Month*   *Year*

by

(1) __Marsha Frost__

(and (2)_____ ),
    *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature __J. Vargas__
    *Signature of Notary Public*

> J. VARGAS
> Commission # 2083417
> Notary Public - California
> Los Angeles County
> My Comm. Expires Sep 26, 2018

*Seal*
*Place Notary Seal Above*

──────────── **OPTIONAL** ────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: __Verification_____ Document Date: _____

Number of Pages: _____ Signer(s) Other Than Named Above: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5910

<u>**VERIFICATION**</u>

STATE OF NEW YORK                    §
                                     §
COUNTY OF _____           §

      BEFORE ME, the undersigned notary public, on this day personally appeared GARY WERESZYNSKI who, after being duly sworn upon his oath, testified as follows:

      "My name is GARY WERESZYNSKI. I am the one of the Representative Class Plaintiffs named in the attached and foregoing Plaintiffs' Class Action Complaint and Application for Temporary Restraining Order and Permanent Injunction ("Complaint"). I am over the age of 21 years and have never been convicted of a felony or other crime involving moral turpitude. I have personal knowledge of all of the facts set forth in the Complaint as to both the general factual allegations, as well as the specific factual allegations for the Sub-Class of Plaintiffs whom I represent, and hereby state that every factual statement set forth therein is true and correct.

      FURTHER AFFIANT SAYETH NOT."

      EXECUTED this ___6___ day of July, 2018.



           GARY WERESZYNSKI

      SUBSCRIBED AND SWORN BEFORE ME on this 6 day of July, 2018, by GARY WERESZYNSKI, to certify which witness my hand and official seal. Identified by Passport # S471825 issued by the U.S.A.

Affidavit #-209-

           Notary Public in and for ~~the State of Texas~~ Puerto Rico
           José L. Sánchez Montalvo
           Printed Name of Notary Public

           My Commission Expires on: never expires

RECIBO

18-A5581044

Sello

Luis Sánchez Montalvo
ABOGADO-NOTARIO

932...
06/13/2018
$5.00

Sello de Asistencia Legal
80004-2018-0613-80166124

---